**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| JANE DOE (S.B.C.), AN INDIVIDUAL<br><br>Plaintiff,<br><br>v.<br><br>WYNDHAM HOTELS & RESORTS, INC.;<br>RAMADA FRANCHISE SYSTEM, INC.;<br>AND SWISS HOTELS 786, L.L.C.<br><br>Defendants. | CIVIL ACTION NO: 2:24-cv-11512 |

## PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

Jane Doe (S.B.C.), Plaintiff in the above-styled and numbered cause, files this Original Complaint against WYNDHAM HOTELS & RESORTS, INC., RAMADA FRANCHISE SYSTEM, INC; AND SWISS HOTELS 786, L.L.C. as Defendants, and would respectfully show the Court and jury as follows.

## SUMMARY

1. Jane Doe (S.B.C.) files this civil lawsuit seeking compensation for the harm she suffered as a result of the sex trafficking she endured in a hotel owned, operated, maintained, and controlled by Defendants and their agents and employees.

2. Sex trafficking is the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purposes of causing the person to engage in a commercial sex act either (1) before the person turns 18 years old; or (2) through force, fraud, or

1

coercion.[1] To "harbor" means to "give shelter or refuge to."[2] Traffickers or 'pimps', who use threats, violence, manipulation, lies, debt bondage, and other forms of coercion to compel adults and children to engage in commercial sex acts against their will, often use hotels to harbor their victims.

3.    Some victims are brought into trafficking through abduction or use of physical violence, while many other trafficking relationships begin with a false promise of a romantic relationship or financial security.[3] Traffickers often prey on individuals with vulnerabilities that make them more susceptible to coercion and control.[4]

4.    Sex trafficking has become a public health crisis that has reached epidemic proportions in the United States. It is now widely recognized, including by Congress and many state legislatures, that combating sex trafficking requires more than just criminal penalties for traffickers and sex buyers.

5.    Since 2003, federal law, through the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §1581, et seq, has provided victims of sex trafficking a civil remedy against perpetrators of criminal sex trafficking.

6.    In 2008, Congress recognized the need to extend liability beyond sex buyers and sellers and intentionally expanded the scope of the TVPRA to reach those who—while not criminally liable under the TVPRA—financially benefit from participation in a venture that they know or *should know* engages in criminal sex trafficking.

7.    As discussed herein, Defendants derived financial benefit from facilitating sex trafficking by providing venues where traffickers could exploit victims, including victims like

---

[1] 18 U.S.C. §1591; 22 U.S.C. § 7102.
[2] *Doe v. Hotels*, 6:23-CV-1012, 2024 WL 2955728, at *6 (M.D. Fla. June 12, 2024) (quoting Merriam-Webster Dictionary).
[3] The National Prevention Toolkit, Sex Trafficking, https://nationaltoolkit.csw.fsu.edu/leo/part-2/sex-trafficking
[4] Polaris Project, Sex Trafficking: The Basics, https://polarisproject.org/understanding-human-trafficking/

Jane Doe (S.B.C.) with minimal risk of detection or interruption. Defendants continued supporting traffickers, including Jane Doe (S.B.C.)'s trafficker, despite evident and apparent signs of widespread and ongoing sex trafficking in these hotels. Defendants were, therefore, knowingly receiving a benefit from participation in a venture that Defendants knew or should have known was engaged in sex trafficking.

## PARTIES

8.      Jane Doe (S.B.C.) is a resident of Washington. She may be contacted through her lead counsel, whose information is contained below.

9.      (S.B.C.) is a victim of sex trafficking under 18 U.S.C. §1591(a) because she was harbored, transported, or provided for the purpose of causing her, through force, fraud, or coercion, to commit a commercial sex act.

10.     Given the nature of the allegations in this lawsuit, there is a collective and compelling interest in not publicly revealing the identity of (S.B.C.).

11.     Wyndham Hotels & Resorts, Inc., ("WHR") is a for-profit Delaware corporation with its principal place of business in Parsippany, New Jersey and may be served through its registered agent for service, Corporate Creations Network Inc. at 3411 Silverside Road, Rodney Building #104, Wilmington, Delaware 19810.

12.     All references to WHR include any department, division, office, agency, subsidiary, corporate affiliate, predecessor corporation, or successor corporation, whether domestic, foreign, and/or international. The term also includes any director, officer, agent (either with direct/actual authority or implied/apparent authority), employee, person, firm, or corporation acting on behalf of Wyndham Hotels and Resorts, Inc. now or at any time relevant to the claims herein.

13. Ramada Franchise System, Inc. ("RFS") is a for-profit Delaware corporation with is principal place of business in Parsippany, New Jersey and may be served through its registered agent for service, Corporate Creations Network Inc. at 801 Highway 1, North Palm beach, FL 33408.

14. WHR and RFS will be referred to collectively as the "Wyndham Defendants" or "Wyndham" or "Franchisor Defendants."

15. Upon information and belief, the Wyndham Defendants, either directly or through the acts of predecessors for which they are responsible, owned, operated, controlled, and/or managed the Ramada Inn that was located at 16720 International Blvd., Seattle, WA 98188.

16. Defendant Swiss Hotels 786, L.L.C. is a Washington limited liability company with its principal place of business in Washington. Defendant Swiss Hotels 786, L.L.C. during the period at issue, owned, operated, controlled, and/or managed the Ramada Inn located at 16720 International Blvd, Seattle, WA 98188, through the Wyndham franchising system. Defendant Swiss Hotels 786, L.L.C.. may be served through its registered agent, Jong Park, 16720 International Blvd, SeaTac, WA, 98188 or wherever they may be found.

17. Defendant Swiss Hotels 786, L.L.P. will be referred to herein as "Franchisee" "Ramada Franchisee" or "Franchisee Defendant."

<u>**JURISDICTION AND VENUE**</u>

18. This Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the TVPRA.

19. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because one or more Defendants reside in this district and all Defendants are residents of New Jersey for purpose of venue under 28 U.S.C. §§ 1391(c).

4

20. Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in the District of New Jersey.

21. The Wyndham Defendants all maintains their principal place of business in Parsippany, New Jersey, within the District of New Jersey. Corporate activities related to the operation of each of the Subject Ramada Inn occurred at this New Jersey headquarters, and documents related to each of the Subject Ramada Inn are stored and maintained at this New Jersey headquarters.

22. Plaintiff's claims against of the Franchisee Defendant arise out of Franchisee Defendant's contacts with New Jersey through it franchising relationship with the Wyndham Defendants. These franchising relationships were centered at the Wyndham Defendants' principal place of business in the District of New Jersey. The Franchisee Defendant's participation in a venture with the Wyndham Defendants operating its respective hotel occurred, in substantial part, in New Jersey. For example:

a. Upon information and belief, each Franchisee Defendant actively sought out a franchising relationship by contacting the Wyndham Defendants in New Jersey.

b. The franchising agreement had a choice of law provision selecting the law of New Jersey as the governing law.

c. Franchisee Defendant agreed to resolve all disputes with the Wyndham Defendants by mediation, arbitration and/or litigation in New Jersey.

d. Franchisee Defendant agreed to submit all notices required under the franchising agreement to the Wyndham Defendants in New Jersey.

e. The Wyndham Defendants dictated rules and policies related to operation of the Subject Ramada Inn, including those related to safety, security, human trafficking, employee training and response, from their principal place of business in New Jersey.

f.   Franchisee Defendant was required to submit regular reports regarding financial performance, guest satisfaction, and operational matters to the Wyndham Defendants' corporate offices in New Jersey.

g.   The rules and policies that the Wyndham Defendants adopted required Franchisee Defendant to report information to their headquarters in New Jersey, including information about all incidents involving safety, security, public relations, or serious injury to persons or property that occur at, or involve, the Subject Ramada Inn, including those involving sex trafficking victims like Jane Doe (S.B.C.).

h.   Franchisee Defendant had an ongoing obligation to participate in centralized programs operated by the Wyndham Defendants from their principal place of business in New Jersey.

i.   Franchisee Defendant utilized centralized customer feedback and complaint resolution system managed by the Wyndham Defendants from New Jersey, and the Wyndham Defendants and Franchisee Defendant coordinated efforts to analyze and respond to guest feedback.

j.   Franchisee Defendant's employees received training and operational guidelines from the Wyndham Defendants, with key training materials being developed and distributed from New Jersey, particularly in the areas of safety and anti-trafficking protocols. Upon information and belief, each Franchisee Defendant was required to attend training in New Jersey.

k.   Reservation information for rooms at the Subject Ramada Inn passed through a system operated and managed by the Wyndham Defendants from their principal place of business in New Jersey.

l.   Payment information for rooms at the Subject Ramada Inn passed through a system operated and managed by the Wyndham Defendants in New Jersey.

m.   The benefit that Franchisee Defendant received from room rentals was governed by a New Jersey franchising agreement.

n.   Franchisee Defendant agreed to make all payments due under the franchising agreement at the Wyndham Defendants' principal place of business in New Jersey.

o.   Franchisee Defendant's operation of the Subject Ramada Inn was controlled and/or influenced by many policies set and enforced by the Wyndham Defendants from their principal place of business in New Jersey.

p.   Franchisee Defendant was required to purchase insurance for the New Jersey-based Wyndham entities related to operation of the Subject Ramada Inn.

6

23. Upon information and belief, each Franchisee Defendant contractually consented to jurisdiction in the District of New Jersey.

## FACTS

### I. Jane Doe (S.B.C.) is a Survivor of Unlawful Sex Trafficking at the Hotels Owned, Operated, Managed, and Controlled by Defendants.

1. Jane Doe (S.B.C.) is a survivor of sex trafficking. Jane Doe (S.B.C.) was trafficked through force and coercion by her trafficker to engage in numerous commercial sex acts. Jane Doe (S.B.C.) was trafficked continuously from November 2012 through December of 2016. Specifically, Jane Doe (S.B.C.) was trafficked from January 2013 through December 2014 at the following location:

   a. Ramada located at 16720 International Blvd, Seattle, WA 98188.

2. Jane Doe (S.B.C.)'s trafficking repeatedly occurred in rooms of this Holiday Inn location and was facilitated by IHG and Franchisee Defendant. She was repeatedly harbored, maintained, provided, solicited, and forced to engage in commercial sex at the subject locations.

3. Her trafficker controlled her by manipulating Jane Doe into believing that he cared for her and threatened to leave her with nothing if she did not engage in commercial sex acts for his financial benefit. Her trafficker constantly threatened her to do what he said.

4. Her traffickers posted advertisements of her for commercial sex services online without her consent.

5. Her trafficker engaged in a pattern of control and intimidating behavior that cause Jane Doe (S.B.C.) to believe she would be harmed if she did not comply with his ongoing demand that she engage in commercial sex for his financial benefit.

6. Jane Doe (S.B.C.) was not allowed to keep any of the money she made.

7.      Jane Doe (S.B.C.) was repeatedly trafficked in Defendants' hotel and each Defendant facilitated her trafficking.

8.      Jane Doe (S.B.C.)'s trafficking has profound effects on her, consistent with "red flags" of trafficking that are well-recognized in the hospitality industry. These effects were obvious and apparent to the staff and management of the subject hotel including effects on Jane Doe (S.B.C.)'s appearance, demeanor, movements throughout the hotel, and her interactions with her traffickers, hotel staff, and others. Observing these effects provided Defendants with notice that Jane Doe (S.B.C.) was being continually subjected to coercion, control, and exploitation.

9.      Jane Doe (S.B.C.) remained under the continuous control of her traffickers through at least December of 2014.

10.     During the period that Jane Doe (S.B.C.) was trafficked at the Subject Ramada Inn, there were obvious signs of the activity associated with her trafficking. Throughout this period, Jane Doe (S.B.C.) was under the control of the same trafficker. This trafficker used a consistent *modus operandi* while trafficking Jane Doe (S.B.C.) and other victims. This trafficker imposed strict rules on Jane Doe (S.B.C.) and other victims and followed patterns consistent with how sex traffickers typically operate in hotels. Thus, the trafficking activity at each of the Subject Ramada Inn resulted in obvious and recurring signs that matched "red flags" of sex trafficking recognized by the hotel industry and each of the Defendants.

11.     From between January 2013 to December 2014, Jane Doe (S.B.C.) was trafficked an incalculable number of times at the Subject Ramada Inn.

12.     There were obvious signs that Jane Doe (S.B.C.) was being trafficked at the Subject Ramada Inn such that the Wyndham Defendants and Franchisee Defendant knew or,

8

through the exercise of reasonable diligence should have known, that they were participating in a venture causing her sexual exploitation.

13. Some of the obvious signs of Jane Doe (S.B.C.)'s trafficking at the Subject Ramada Inn included the fact that hotel rooms would be paid for in cash, Jane Doe (S.B.C.)'s trafficker would be present with Jane Doe at check in. Extra towels and clean sheets were frequently requested. Housekeeping was not allowed in the room. There was constant heavy foot traffic in and out of her room involving men who were not hotel guests. These individuals entered and left at unusual hours and were present at the hotel for brief periods of time. Jane Doe had a physical altercation with a John and her screams were heard from the hallway.

14. At relevant times, Franchisee Defendant owned, operated, and managed the Subject Ramada Inn and employed the staff at the Subject Ramada Inn through the franchising system of the Wyndham Defendants.

15. At all relevant times, the Wyndham Defendants were directly involved in the relevant operations of the Subject Ramada Inn and exercised systemic control over the Franchisee Defendant with respect to operation of the Subject Ramada Inn such that the Franchise Defendant were the Wyndham Defendants' actual agents for operation of the Subject Ramada Inn. The Wyndham Defendants also retained control over aspects of the operations of Subject Ramada Inn directly related to the claims of Jane Doe (S.B.C.).

16. The trafficker of Jane Doe (S.B.C.) and other sex traffickers frequently used Wyndham branded hotels for sex trafficking with approval, acquiescence, and/or implicit support of Defendants and their employees and agents, including the staff of the Subject Ramada Inn named herein.

II. **The Hotel Industry's Role in Sex Trafficking and Defendants' Knowledge of the Problem.**

17.     The widely known and pervasive relationship between sex trafficking and the hotel industry necessarily shapes what Wyndham Defendants knew or should have known regarding the trafficking at their hotel properties, the specific trafficking activity that resulted in the trafficking of Jane Doe (S.B.C.) was pervasive and apparent at the Subject Ramada Inn named herein.

18.     Today, sex slavery is pervasive in the United States, and hotels are the primary place where it happens.[5] For years, sex traffickers have been able to reap their profits with little risk when attempting to operate within hotels.[6] In 2014, 92% of calls received by the National Human Trafficking Hotline involved reports of sex trafficking taking place at hotels.[7] Hotels have been found to account for over 90% of the commercial exploitation of children.[8]

19.     Because of this link between hotels and sex trafficking, government agencies and non-profits have devoted significant efforts to educating the hotel industry, including Defendants, on best practices for identifying and responding to sex trafficking.[9]

---

[5] "This is not only a dominant issue, it's an epidemic issue." *See* Jaclyn Galucci, *Human Trafficking is an Epidemic in the U.S. It's Also Big Business*, Fortune (April 2019), https://fortune.com/2019/04/14/human-sex-trafficking-us-slavery/ (citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council). "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere." *Id.*

[6] *See Human Trafficking in the Hotel Industry*, Polaris Project (Feb. 10, 2016), https://polarisproject.org/blog/2016/02/10/human-trafficking-hotel-industry; *see also* Eleanor Goldberg, *You Could Help Save A Trafficking Victim's Life With Your Hotel Room Pic*, Huffington Post (June 2016), http://www.huffingtonpost.com/entry/taking-a-photo-of-your-hotel-room-could-help-save-a-trafficking-victimslife_us_57714091e4b0f168323a1ed7.

[7] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hotel Industry*, Cornell Hotel Report (Oct. 2015), https://scholarship.sha.cornell.edu/cgi/viewcontent.cgi?article=1222&context=chrpubs.

[8] *See* Erika R. George and Scarlet R. Smith, *In Good Company: How Corporate Social Responsibility Can Protect Rights and Aid Efforts to End Child Sex Trafficking and Modern Slavery*, 46 N.Y.U. J. Int'l L. & Pol. 55, 66-67 (2013).

[9] *See, e.g.*, Department of Homeland Security, *Blue Campaign Toolkit*, available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf; National Center for Missing & Exploited Children, *Child Sex Trafficking Overview*, available at: https://www.missingkids.org/content/dam/missingkids/pdfs/CST%20Identification%20Resource.pdf; Love 146, *Red Flags for Hotel and Motel Employees*, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf; Texas Attorney

20.    Multiple agencies and organizations who actively combat sex trafficking, including the United States Department of Homeland Security, the National Center for Missing and Exploited Children, the Polaris Project, the Texas Attorney General, Love 146, and EPCAT, among others, have established recommended policies and procedures for recognizing the signs of sex trafficking.[10] This resulted in the development of "red flags" of sex trafficking. Law enforcement agencies and other organizations with subject-matter expertise identified specific indicators of the presence of sex trafficking at a hotel. The signs of sex trafficking in a hotel environment follow well-established patterns and can easily be detected by appropriately trained staff. From check-in to check-out, there are indicators that traffickers and their victims routinely exhibit during their stay at a hotel. These recurring indicators are known as "red flags" of sex trafficking.

21.    Recognized "red flags" of sex trafficking that are considered general indicators of trafficking that can be observed by staff throughout a hotel[11] include:

- individuals who appear to be with a significantly older "boyfriend" or in the company of much older males;
- a group of girls who appears to be traveling with an older female or male;
- a group with similar tattoos, which can indicate "branding" by a trafficker;
- individuals showing fear, anxiety, tension, submissiveness and/or nervousness;
- individuals who seem disoriented;
- individuals showing signs of physical abuse;
- individuals showing signs of restrain or confinement;
- individuals showing signs of malnourishment, poor hygiene, fatigue, or sleep deprivation;

General, Human Trafficking Red Flags, available at:
https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf .
[10] United States Department of Homeland Security Blue Campaign – One Voice. One Mission. End Human Trafficking, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf (last visited April 13, 2023);National Center for Missing and Exploited Children, https://www.missingkids.org/theissues/trafficking#riskfactors (last visited April 13, 2023); Love 146, *Red Flags for Hotel & Motel Employees*, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf (last visited April 13, 2023); Texas Attorney General, *Human Trafficking Red Flags*, https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf (last visited April 13, 2023).
[11] *See id.*

- individuals with signs of untreated illness or injuries;
- individuals who appear to lack freedom of movement;
- individuals who are being constantly monitored and/or escorted around the hotel;
- individuals who avoid eye contact;
- individuals who avoid interactions with others;
- individuals who are not in possessions of their own identification;
- individuals who have few or no personal possessions;
- individuals who dress provocatively;
- a high volume of men who are not registered guests entering and exiting a room; and
- individuals who wait in common areas while other men frequent the room.

22.    Recognized "red flags" of sex trafficking that can be detected by front-desk staff and hotel security[12] include:

- patrons appeared distressed at check-in;
- the same person reserving multiple rooms;
- rooms paid for with cash or prepaid cards;
- rooms are paid for one day at a time;
- requests for isolated rooms or rooms close to an exit;
- use of hotel computers for adult oriented or sexually explicit websites;
- patrons not forthcoming about identifying information when registering;
- individuals checking in but then leaving a room only infrequently, not at all, or at odd hours;
- individuals lack identification;
- car in the parking lot is parked so license plate is not visible;
- individual present who avoids eye contact, does not communicate, and is accompanied by someone else who appears to speak for them; and
- individual appears to be giving scripted responses.

23.    Recognized "red flags" of sex trafficking that can be detected by housekeeping, maintenance, and room service staff[13] include:

- constant use of the "Do Not Disturb" sign;
- requests for housekeeping services (towels, linens, etc.) but denying staff entry into the room;
- refusal of cleaning services for multiple days;
- excessive amounts of cash in a room;
- presence of multiple computers, cell phones, pagers, or other technology;
- the same person reserving multiple rooms;
- individuals leaving the room infrequently, not at all, or at unusual hours;

---

[12] *See id.*
[13] *See id.*

12

- individuals loitering in hallways or appearing to monitor a room;
- excessive alcohol in a room;
- illegal drugs in a room;
- evidence of pornography;
- excessive number of people staying in a room;
- guests with few or no personal possessions in room;
- provocative clothing and shoes;
- constant flow of men into a room at all hours; and excessive amounts of sex paraphernalia in rooms.

24.     The signs of sex trafficking in a hotel environment follow well-established patterns and can easily be detected by appropriately trained staff. Toolkits specific to the hotel industry have been developed, which help hotel staff in every position identify and respond to signs of sex trafficking.[14]   From check-in to check-out, there are indicators that traffickers and their victims routinely exhibit during their stay at a hotel.

25.     The organizations who developed these "red flags," then educated and trained the hotel industry about them. For example, the United States Department of Homeland Security's Blue Campaign initiative issued specific guidance to the United States hotel industry through a "Hospitality Toolkit" describing human trafficking warning signs that could be detected by various categories of hotel staff. [15]

26.     Before Jane Doe (S.B.C.)'s trafficking at the Subject Ramada Inn, each Defendant was educated and trained on these "red flags" of sex trafficking. The organizations that developed these "red flags" identified them as indicators specific to sex trafficking in a hotel environment. At all relevant times, each Defendant acknowledged and recognized these "red flags" specifically as signs of sex trafficking and instructed and trained their staff to identify and investigate them as signs of sex trafficking when observed in the hotel.

[14] Department of Homeland Security, *Blue Campaign Toolkit*,
https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.
[15] / Department of Homeland Security, Blue Campaign Toolkit,
https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.;
www.doj.state.wi.us/sites/default/files/ocvs/human%20trafficking/Hospitality%20Toolkit%20-%20English%20-%20Wisconsin%20AG%20Office%281%29.pdf

13

27.     The relationship between a pimp and a prostitute is inherently coercive, and the United States Department of Justice and other agencies and organizations have recognized that most individuals involved in prostitution are subject to force, fraud, or coercion.[16] It is also well understood that "prostitution," "sex trafficking," and "child sex trafficking" involve a single common denominator, the exchange of sex for money.

28.     The definition of sex trafficking in the TVPRA under 18 U.S.C. §1591(a)(1) incorporates the definition of commercial sex act. Defendants may attempt to draw a distinction between commercial sex or prostitution and sex trafficking, but they have long understood the practical and legal association between commercial sex and sex trafficking in a hotel environment. Thus, Defendants knew or should have known that signs of commercial sex (prostitution) activity in their hotels were in fact signs of sex trafficking.[17]

29.     All Defendants were aware or should have been aware of these signs of sex trafficking when operating, controlling, and managing their hotel properties, when enacting and enforcing policies and procedures applicable to those hotels and when training, educating, and supervising the staff of that hotel.

30.     There were also well-established practices for hotels to avoid the facilitation of sex trafficking. For example, End Child Prostitution and Trafficking ("ECPAT-USA") has identified hotel-specific best practices for preventing sex trafficking, such as (1) not permitting cash payments; (2) requiring vehicle information and photo id at check-in; (3) monitoring online sex ads such as Craigslist and Backpage for their hotel name and pictures of the rooms; (4) changing Wi-Fi passwords in rooms and cafes regularly and blocking websites frequently used to

---

[16] *See, e.g.*, *A National Overview of Prostitution and Sex Trafficking Demand Reduction Efforts, Final Report*, https://www.ojp.gov/pdffiles1/nij/grants/238796.pdf; *Prostitution and Trafficking in Women: An Intimate Relationship*, https://www.ojp.gov/ncjrs/virtual-library/abstracts/prostitution-and-trafficking-women-intimate-relationship.
[17] *Id.*

advertise commercial sex on hotel Wi-Fi; (5) watching for a trend of visitors to the same room; (6) being aware of rooms with excess condoms, lubricants, and towels; (7) requiring all visitors to be logged, including guest name, visitor name, arrival time, departure time, and room number; and (8) developing a protocol for response to indicia of trafficking activity.[18]

31.    The most effective weapon against sexual exploitation and human trafficking is education and training.[19]  As ECPAT concluded:

> The hospitality industry is in a unique position to identify and report human trafficking due to its perceived anonymity. Traffickers believe they can go unnoticed while exploiting victims across the globe in hotels— ranging from budget properties to luxury resorts. From check-in to check-out, there are a number of indicators victims and exploiters exhibit during the time they are on a hotel property.[20]

32.    This same conclusion is echoed by others who seek to eliminate sex trafficking in the hospitality industry, including the American Hotel Lodging Association: "Hotel employees who have undergone training are more aware of trafficking when it happens – and are more willing to report it – than those who have not been trained.[21]  In reference to companies like the Defendants, ECPAT observed: "If they do nothing to raise awareness or to prevent child trafficking, they risk becoming an indirect and unintentional conduit for the abuse that takes place."

33.    Given the prevalence of sex trafficking in hotels and the abundance of information about how franchisors, owners, operators and hotel employees can identify and respond to this trafficking, it has become apparent that the decision of a hotel chain to continue

---

[18]https://static1.squarespace.com/static/594970e91b631b3571be12e2/t/5cd329e8a4222f20baf5378b/1557342696892/ECPAT-USA_AntiTraffickingHotelChecklist.pdf
[19] Polaris, *Recognizing Human Trafficking*, https://polarisproject.org/recognizing-human-trafficking/ (last visited April 13, 2023).
[20] ECPAT USA, *Training for Hotel Associates*, https://www.ecpatusa.org/hotel-training (last visited April 13, 2023). *See also* Carolin L. et al., *Sex Trafficking in the Tourism Industry*, J. Tourism Hospit. (2015), https://www.longdom.org/open-access/sex-trafficking-in-the-tourism-industry-2167-0269-1000166.pdf.
[21] AHLA, *Free Online Training*, https://www.ahla.com/issues/human-trafficking (last visited April 13, 2023).

generating revenue from traffickers without taking necessary steps to identify and prevent trafficking in its hotels is a conscious decision to financially benefit by supporting and facilitating unlawful sex trafficking.

34.    The Wyndham Defendants and Franchisee Defendant had a responsibility to adopt, implement, and adequately enforce policies to avoid facilitating sex trafficking and to train hotel staff to identify and respond to "red flags" of sex trafficking.

35.    Unfortunately for Jane Doe (S.B.C.), the Wyndham Defendants and Franchisee Defendant have failed, at all levels, to take appropriate action in response to their knowledge of widespread and ongoing human trafficking in their hotels. Instead, they have continued financially benefiting by providing venues for the sexual exploitation of victims like Jane Doe (S.B.C.).

## III.    Sex Trafficking Has Long Been Prevalent at Defendants' Hotel Properties, and Defendants Have Known About It.

36.    Defendants' actual knowledge is *not* limited to a general awareness of the problem of sex trafficking in the hotel industry. Each of the Defendants has known, since well before Jane Doe (S.B.C.)'s trafficking, that sex trafficking was ongoing and widespread at Wyndham branded properties including the properties where Jane Doe (S.B.C.) was trafficked.

### A. Sex Trafficking at Wyndham Branded Hotels was well Known by Wyndham Defendants.

37.    Upon information and belief, each of the Defendants monitored criminal activity occurring at Wyndham branded hotels and were aware of activity indicating commercial sex, sex trafficking and/or related crimes occurring at those branded hotels, including the specific hotel properties where Jane Doe (S.B.C.) was trafficked.

38.    Upon information and belief, at all relevant times Wyndham has adopted a centralized approach to trafficking-related issues at all its branded properties. Wyndham's public

statements confirm that it knew sex trafficking was a problem at its hotels and that it retained control over the response of its branded hotels to sex trafficking. Wyndham has recognized it has a "critical role in increasing awareness and prevention" of sex trafficking in its hotels.[22] It has publicly claimed to be taking steps to avoid facilitating sex trafficking in its hotels since at least 2011.[23] However, Wyndham has refused to publish reports to show its progress on the EPCAT goals to combat sex trafficking in hotels.[24]

39.    Unfortunately, while Wyndham's statements reflect actual knowledge of the problem of sex trafficking, they reflect only a public relations strategy rather than a genuine commitment to stop facilitating trafficking. Emails among company executives reflect a hesitance to commit to meaningful anti-trafficking measures and a desire to avoid negative publicity without any significant burden.[25]

40.    The problem of sex trafficking at Wyndham branded properties was sufficiently well known that, in 2011, there was a public petition with thousands of signatures to stop Wyndham hotels from supporting child sex exploitation at Wyndham properties. Although the Wyndham brand publicly committed to take steps to stop facilitating trafficking, this promise proved empty; the Wyndham brand has been named a "major contributor to sexual exploitation" and part of the "dirty dozen list" by the National Center on Sexual Exploitation.[26]

---

[22] https://hotelsmag.com/news/wyndham-implements-anti-prostitution-training/

[23] https://hotelsmag.com/news/wyndham-implements-anti-prostitution-training/

[24] https://thecode.my.salesforce-sites.com/apex/MemberProfilenew?id=0019000000GxgPrAAJ&year=2023

[25] https://journalism.berkeley.edu/projects/should-hotel-chains-be-held-liable-for-human-trafficking/ ("Scott McLester, Wyndham's former general counsel and chief compliance officer, wrote in an e-mail to the company's then C.E.O., Stephen Holmes, 'Even though we have been hesitant to commit to everything the [EPCAT] Code was asking for, the issue is not going away and it's starting to impact commercial relationships.' McLester added that the organization's 'concern about being 'bullied' into signing the Code is outweighed by the relative harmlessness of the Code itself.'")

[26] https://endsexualexploitation.org/wyndham/

41.     In the past twenty years, Wyndham-branded properties have been mentioned in at least two hundred criminal trafficking cases filed by the federal government.[27]

42.     Information that has become public through news stories establishes the entrenched and pervasive nature of Wyndham hotels' role in providing a venue where sex trafficking has continued unabated for years. Upon information and belief, Wyndham Defendants and Franchisee Defendant monitored news stories and online reviews for indicia of criminal activity, including sex trafficking. Examples of news stories confirm the widespread presence of sex trafficking, prostitution, and related criminal activity at Wyndham branded hotels include:

- In September 2009, police discovered a prostitution ring at the Ramada Inn on Roosevelt Boulevard in Philadelphia. Police looking for a defendant in a drug case discovered 11 women. Some of the women reported that they were being held against their will and sexually assaulted."[28]

- In May 2010, Waterloo, Iowa Police followed used a Craigslist ad and made arrangements to meet females for sex at the local Ramada Inn. Police arrested two.[29]

- In February 2010, police in Burbank, California arrested three at the Ramada Burbank Airport Hotel on charges of prostitution as part of their effort to curb the sex trade..[30]

- In June 2012 Beaverton, Oregon police made an arrest at a Ramada Inn Northeast Portland in connection with a nationwide FBI sex trafficking sting.[31]

- In July 2012, East Hartford's "Hot Spot Unit" conducted a sting at at the Ramada Inn on Roberts Street in Hartford, Connecticut where it arrested a man for promoting prostitution and 6 women on charges of prostitution.[32]

---

[27] https://journalism.berkeley.edu/projects/should-hotel-chains-be-held-liable-for-human-trafficking/
[28] *Possible prostitution ring discovered at Boulevard Ramada*, WHYY PBS (Sept. 8, 2009), https://whyy.org/articles/possible-prostitution-ring-discovered-at-boulevard-ramada/
[29] *Police make Prostitution Arrests*, Waterloo Police Department, https://www.waterloopolice.com/press-release/654-police-make-prostitution-arrests.html
[30]    Olsen    Ebright,    Burbank    Hookers,    Beware,    NBC    4    Los    Angeles,    (Mar.    3,    2010), https://www.nbclosangeles.com/news/local/burbank-prostitution/1867548/
[31] *Beaverton police arrest two in nationwide, FBI sex trafficking sting*, The Oregonian, (Jun. 26, 2012), https://www.oregonlive.com/beaverton/2012/06/beaverton_police_arrest_two_in.html
[32] *East Hartford Police Arrest Seven on Prostitution Charges*, Harford Courant, (Jul. 26, 2012), https://www.courant.com/community/hartford/hc-xpm-2012-07-27-hc-east-hartford-prostitution-arrests-0728-20120727-story.html

- In January 2013 two women were arrested on suspicion of prostitution at the Ramada Inn Burbank in Burbank, CA.[33]

- In April 2013, police found an underage girl in a room where prostitution was believed to be occurring at a Tampa, Florida Ramada Inn. A twenty-five-year-old woman fled the scene. She was later arrested on charges of procuring a person under 18 for the purpose of prostitution, deriving support from the proceeds of prostitution and renting space to be used for prostitution.[14] She was later convicted of charges of trafficking three underage teens, including a 16-year-old girl and a 14-year-old boy.[34]

- In November 2013, an investigation into prostitution ring, led to the arrest of five people and the seizure electronic equipment at the Ramada Inn in La Vergne, Tennessee.[35]

- In March 2014, undercover police raided a room at the Ramada Inn on Roosevelt Boulevard in Philadelphia arresting a woman for solicitation of prostitution and a man for suspected drug dealing.[36]

- In April 2014, police in Rock Hill, North Carolina, as part of a prostitution sting that netted five, made arrests at the Ramada Inn. In total the arrests included three women and two men.[37]

- In June 2014, the mother of a mentally ill woman who police say was killed after meeting for sex at a Ramada Inn in College Park, Maryland said her daughter was mentally ill and was pimped by men via computer ads."[38]

- In September 2014, police in Parsippany, New Jersey – the same city Wyndham maintains its principal place of business - arrested a man and a woman in at a Ramada Inn only 12 minutes from Wyndham's corporate office on charges of theft and prostitution.[39]

---

[33]*Two women arrested on suspicion of prostitution at Burbank Ramada Inn*, Burbank Leader (Feb. 1, 2013), https://www.latimes.com/socal/burbank-leader/the818now/tn-818-0201-two-women-arrested-on-suspicion-of-prostitution-at-burbank-ramada-inn-story.html

[34] Dan Sullivan, Tampa woman gets 15 years in prison for recruiting teens for prostitution, Tampa Bay Times, (Nov. 11, 2016), https://www.tampabay.com/news/courts/criminal/tampa-woman-gets-15-years-in-prison-for-recruiting-teens-for-prostitution/2302520

[35] Marie Kemph, Police: Drugs seized in prostitution ring raid, Murfreesboro Post, (Nov. 27, 2017), https://www.murfreesboropost.com/news/police-drugs-seized-in-prostitution-ring-raid/article_5ed959b6-fe72-52ee-bcc8-401c8f28d986.html

[36] *Undercover cops make prostitution, drug arrests* Northeast Times (Mar. 20, 2014), https://northeasttimes.com/2014/03/20/undercover-cops-make-prostitution-drug-arrests/

[37] *Five arrested in prostitution sting at two Rock Hill motels, police say*, WBTV, (Apr. 24, 2014), https://www.wbtv.com/story/25330215/five-arrested-in-prostitution-sting-at-two-rock-hill-motels-police-say/

[38] Darcy Spencer, Mother of Motel Murder Victim: "She's Not a Prostitute," 4 Washington, (Jun. 8, 2014), https://www.nbcwashington.com/news/local/mother-of-motel-murder-victim-denies-daughter-was-a-prostitute/59771/

[39] William Westhoven, Stolen purse at Kmart leads to prostitution bust, Daily Record, (Sept. 7, 2014), https://www.dailyrecord.com/story/news/local/2014/09/07/stolen-purse-kmart-leads-prostitution-bust/15192421/.

- In March 2015, police arrested a woman who was renting a room at the Ramada Inn in Wayne, New Jersey for prostitution.[40]

- In April 2015, a woman was arrested on prostitution and drug charges by an undercover police officer in a sting at a Whitehall, Pennsylvania Ramada Inn.[41]

- In August 2015, at least 20 people were arrested in a prostitution sting conduced at a Des Moines, Iowa Ramada by Wyndham as part of an operation that began as a result of complaints from local business owners and citizens.[42]

- In December 2015 Hanover County, North Carolina District Attorney issued an admonishment to a Ramada Inn on Market Street, Wilmington, North Carolina, among others, for, "repeated acts which create and constitute a breach of the peace, including but not limited to prostitution, assaults, fights, and discharging firearms.[43]

- In February 2016, a Franklin Tennessee Police Department used Backpage.com as part of a sting operation that lead to the arrest of a woman at the Ramada Inn on charges of prostitution, and possession of drug paraphernalia.[44]

43.    These articles are only representative examples. There are many similar articles about sex trafficking and other associated criminal activity at Wyndham branded hotels. Moreover, on information and belief, the Wyndham Defendants are aware of additional significant law enforcement activity related to trafficking at their hotels that was not reported in the media.

---

[40] Natalie Mieles, Prositution Arrest Made N Wayne Hotel, Patch, (Mar. 23, 2015), https://patch.com/new-jersey/wayne/prostitution-arrest-made-wayne-hotel-0

[41] Manuel Gamiz, Jr., Woman faces prosecution, drug charges after sting at Whitehall hotel, The Morning Call, (Apr. 23, 2015), https://www.mcall.com/news/breaking/mc-c-whitehall-hotel-prostitution-arrest-20150423- story.html

[42] Grant Rodgers and Kim Norvell, More arrests as prostitution stings continue, Des Moines Register, (Aug. 19, 2015), https://www.desmoinesregister.com/story/news/crime-and-courts/2015/08/19/urbandale-businessman-charged-prostitution/31987431/

[43] *DA, police chief focus on motel crime on Market Street*, Star News Online, (Jan. 10, 2016), https://www.starnewsonline.com/story/news/2016/01/10/da-police-chief-focus-on-motel-crime-on-market-street/30994128007/

[44] Zach Harmuth, Nolensville Woman Arrested in Prostitution Sting Awaits Court, Williamson Source, (Feb. 5, 2016), https://williamsonsource.com/nolensville-woman-arrested-prostition-sting-awaits-court

44.    Based on information and belief, the Wyndham Defendants and Franchisee Defendant managed and monitored on-line reviews of Ramada Inn hotel locations. Examples of reviews reflecting indica of sex trafficking and related criminal activity include:

- In December 2007 – Regarding the very Toms River, New Jersey Ramada Inn which Jane Doe was trafficked, in a review titled, "Hookers, Drugs, and poor service," a reviewer wrote "[a]s my wife and I went to our room, we were first asked for money from some guy in the hallway, then a prostitute informed us for a fee, she would join us…."[45]

- In February 2010 - Regarding the Ramada by Wyndham in Rochelle Park, New Jersey, a reviewer wrote, "[t]hin walls, so EVERYTHING was heard, especially when some pimp was yelling & cursing at his "employee" from 1am till 4 am. The clientele were mostly thugs & one-night-standers"[46]

- In September 2010 – regarding the Ramada by Wyndham Pikesville/Baltimore North, a customer complained, "[a]nd to top it all off, we were awakened at 2 AM by a large party of about 25 young people outside the room, some of whom were apparently prostitutes-- young girls in skimpy clothes talking to men through car windows." The General Manager replied but did not address the prostitution complaint."[47]

- In October 2011 – Regarding the Ramada by Wyndham in East Orange, New Jersey, a reviewer wrote, "[w]as there any prostitution at the hotel? Maybe. But the pimps in the lobby always held the door for us..."[48]

- In June 2012 – Regarding the Ramada by Wyndham in East Orange, New Jersey, in a review titled, "It Is As Bad As They Say," a reviewer wrote, "[v]isible prostitutes going up and down the hall"[49]

- In September 2012 - regarding the Ramada by Wyndham in Wyndham's home town of Parsippany, New Jersey, a reviewer advised, "[p]lease avoid this hotel at all costs unless you're a trucker or prostitute"[50]

---

[45]https://www.tripadvisor.co.uk/ShowUserReviews-g46870-d98468-r11235472-Ramada_by_Wyndham_Toms_River-Toms_River_New_Jersey.html
[46]https://www.tripadvisor.com/ShowUserReviews-g46782-d92577-r55266477-Ramada_by_Wyndham_Rochelle_Park_Near_Paramus-Rochelle_Park_New_Jersey.html
[47]https://www.tripadvisor.com/ShowUserReviews-g41317-d250631-r80299255-Ramada_by_Wyndham_Pikesville_Baltimore_North-Pikesville_Maryland.html
[48]https://www.tripadvisor.com/ShowUserReviews-g46403-d92370-r119573653-Ramada_by_Wyndham_East_Orange-East_Orange_New_Jersey.html
[49] https://www.tripadvisor.com/ShowUserReviews-g46403-d92370-r132718173-Ramada_by_Wyndham_East_Orange-East_Orange_New_Jersey.html
[50] https://www.tripadvisor.com/ShowUserReviews-g46715-d98515-r141158336-Ramada_by_Wyndham_Parsippany-Parsippany_Morris_County_New_Jersey.html

- In October 2012 – regarding the Ramada by Wyndham in Flemington, New Jersey, a local resident wrote a review saying, "i'M A LOCAL, SO I CAN GIVE YOU AN IDEA OF THIS PLACE. First, don't go. period. If you GOOGLE this location, you'll get results that include MURDER, PROSTITUTION, DRUGS, OD'D, SUICIDE and more."[51]

- In November 2012 – regarding the Ramada Limited in Cockeysville, Maryland, a reviewer wrote, "seems to be mainly a place for hooker hookups and not somewhere anyone actually stays."[52]

- In December 2012 – Regarding a Ramada by Wyndham in East Orange, New Jersey, a reviewer wrote, "[m]y colleague rode up the elevator with someone she was sure was a hooker…"[53]

- In March 2013 – regarding the Ramada by Wyndham Baltimore West in Baltimore, Maryland, a reviewer, in a review titled "Prostitute plaza," wrote, "[o]ur second evening we were confronted by ladies who were at the time selling themselves to us. As we walked to our car the next morning we were once confronted again by 2 different professional women advancing sexual and in appropriate verbiage to my 18 year old son"[54]

- In April 2013 – Regarding the Ramada by Wyndham in East Orange, New Jersey, a reviewer wrote, "[t]his is a criminal house. Prostitution, Drugs…"[55]

- In July 2013 – Regarding the Ramada by Wyndham in East Orange, New Jersey, a reviewer wrote, "[w]hile on of my family members was checking in it became obvious to them this is also a place where prostitutes come to request a room for only 3-4 hours."[56]

- In August 2013 – regarding Ramada by Wyndham West Atlantic City in Atlantic City, New Jersey, a reviewer reported, "a load of police cars because there was a prostitution raid…." The hotel's webmaster replied saying they appreciated the review and observations"[57]

---

[51] https://www.expedia.com/Nyack-Hotels-Days-Inn-By-Wyndham-Nanuet-Spring-Valley.h172075.Hotel-Reviews
[52] https://www.tripadvisor.com/ShowUserReviews-g41075-d93714-r146214352-Ramada_Limited_Cockeysville-Cockeysville_Maryland.html
[53] https://www.tripadvisor.com/ShowUserReviews-g46403-d92370-r147757836-Ramada_by_Wyndham_East_Orange-East_Orange_New_Jersey.html
[54] https://www.tripadvisor.co.nz/ShowUserReviews-g41045-d93846-r154472777-Ramada_by_Wyndham_Baltimore_West-Catonsville_Maryland.html
[55] https://www.tripadvisor.com/ShowUserReviews-g46403-d92370-r156310774-Ramada_by_Wyndham_East_Orange-East_Orange_New_Jersey.html
[56] https://www.tripadvisor.com/ShowUserReviews-g46403-d92370-r166806340-Ramada_by_Wyndham_East_Orange-East_Orange_New_Jersey.html
[57] https://www.tripadvisor.com/ShowUserReviews-g46742-d98115-r174159963-The_Ramada_Atlantic_City_West-Pleasantville_New_Jersey.html

22

- In September 2013 - regarding the Ramada by Wyndham in Yonkers, New York, a reviewer complained, "[a]ll night…drugs and prostitution business is going on there with the knowledge of the staff and managers…"[58]

- In February 2014 – regarding the Ramada by Wyndham in East Orange, New Jersey, a concerned citizen reported, "[t]here is also a revolving door of prostitution going on at the Ramada Inn" in East Orange, New Jersey on a message board"[59]

- In May 2014 – regarding the Ramada by Wyndham in Flemington, New Jersey, a reviewer reported, "[a] local restaurant informed us the Ramada is used as a half-way house for criminals recently released from prison, the late night visit to one of the rooms for suspected prostitution is about all you need to know about Ramada-Flemington."[60]

- In September 2014 – Regarding the Ramada by Wyndham in East Orange, New Jersey, a reviewer wrote, "[t]here were pimps and prostitutes everywhere."[61]

- In November 2014 – regarding the Ramada by Wyndham Waukegan/Great Lakes in Waukegan, Illinois, a reviewer noted, "I encountered the back door propped open on several occasions and different men pulling up in numerous vehicles, staying for a half hour or less each time. I called the front desk and reported this and was told the one man security would handle it. He didn't. Condoning prostitution is grounds for business license revocation or suspension." Regarding prostitution, the Manager replied, "We never condone any illegal activities, have overnight security to assure the peace of all our guests, and cooperate fully with local law enforcement immediately should we encounter any illegal activities."[62]

- In June 2015 regarding the Ramada by Wyndham Whitehall/Allentown in Whitehall, Pennsylvania, a reviewer said, "[t]here were prostitutes in and out of this place."[63]

---

[58] https://www.tripadvisor.com/ShowUserReviews-g48922-d93875-r175810200-Ramada_by_Wyndham_Yonkers-Yonkers_New_York.html

[59] https://seeclickfix.com/issues/928962-dangerous-elevator-ramada-inn

[60] https://www.tripadvisor.com/ShowUserReviews-g46439-d98299-r207477406-Ramada_by_Wyndham_Flemington-Flemington_New_Jersey.html

[61] https://www.tripadvisor.com/ShowUserReviews-g46403-d92370-r227874288-Ramada_by_Wyndham_East_Orange-East_Orange_New_Jersey.html

[62] https://www.tripadvisor.com/ShowUserReviews-g36854-d90331-r239174515-Ramada_by_Wyndham_Waukegan_Great_Lakes-Waukegan_Lake_County_Illinois.html

[63] https://www.tripadvisor.com/ShowUserReviews-g46439-d98299-r207477406-Ramada_by_Wyndham_Flemington-Flemington_New_Jersey.html

- In a July 2015 review of a Ramada by Wyndham in East Orange, New Jersey, a reviewer wrote, "[o]n the way back to our room, my husband heard a prostitute making "deals" with her clients. The foot traffic is heavy within this hotel, and now it makes sense. If you're looking for a prostitute, then this is the place to be, but this is not a family friendly hotel." The General Manager replied but did not address the concerns regarding prostitution"[64]

- In August 2015 - regarding the Ramada by Wyndham Parsippany in Wyndham's home town of Parsippany, New Jersey, a reviewer titled their review, "Do NOT Feel SAFE Here Anymore-- has Become a HOTSPOT for Prostitution!!-," and wrote, "FIRST ALL DOORS Of the Hotel are "Open" to ANYONE walking from the Streets…Arriving back to my Room one evening at 1A, watching cars parking, then Various men Walking Right into the hotel. When I Went into End main door), I Was Absolutely Scared to Death Noticing a Man Crouched down Behind The STAIRS!!!! "Obviously Waiting His Turn" Hearing him Say "I am here". "I am Inside". The TRAFFIC Coming and Going Just that ONE NIGHT Was unbelieveablofe. It Became OBVIOUS That PROSTITUTION Had Become Quite POPULAR At This Hotel, It Was like a "Rats Nest", Men Walking in all hours, Men sitting in their Cars ALL HOURS. It Was a Very Shameful, and Disturbing Sight. I Did Not Feel SAFE I Did Not Feel Respected by the Hotel, I Was Very Saddened to See What has happened to this place!!!! I Actually Sat in my Car one evening at 11:30PM, literally Saw 7 Vehicles pull into parking lot, they would park, Men walking straight into the HOTEL!!! I Sat for about 20 minutes was All, Seeing All the Weird Men Coming and Going It was A Very CREEPY experience, it was Very Disturbing to me. You Don't have to be a Genius to See what is going on There…It is Hard to Believe that The Hotel is Allowing this type of Illegal Activity, These prostitutes are "Running Their Business" Selfish behavior and Non-Caring. The Hotel is CREEPY Now, ALL WEIRD MEN Coming and Going…The Ramada REPUTATION has certainly Changed for the WORSE. The Prostitution at the Hotel is Bringing WEIRD, CREEPY, LOW-CLASS people, If I WANTED A HOTEL With prostitution, With NO LOCKS on the Doors, With NO SECURITY, Random Men Hiding under stairway, Walking Around inside All hours, I Could get That in Newark. This Whole Place Has Become SHAMEFUL…I Don't Recommend it for Anyone, Unless you are a "JOHN" Wanting a Good Time!!!!"[65]

- In September 2015 – regarding the Ramada by Wyndham Parsippany in Wyndham's home town of Parsippany, New Jersey, a reviewer titled their

---

[64] https://www.tripadvisor.com/ShowUserReviews-g46403-d92370-r294451091-Ramada_by_Wyndham_East_Orange-East_Orange_New_Jersey.html
[65] https://www.tripadvisor.com/ShowUserReviews-g46715-d98515-r302891589-Ramada_by_Wyndham_Parsippany-Parsippany_Morris_County_New_Jersey.html

24

review, "ALL I SAW Was Hookers, (And to Make it More Interesting, TRANS-SEXUAL MEN Who WERE PROSTITUTES)," and wrote, "…the LOCKS ARE ALL BROKEN and ANYONE CAN JUST WALK INSIDE THE BUILDING, NO SECURITY, NO LOCKS … I Think That 75% of the people Were prostitutes, and Everyone that I Saw parking and going inside Were Not GUESTS at the hotel, I Find it very Hard to believe That there is NO MANAGEMENT Seeing this activity…DRUGS, Hookers, It was AWFUL!!!!!"[66]

- In November 2015 – regarding the Ramada Hotel & Conference Center by Wyndham in Edgewood, Maryland a reviewer titled their review, "Hookers bad WiFi and smelly room." The General Manager replied as to the other issues raised, but ignored the prostitution complaint."[67]

45.     This sampling of news stories, reviews, and other public information establishes that, at the time Jane Doe (S.B.C.) was trafficked at the Subject Ramada Inn, the Wyndham Defendants knew or should have known that:

a.  There was widespread and ongoing sex trafficking occurring at Wyndham branded properties;

b.  Sex trafficking was a brand-wide problem for Wyndham originating from management level decisions at their corporate offices in New Jersey;

c.  Wyndham franchisees and hotel staff were not taking reasonable steps to deter, detect, and disrupt known or probable sex trafficking occurring at their hotel properties and were facilitating sex trafficking at the branded hotel properties;

d.  Wyndham's efforts, if any, to stop facilitating sex trafficking in their branded properties were not effective; and

e.  Wyndham and its franchisees were earning revenue by providing venues where widespread and ongoing sex trafficking was occurring.

46.     Despite the mounting evidence that sex trafficking at their properties was ongoing and growing, Wyndham Defendants and each of the Franchisee Defendant chose to earn revenue by continuing conduct that they knew or should have known would facilitate that trafficking.

---

[66] https://www.tripadvisor.com/ShowUserReviews-g46715-d98515-r313180289-Ramada_by_Wyndham_Parsippany-Parsippany_Morris_County_New_Jersey.html
[67] https://www.tripadvisor.com/ShowUserReviews-g41125-d89414-r325336267-Ramada_Hotel_Conference_Center_by_Wyndham_Edgewood-Edgewood_Maryland.html

**B. The Wyndham Defendants and Franchisee had actual and constructive knowledge of widespread and ongoing sex trafficking at the Subject Ramada Inn.**

47.     Sex trafficking was widespread and pervasive at the Subject Ramada Inn specifically.

48.     The Wyndham Defendants and Franchisee Defendant knew or should have known about the sex trafficking pervasive at their respective Subject Ramada Inn location based on obvious indicators of this activity.

49.     Internet reviews for the Subject Ramada Inn, which upon information and belief Wyndham Defendants and Franchisee Defendant manage and monitor, show the pervasiveness of sex trafficking before and well after Jane Doe (S.B.C.) was trafficked. For example:

- o A 2010 TripAdvisor review of the Subject Ramada Inn states: "Basically if you like Prostitutes and Drug Dealers this is your place, The place is managed by a Very Young Arrogant Manager and his response to my complaints was everyone deserves a second chance, not to mention the noise…"[68]

- o A 2012 TripAdvisor review of the Subject Ramada Inn states: "… keep in mind ur in a drug and prostitute area. so i would make sure ur not walking alone. And hell no I would not recommend this hotel to my worse enemy!!!..... Oh yeah and each and everyone of us itched from something in that room! Not sure what was going on with that. We cut our vacation short to get out of there. It was just gross and we will never return! Even if our free voucher shows up."[69]

- o A 2014 TripAdvisor review of the Subject Ramada Inn states: This Ramada in was old, dirty and no attention is paid to detail. Why do I say that? Because beside the brown spots in a 12" circle on the ceiling above the bed, someone wrote "Dead Hooker Blood" with an arrow pointing to the ... 30-50 spots on the ceiling."[70]

[68] https://www.tripadvisor.com/Hotel_Review-g58732-d224851-Reviews-Ramada_by_Wyndham_SeaTac_Airport-SeaTac_Washington.html

[69] https://www.tripadvisor.com/Hotel_Review-g58732-d224851-Reviews-Ramada_by_Wyndham_SeaTac_Airport-SeaTac_Washington.html

[70] https://www.tripadvisor.com/Hotel_Review-g58732-d224851-Reviews-Ramada_by_Wyndham_SeaTac_Airport-SeaTac_Washington.html

26

- o A 2014 TripAdvisor Review of the Subject Ramada Inn states: "We love Ramada...this one we will never return to. Broken equipment. Dirty. Prostitutes. Fight in the hall. This was just some of the issues."[71]

- o A 2014 TripAdvisor review of the Subject Ramada Inn states: "… There were prostitutes in the hallways and a drunk man tried to force his way into my room(no joke). We had to call security…"[72]

- o A 2016 TripAdvisor  review for the Subject Ramada Inn states: "Parked car on 6/26 through 7/3. Upon check out on 7/4 my daughters car had her glove box was open. When she checked in her trunk all Hef clothes were stolen. The night of 7/3 was really loud with street people. Not a good idea walking to the mini mart at mid night ( flight got in at 11:30pm) gig approached twice by drug dealers and a hooker. Will not stay at hotel of in the similar neighborhood again. Ramada just said thanks for telling us about car broke into and still charged us for leaving are car for the week."[73]

- o A 2016 TripAdvisor review for the Subject Ramada Inn states: the Daytime Ladies was great the helpfulness and very professional no complaints on them. The night crew was very bad if I was the owners I would clean House all would be fired the front desk person is rude needs a lot of work the parking guy was sleeping and cones off parking spaces for people that will pay him drugs and hookers go through the back door all night no sign of security at all."[74]

50.    Defendants knew that a population of traffickers, including Jane Doe (S.B.C.)'s trafficker, repeatedly chose to use the Subject Ramada Inn location for their sex trafficking activity. They selected these hotels because of policies and practices that created a favorable environment for trafficking and because hotel staff turned a blind eye to signs of trafficking. These traffickers followed a repetitive and routine procedure during stays at the Subject Ramada Inn. There were obvious signs of this activity, which were consistent with the well-known "red

---

[71] https://www.tripadvisor.com/Hotel_Review-g58732-d224851-Reviews-Ramada_by_Wyndham_SeaTac_Airport-SeaTac_Washington.html

[72] https://www.tripadvisor.com/Hotel_Review-g58732-d224851-Reviews-Ramada_by_Wyndham_SeaTac_Airport-SeaTac_Washington.html

[73]https://www.tripadvisor.com/Hotel_Review-g58732-d224851-Reviews-Ramada_by_Wyndham_SeaTac_Airport-SeaTac_Washington.html

[74]https://www.tripadvisor.com/Hotel_Review-g58732-d224851-Reviews-Ramada_by_Wyndham_SeaTac_Airport-SeaTac_Washington.html

27

flags" for sex trafficking in the hospitality industry. As such, Defendants also knew or should have known about the pervasive sex trafficking at their respective Subject Ramada Inn location based on obvious indicators of this activity.

51. These traffickers, including (S.B.C.)'s trafficker, operated with little regard for concealment, due to an implicit understanding between Defendants and the traffickers. This understanding enabled the traffickers to operate openly, as they had found a venue where they could conduct their operations without disruption from Defendants.

52. Upon information and belief, there were other victims being trafficked at the Subject Ramada Inn at the same time as (S.B.C.), and there were obvious signs these victims were being trafficked.

53. Based upon information and belief, the conduct of Defendants facilitated the trafficking of multiple victims by multiple traffickers at their respective Subject Ramada Inn. Defendants developed a continuous business relationship with these traffickers who operated at the hotels on a routine and repetitive basis.

54. Upon information and belief and based on hotel reviews and records of law-enforcement calls, there were multiple trafficking victims exploited at each of the Subject Ramada Inn prior to Jane Doe (S.B.C.)'s trafficking who exhibited "red flags" of trafficking that were observed by hotel staff and management, including paying with cash or prepaid cards, having high volumes of men who not registered guests in and out of their room at unusual times, and other signs consistent with the "red flags" of trafficking identified above. Trafficking has a significant effect on its victims, and, upon information and belief, there were obvious "red flags" of trafficking apparent from the appearance, demeanor, and restricted movements of these victims, as well as the nature of these victims' interactions with their traffickers and others, all of

which provided notice that these victims were being subject to violence, coercion, control, and exploitation.

55. All knowledge from the staff at the Subject Ramada Inn is imputed to the Franchisee Defendant, which employed the hotel staff. Thus, each Franchisee knew about the widespread and ongoing trafficking at the Subject Ramada Inn location, including the trafficking of Jane Doe (S.B.C.), through the direct observations of hotel staff, including management-level staff. This knowledge is further imputed to the Wyndham Defendants based on the existence of an actual agency relationship as described below.

56. In addition to available public sources of information about trafficking and knowledge imputed from the hotel staff and management, each of the Franchisee Defendant learned or should have learned about the obvious signs of widespread trafficking at its hotel, based on non-public sources of information including but not limited to:

    a. surveillance of the property;

    b. internal investigations;

    c. customer complaints;

    d. monitoring of customer feedback;

    e. information received from law enforcement;

    f. and other sources of non-public information available to each Franchisee.

57. Upon information and belief, the Wyndham Defendants knew or should have known about the widespread trafficking at the Subject Ramada Inn based on the tools they used to monitor and oversee these hotels. The tools they used included:

    a. The obligation of hotel staff and franchisee to report suspected criminal activity, including sex trafficking, to the Wyndham Defendants;

    b. The Wyndham Defendants' regular monitoring of online reviews;

c. The Wyndham Defendants' collection and monitoring of customer surveys and complaints;

d. The Wyndham Defendants' requirement that franchisee submit regular and detailed reports to the Wyndham Defendants about day-to-day hotel operations;

e. The Wyndham Defendants' collection and monitoring of data about guests at the Subject Ramada Inn, including but not limited to room reservations, identification and payment information, data from websites visited on Wi-Fi, and other guest data;

f. The Wyndham Defendants' supervision and control over day-to-day operations of the Subject Ramada Inn through detailed information and extensive reports that it obtained through the property management system and other software systems it required franchisee to use and through which franchisee was obligated to allow the Wyndham Defendants to obtain real-time data to allow it to monitor hotel operations on a day-to-day basis;

g. The Wyndham Defendants' regular inspections of each of the Subject Ramada Inn;

h. The Wyndham Defendants' employment of "field agents" to work with hotels on security issues, including trafficking issues;

i. The Wyndham Defendants' access to surveillance and security systems;

j. Information provided to the Wyndham Defendants by law enforcement; and

k. Other sources of information available to the Wyndham Defendants.

58. The Wyndham Defendants required hotel staff, management, and franchisee to report suspected criminal activity at the Subject Ramada Inn, including suspected sex trafficking, to the Wyndham Defendants.

59. Based on the obvious "red flags" of sex trafficking at the Subject Ramada Inn, Franchisee Defendant and the staff and management of the Subject Ramada Inn were required to, and upon information and belief did, report numerous instances of suspected sex trafficking to the Wyndham Defendants before and during Jane Doe (S.B.C.)'s trafficking.

30

60.     Upon information and belief, before and during Jane Doe (S.B.C.)'s trafficking, the Wyndham Defendants observed obvious "red flags" of numerous instances of sex trafficking occurring at the Subject Ramada Inn based on their supervision and monitoring of the properties.

**C. Defendants knew Jane Doe (S.B.C.) was being trafficked at the Subject Ramada Inn because of the apparent and obvious "red flags" of sex trafficking.**

61.     During the period that Jane Doe (S.B.C.) was trafficked at the Subject Ramada Inn, there were obvious signs that her traffickers were engaged in sex trafficking:

  a. The hotel rooms in which she was trafficked were frequently paid for with cash;

  b. Jane Doe (S.B.C.)'s trafficker was present with her at check in.

  c.  When she was with a john her trafficker would often wait in the hotel's stairwell/hallway or linger outside in the parking lot to smoke a cigarette. It was obvious to hotel staff that Jane Doe (S.B.C.) was being monitored and her freedom being restricted.

  d. Extra towels and sheets were frequently requested. Housekeeping was not allowed into the room.

  e. Jane Doe (S.B.C.) had several johns every day. These individuals entered and left at unusual hours and were present at the hotel for brief periods of time.

  f. There was heavy foot traffic in and out of Jane Doe (S.B.C.)'s room involving men who were not hotel guests. This traffic was visible to hotel staff.

  g. Jane Doe got into a physical altercation with a john and her screams were heard from the hallway. Her trafficker rushed into the room when he heard her screams.

  h. After Jane Doe (S.B.C.) checked out, hotel cleaning staff would have noticed sex paraphernalia like excessive condom wrappers in the trash.

  i. Other obvious signs of trafficking consistent with the modus operandi of her trafficker and which included well known "red flags" for trafficking in a hotel.

62.     Based upon information and belief, multiple employees at the Subject Ramada Inn, including management-level employees, observed or were made aware of these obvious signs of trafficking while acting within the scope and course of their employment.

31

63.     As such, Franchisee Defendant and Wyndham Defendants knew or were willfully blind to the fact that Jane Doe (S.B.C.) was being trafficked at the Subject Ramada Inn.

64.     Given these obvious signs, the Wyndham Defendants knew or should have known about the trafficking of Jane Doe (S.B.C.) based on their policies or protocols that required hotel staff to report suspected criminal activity including sex trafficking.

65.     The Wyndham Defendants also knew or should have known about the trafficking of Jane Doe (S.B.C.) based on the numerous tools, described above, through which they monitored and supervised the Subject Ramada Inn. The "red flags" of Jane Doe (S.B.C.)'s trafficking at this hotel were sufficiently obvious that, during the numerous times she was trafficked at this hotel, they were readily detectable through the oversight tools that the Wyndham Brand Defendant used.

66.     The Wyndham Defendants and Franchisee Defendant had constructive knowledge of the trafficking of (S.B.C.) at the Subject Ramada Inn because that trafficking was the direct result of the Wyndham Defendants and Franchisee Defendant facilitating trafficking at the Subject Ramada Inn.

67.     Based on their knowledge of the problem of sex trafficking in the hotel industry, at Wyndham branded hotels, and at the Subject Ramada Inn, the Wyndham Defendants and Franchisee Defendant each had a duty to exercise reasonable prudence to detect ongoing sex trafficking at the Subject Ramada Inn and to make a reasonable investigation in response to signs of potential sex trafficking. If the Wyndham Defendants and Franchisee Defendant had used reasonable prudence, they would have been aware of Jane Doe (S.B.C.)'s trafficking at the Subject Ramada Inn and that they were benefiting from such trafficking.

IV. **Defendants actively facilitated sex trafficking at the Subject Ramada Inn, including the trafficking of Jane Doe (S.B.C.)**

A. **Franchisee Defendant facilitated the trafficking activity at the Ramada Inn, including the trafficking of (S.B.C.)**

68.     Franchisee Defendant is responsible for the acts, omissions, and knowledge of employees of Subject Ramada Inn property when operating the hotel because these acts and omissions were committed in the scope and course of employment, because Franchisee Defendant ratified these acts and omissions, and because Franchisee Defendant failed to exercise reasonable care with regard to the hiring, training, and supervision of their employees given the specific risks, known to Franchisee Defendant of human trafficking occurring at the Subject Ramada Inn location.

69.     Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Subject Ramada Inn location, Franchisee Defendant continued renting rooms to these traffickers, including the rooms used to sexually exploit victims.

70.     Franchisee Defendant knew or was willfully blind to the fact that (S.B.C.) was being trafficked at the Subject Ramada Inn location and, despite this, benefited from continued association with her trafficker by providing them a venue in the form of hotel rooms and related services, to facilitate (S.B.C.)'s sexual exploitation.

71.     Franchisee Defendant also facilitated widespread trafficking at the Subject Ramada Inn location, including the trafficking of (S.B.C.), in ways including:

   a. developing relationships with traffickers, including (S.B.C.)'s trafficker, and creating an understanding that these traffickers could operate at their hotel without risk of interference;

   b. continuing to provide rooms, services, and assistance to traffickers in the face of obvious "red flags" of trafficking of (S.B.C.) and other victims at the Subject Ramada Inn;

33

c. allowing inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining their front-line staff regarding issues related to human trafficking;

d. inadequate and inadequately enforced sex trafficking notice and training for their hotel staff;

e. failing to contact law enforcement despite obvious indicia of criminal activity, including sex trafficking, occurring at the Subject Ramada Inn;

f. implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by their hotel staff;

g. providing rooms at the Subject Ramada Inn location in a designated area of the property allowing ease of access for "johns" but also minimizing risks of detection; and

h. accommodating specific requests made by traffickers at the Subject Ramada Inn location.

72. Franchisee Defendant's acts and omissions, which were motivated by a single-minded focus on profit-maximization, showed serious indifference to and callous disregard for the rights of sex trafficking victims, including Jane Doe (S.B.C.).

73. Franchisee Defendant knew that sex trafficking causes immeasurable harm to victims and, nonetheless, knowingly or recklessly engaged in a longstanding pattern of conduct that generated revenue by facilitating that trafficking at the Subject Ramada Inn location.

**B. The Wyndham Defendants facilitated the trafficking of Jane Doe (S.B.C.)**

74. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Subject Ramada Inn, Wyndham Defendants continued renting rooms to these traffickers, including the rooms used to sexually exploit victims.

75. Wyndham Defendants knew or were willfully blind to the fact that Jane Doe (S.B.C.) was being trafficked and, despite this, benefited from continued association with her

trafficker by providing them a venue in the form of hotel rooms and related services, to facilitate Jane Doe (S.B.C.)'s sexual exploitation.

76.    Wyndham Defendants participated directly in aspects of the operation of the Subject Ramada Inn that influenced whether and to what extent trafficking occurred at the hotels, including but not limited to the trafficking of Jane Doe (S.B.C.), as follows:

a. The Wyndham Defendants have publicly assumed responsibility and control over the human trafficking response of all Wyndham properties, including the Subject Ramada Inn, including design and implementation of practices to prevent trafficking, safety and security procedures, employee and franchisee education, training, and response, partnership with external organizations, and advocacy;

b. The Wyndham Defendants retained control over when its branded hotels would share information with law enforcement and when law enforcement would be contacted about suspected criminal activity in Wyndham branded hotels, such as the Ramada Inn hotels;

c. The Wyndham Defendants retained control over the response to trafficking by creating a reporting hotline for hotel staff and franchisees to report suspected human trafficking to the Wyndham Defendants. The Wyndham Defendants determined when issues should be escalated to the National Human Trafficking Hotline or law enforcement;

d. The Wyndham Defendants retained control over determining which hotels needed additional training or other resources based on a high risk of human trafficking and other related criminal activity;

e. The Wyndham Defendants expressly retained control to terminate hotel staff and/or a franchising agreement based on the response to human trafficking;

f. The Wyndham Defendants retained control, at the brand-wide level, over training on how to spot the signs of and help prevent human trafficking. The Wyndham Defendants determined whether the training is provided, when it is provided, the content of the training, how the training is delivered, who receives the training, and the consequences if someone does not participate in the training or fails to follow such training;

g. Although they delayed making any reasonable effort to do so, the Wyndham Defendants acknowledge that they retain control to adopt requirements for franchised hotels specifically designed to prevent human trafficking and other criminal activity;

35

h.  The Wyndham Defendants maintain a Safety & Security Team and a Critical Incident Rapid Response Team that are charged with investigating and responding to potential criminal incidents at all Wyndham properties, including suspected trafficking incidents;

i.  The Wyndham Defendants are responsible for adopting, enforcing, and monitoring policies and codes of conduct related to human trafficking at the Subject Ramada Inn;

j.  The Wyndham Defendants maintained control over all details of the terms under which franchised hotels, including the Subject Ramada Inn, offered internet services to customers, including dictating the software, hardware, and service provider to be used, setting all policies about use and restrictions on use, and actively collecting and monitoring guest internet usage data. The Wyndham Defendants dictated whether sites frequently used to solicit clients for sex trafficking victims would be accessible through the internet at the Subject Ramada Inn;

k.  The Wyndham Defendants retained control over the setting, supervision, overseeing, and enforcement of detailed policies and protocol for housekeeping services at the Subject Ramada Inn, including policies for how often rooms must be entered, how to respond to guest refusals of entry into rooms, and steps to monitor guest safety issues through housekeeping services; and

l.  The Wyndham Defendants collected, maintained, and analyzed detailed data regarding housekeeping services at the Subject Ramada Inn, including trends that would reveal patterns consistent with human trafficking.

77.  Wyndham directly participated in and retained day-to-day control over renting rooms at all the Subject Ramada Inn by, among other things:

a.  The Wyndham Defendants controlled all details of the guest reservation, check-in, and payment processes through management and control over all systems used for those processes and adoption of detailed and specific policies governing the means and methods used for each of these processes;

b.  The Wyndham Defendants directly made reservations for rooms at the Subject Ramada Inn and accepted payment for those rooms through a central reservation system that they controlled and operated. The Wyndham Defendants could reserve rooms and accept payments without requiring franchisee approval or involvement;

c.  The Wyndham Defendants established and maintained control over a brand-wide "do not rent" system. The Wyndham Defendants set all policies related to use of this system and dictated the day-to-day details of reservations at the Subject

36

Ramada Inn through detailed policies that it established regarding use of this "do not rent" system;

d. The Wyndham Defendants controlled room rates, required discounts, mandatory fees, and rewards program;

e. The Wyndham Defendants controlled and restricted the ability of franchisee and staff to refuse or cancel a reservation;

f. The Wyndham Defendants controlled and oversaw policies and procedures regarding check-in, payment, and identity verification procedures;

g. The Wyndham Defendants collected, retained, monitored, and analyzed detailed data about every guest who stayed at the Subject Ramada Inn;

h. The Wyndham Defendants established detailed policies and protocol that dictated, step-by-step, everything that would happen from the time a guest arrived at the Subject Ramada Inn until they entered their guest room. This included operational directives regarding payment methods, identification requirements, the number of guests that could be in each room and whether information needed to be collected for each guest, what questions hotel staff should and should not ask, and other matters related to check-in; and

i. The Wyndham Defendants required franchisees to use Wyndham's property management system, which was owned, maintained, controlled, and operated by the Wyndham Defendants, for virtually all aspects of hotel operations regarding room reservations and payment.

78. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Subject Ramada Inn named herein, Wyndham continued renting rooms to traffickers, including the rooms used to traffic victims, including Jane Doe (S.B.C.)

79. Wyndham knew or should have known that Jane Doe (S.B.C.) was being trafficked and, despite this, benefited from continued association with her traffickers by providing them hotel rooms and related services to facilitate Jane Doe (S.B.C.)'s sexual exploitation.

80. The Wyndham Defendants formed a business relationship with traffickers at the Subject Ramada Inn by renting rooms, collecting guest data, and operating the hotels in a way

37

that attracted business from traffickers and allowed them to operate efficiently with minimal risk of detection or traceability.

81.     Upon information and belief, despite having actual or constructive knowledge of the ongoing sex trafficking at the Subject Ramada Inn, the Wyndham Defendants continued participating in a venture at these hotels, with its franchisees and hotel staff, in a way that it knew or should have known would lead to additional sex trafficking at the hotels, including but not limited to by the following:

a.  The Wyndham Defendants adopted inappropriate and inadequate practices for selecting, training, supervising, managing, and disciplining franchisees and hotel staff regarding issues related to human trafficking;

b.  The Wyndham Defendants provided inadequate training on issues related to human trafficking and unreasonably delayed providing training;

c.  The Wyndham Defendants adopted a safety and security budget and safety and security practices that were clearly insufficient considering the known problem of sex trafficking at their properties;

**d.**  The Wyndham Defendants implicitly approved decisions by franchisees and hotel staff not to report or respond to criminal activity including sex trafficking appropriately;

e.  The Wyndham Defendants continued to use policies, protocols, and practices that had been shown to lead to widespread trafficking at the Subject Ramada Inn;

f.  The Wyndham Defendants attracted traffickers by affirmatively creating a favorable venue where access was easy, risks of interference were low, and traceability was minimal;

g.  Despite having specific knowledge of policies that would significantly reduce sex trafficking at its branded locations including the Subject Ramada Inn, the Wyndham Defendants declined to implement policies that would likely have the effect of reducing its sex-trafficking related profits or that would require publicly acknowledging the ongoing problem of sex trafficking at its properties;

**h.**  The Wyndham Defendants willfully delayed taking obvious and apparent steps to stop facilitating sex trafficking, which they had the ability and responsibility to take sooner;

i.  The Wyndham Defendants allowed traffickers to reserve rooms using cash, which provided relative anonymity and non-traceability; and

38

j. The Wyndham Defendants provided traffickers with access to internet services in a manner that the Wyndham Defendants knew or should have known would be used to facilitate trafficking by promoting commercial sex services online.

82. If Wyndham Defendants had exercised reasonable diligence when operating Subject Ramada Inn and in the areas where they retained control, Wyndham Defendants would have prevented the Subject Ramada Inn from being used to facilitate widespread and ongoing sex trafficking, including the trafficking of Jane Doe (S.B.C.). Instead, Wyndham Defendants engaged in the course of conduct that affirmatively facilitated widespread and ongoing sex trafficking, including the trafficking of Jane Doe (S.B.C.).

## V.    Defendants' Ventures at the Subject Ramada Inn Locations

83. Franchisee Defendant and the Wyndham Defendants benefited from use of the Subject Ramada Inn for sex trafficking. Jane Doe (S.B.C.)'s traffickers and other traffickers rented rooms at the Subject Ramada Inn and used these hotels to harbor, maintain, and provide victims including Jane Doe (S.B.C.). When these traffickers rented rooms, both the Franchisee Defendant and the Wyndham Brand Defendants received a financial benefit.

84. Franchisee Defendant generated revenue every time a sex trafficker rented a room at the Subject Ramada Inn location, both from room rental fees and from fees for other hotel services

85. Each of the Wyndham Brand Defendants generated substantial income from operations of hotels such as the Subject Ramada Inn. In exchange for providing the services described above, each of the Wyndham Brand Defendants received a share of the revenue from room rentals collected at the Subject Ramada Inn. The fees generated by the Wyndham Brand Defendants are primarily based on gross room rentals; therefore, the Wyndham Brand Defendants' revenue increase with each room rental at the Subject Ramada Inn. Revenue

39

generated from rooms rented at the Subject Ramada Inn was distributed among the Wyndham Brand Defendants, with each benefiting from each rental of a hotel room by traffickers.

86. The Wyndham Brand Defendants also benefited from sex traffickers' frequent use of the Subject Ramada Inn because this regular and routine use of those hotels increased the hotel occupancy rate, and an increase in the hotel occupancy rate resulted in several benefits for the Wyndham Brand Defendants, including that this assisted them in obtaining financing and helped them market franchising opportunities to potential franchisees.

87. In ways described more fully above, the Wyndham Defendants and Franchisee Defendant knowingly received a financial benefit from participating in a venture in the form of a continuous business relationship and implicit understanding with the traffickers operating out of Subject Ramada Inn, including Jane Doe (S.B.C.)'s trafficker. (hereinafter "Venture 1").

88. The Wyndham Defendants and each Franchisee Defendant formed this continuous business relationship and implicit understanding with the traffickers at the Subject Ramada Inn by continuing to rent rooms to be used for trafficking (including Jane Doe (S.B.C.)'s trafficking) after the Wyndham Defendants and Franchisee Defendant knew or should have known that the rooms were being used for unlawful trafficking.

89. This business relationship involved mutual pursuant of financial benefit: the traffickers were renting the hotel rooms to generate revenue from sex trafficking and the Wyndham Defendants and Franchisee Defendant were generating revenue by renting the hotel rooms.

90. This implicit understanding developed because sex traffickers, including Jane Doe (S.B.C.)'s trafficker, frequently used the Subject Ramada Inn for their trafficking knowing that staff members would look the other way. This occurred because of the acts and omissions of the

40

Wyndham Defendants and Franchisee Defendant that created a favorable environment for sex trafficking to flourish. Multiple traffickers operated at each of these hotels, and multiple victims were harbored, provided, and exploited at each of these hotels.

91.     Both the Wyndham Defendants and Franchisee Defendant participated in this venture by acting jointly to rent rooms to traffickers and to operate these hotels in a way that attracted business from traffickers and facilitated their trafficking activity. As further described above, each Franchisee Defendant provided "boots on the ground" at its respective hotel, and the Wyndham Defendants played a primary role in renting rooms at each of the Subject Ramada Inn and retained control over and was directly involved in aspects of hotel operations related to sex trafficking.

92.     The Wyndham Defendants and Franchisee Defendant participated in the venture by continually renting rooms to traffickers, including Jane Doe (S.B.C.)'s, after they knew or should have known that victims like Jane Doe (S.B.C.) were being subjected to unlawful trafficking. They also continued operating the hotel in a way that they knew or should have known would encourage traffickers to select the Subject Ramada Inn as venues for their illegal activities.

93.     The Wyndham Defendants and Franchisee Defendant did not only provide these traffickers with a physical space (harboring) where they could imprison victims and sell them "johns" (providing), but they also provided these traffickers with the cover of a legitimate business as a venue where they could profit from sexual exploitation with a low risk of disruption. This was done pursuant to an implicit agreement with traffickers, which is evidenced by, among other things:

        a.   The traffickers, including Jane Doe (S.B.C.)'s, were familiar to the staff at the Subject Ramada Inn;

    **b.** These traffickers reduced their operating burden because they did not need to make significant efforts to conceal their activities from the staff at the Subject Ramada Inn but, instead, freely made requests that would facilitate their trafficking activities without concern for detection or interference by the staff;

    **c.** Defendants allowed traffickers to take steps that would minimize their traceability to law enforcement, such as accepting cash payments and not requiring identification from appropriate parties; and

    **d.** Defendants provided additional services to traffickers (including Jane Doe (S.B.C.)'s trafficker), including but not limited to, internet access, excessive towels, and extra housekeeping services to clean the activities of the trafficking venture once the traffickers vacated the rooms.

94. The criminal traffickers operating at the Subject Ramada Inn as part of Venture 1 violated 18 U.S.C. §1591 as to victims including Jane Doe (S.B.C.).

95. If Wyndham Defendants and Franchisee Defendant had not continued participating in a venture that they knew or should have known engaged in violations of the TVPRA, they would not have received a benefit from (S.B.C.)'s trafficking at the Subject Ramada Inn.

96. In ways described more fully above, the Wyndham Defendants and Franchisee Defendant also knowingly received a financial benefit from participating in a commercial hotel-operating venture at their respective Subject Ramada Inn (hereinafter "Venture 2").

97. The Wyndham Defendants had a longstanding business relationship with the Franchisee Defendant pursuant to which they jointly participated in operation of the Subject Ramada Inn with a shared goal of maximizing revenue, including gross room revenue.

98. The Wyndham Defendants and Franchisee Defendant, through their respective roles in hotel operations as described above, facilitated widespread sex trafficking at the Subject Ramada Inn by continuing to operate the hotels in a way that they knew or should have known resulted in them benefiting from significant sex trafficking occurring on site at this hotel.

99.    Venture 2 was engaged in a violation of the TVRPA through the widespread sex trafficking at the Subject Ramada Inn, which resulted in Jane Doe (S.B.C.) and other victims being harbored, maintained, and provided in the rooms of the Subject Ramada Inn. Venture 2 also engaged in a violation of the TVPRA through the actions of the Franchisee Defendant who violated the TVPRA as perpetrators by harboring sex trafficking victims as defined by 18 U.S.C §1591(a)(1) and by participating in a criminal trafficking venture as defined by 18 U.S.C §1591(a) (2).

100.    Despite their actual or constructive knowledge that Venture 2 was engaged in violations of 18 U.S.C. §§ 1591(a) and 1595(a), the Wyndham Defendants and Franchisee Defendant participated in the venture by continuing to operate the Subject Ramada Inn in a way that they knew or should have known would lead to further violations of 18 U.S.C. §1591, including the trafficking of Jane Doe (S.B.C.). The Wyndham Defendants provided Franchisee Defendant with operational support, use of trademarks, marketing services, and other resources to operate the Subject Ramada Inn in a way that they knew or should have known was engaging in violations of 18 U.S.C §1591(a).

## VI.    Franchisee Defendant and the Staff at the Subject Ramada Inn location Acted as Actual Agents of Wyndham

101.    Wyndham Defendants are vicariously liable for the acts, omissions, and knowledge of Franchisee Defendant and staff at the Subject Ramada Inn location, which are Wyndham Defendants' actual agents or subagents.

102.    The Wyndham Defendants subjected Franchisee Defendant to detailed standards and requirements regarding the operation of the Subject Ramada Inn through the franchising agreement, through detailed written policies and manuals, and through other formal and informal

protocols, directives, mandates, and expectations imposed by the Wyndham Defendants as they oversaw and supervised hotel operations at each subject location.

103. The Wyndham Defendants obscure the full extent of control they exercise over the franchisee by treating the manuals and certain policies as confidential and proprietary and prohibiting any public disclosure of those policies and manuals. The standards that the Wyndham Defendants imposed on the franchisee:

   a. did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools Franchisee Defendant used; and

   b. covered virtually all aspects of hotel operations, including but not limited to personnel, building, grounds, furnishings, fixtures, decor, equipment, vehicles, supplies, foodstuffs, printed matters, and internal operating functions; and

   c. dictated the specific manner in which Franchisee Defendant and their respective hotel staff must carry out most day-to-day functions; and

   d. significantly exceeded what was necessary for Wyndham to protect its registered trademarks.

104. In addition to the ways described above, upon information and belief, Wyndham Defendants exercised and reserved the right to exercise systemic and pervasive control over Franchisee Defendant's day-to-day operation of the Subject Ramada Inn. The ways that the Wyndham Defendants exercised this control include:

   a. Wyndham Defendants required franchisees and management of franchised hotels to participate in mandatory training programs, both during onboarding and on an ongoing basis. This training covered all aspects of hotel operations, including aspects of hotel operations that go significantly beyond what would be necessary for Wyndham to protect its registered trademarks;

   b. Wyndham Defendants maintained a team of regionally based trainers to provide training at branded hotels. Wyndham provided training for hotel management and select hotel staff on-site and at locations selected by Wyndham;

   c. Wyndham Defendants provided hotels staff with training it created through an online learning platform, Wyndham University, it controlled and maintained,

44

including training specific to hotel-based jobs, such as safety and security training for housekeeping staff and safety and security training for the front desk;

d.  Wyndham Defendants controlled training provided by franchisees to hotel staff by dictating the content of that training, providing required content for that training, and dictating the training methods used;

e.  Wyndham Defendants retained sole discretion to determine whether all training had been completed satisfactorily;

f.  Wyndham Defendants maintained oversight in hiring, disciplining, and terminating hotel management and employees;

g.  Wyndham Defendants required franchisees to participate in mandatory centralized services for day-to-day operation of the hotels;

h.  For certain products and services that franchisees were required to purchase to operate the property, Wyndham Defendants designated approved vendors and prohibited franchisees from purchasing goods and services from anyone other than an approved vendor;

i.  Wyndham Defendants required franchisees to use its revenue management system, through which it dictated pricing and strategies to maximize revenue, and which gave it direct ability to supervise day-to-day operations at the hotels through direct access to the system;

j.  Wyndham Defendants set required staffing levels for the subject property;

k.  Wyndham Defendants established detailed job descriptions for all positions in its branded properties and drafted numerous, detailed policies that referenced these positions and dictated which positions must perform which tasks and how they must do so;

l.  Wyndham Defendants set requirements for the hiring process used by franchisees and oversaw employee discipline processes and termination decisions;

m. Wyndham Defendants provided benefits for employees of franchised hotels;

n.  Wyndham Defendants controlled channels for guests to report complaints or provide feedback regarding the subject properties and directly participated in the response and/or supervised and the response to customer complaints or other feedback. Wyndham retained the right to provide refunds or other compensation to guests and to require Franchisee Defendant to pay associated costs;

o.  Wyndham Defendants generated reports and analysis of guest complaints and online reviews for the subject properties;

45

p. Wyndham Defendants set detailed requirements for insurance that Franchisee Defendant must purchase;

q. Wyndham Defendants exercised or retained control over the franchisee's day-to-day accounting and banking practices;

r. Wyndham Defendants regularly audited the books and records of Franchisee Defendant;

s. Wyndham Defendants conducted frequent and unscheduled inspections of the subject property;

t. Wyndham Defendants retained the right to issue fines, require additional training, to impose and supervise implementation of detailed corrective action plans, and to take other steps up to and including termination of the franchising agreement if franchisees violated any of Wyndham' detailed rules, expectations, protocols, or policies, including those that governed day-to-day operations of the subject properties;

u. Wyndham Defendants controlled all marketing for the subject properties, directly provided marketing services, and prohibited Franchisee Defendant from maintaining any online presence unless specifically reviewed and approved by Wyndham;

v. Wyndham Defendants exercised or retained control over all aspects of building and facility design;

w. Wyndham Defendants imposed detailed recordkeeping and reporting requirements on Franchisee Defendant regarding virtually all aspects of hotel operations;

x. Wyndham Defendants supervised and controlled day-to-day operations of the subject properties through detailed information and extensive reports that it obtained through the property management system and other software systems it required Franchisee Defendant to use;

y. Wyndham Defendants required the franchisees and hotel staff to implement a data system that gives Franchisor real-time information that it can monitor on a day-to-day basis; and

z. Wyndham Defendants retained the virtually unlimited right to revise policies or adopt new requirements for the day-to-day aspects of hotel operations.

**105.**   The Wyndham Defendants had the right to and did enforce its control over Franchisee Defendant through various methods, including:

   a.   the right to conduct detailed inspections of the subject properties;

   b.   monitoring or auditing the Franchisee Defendant for compliance with policies and expectations;

   c.   directing Franchisee Defendant to take specific steps to come into compliance with detailed and exacting standards regarding day-to-day operations;

   d.   mandating training and education for franchisees and/or hotel staff;

   e.   employing consultants or field agents to become involved in the day-to-day operations of franchised hotels;

   f.   the right to impose fines or penalties;

   g.   the right to impose additional conditions on franchisees or to restrict or limit its right to provide goods and services; and

   h.   the right to terminate the franchise agreement for failure to comply with policies that govern the means and methods used for day-to-day operations.

106.   The Wyndham Defendants are also vicariously liable for Franchisee Defendant and the hotels staff because, as further described above, they retained and exercised control over the specific instrumentalities and aspects of operations that caused Jane Doe (S.B.C.)'s harm, including but not limited to reservations of rooms, hotel security, and detection of and response to suspected sex trafficking. They Wyndham Defendants had the right to exercise detailed, day-to-day control over and involvement in these areas. It also regularly and closely monitored these areas.

**VII.   Defendants are Jointly and Severally Liable for Jane Doe (S.B.C.)'s Damages.**

107.   The venture or ventures in which each Defendant participated were direct, producing, and proximate causes of the injuries and damages to Jane Doe (S.B.C.).

47

108. Under the TVPRA, Defendants are jointly and severally liable for all damages that a jury awards to Jane Doe (S.B.C.) for past and future losses she suffered as a proximate result of her sexual exploitation and trafficking.

### CAUSES OF ACTION—SEX TRAFFICKING UNDER THE TVPRA

109. Jane Doe (S.B.C.) incorporates all other allegations.

**I. Cause of Action: Perpetrator liability under 18 U.S.C §1595(a) based on violation of 18 U.S.C §1591(a) (Franchisee Defendant)**

110. Jane Doe (S.B.C.) is a victim of sex trafficking within the meaning of § 1591 and 1595(a) and is thus entitled to bring a civil action under 18 U.S.C §1595(a) against the "perpetrator" of any violation of the TVPRA.

111. Franchisee Defendant is a perpetrator within the meaning of 18 U.S.C §1595(a) because they:

   a. violated 18 U.S.C §1591(a)(1) when, through the acts and omissions described throughout this Complaint, they harbored individuals (including Jane Doe (S.B.C.)) knowing or in reckless disregard of the fact that the victims would be caused, through force, coercion, or fraud, to engage in commercial sex acts while at the Subject Ramada Inn property.

   b. violated 18 U.S.C §1591(a)(2) when, through the acts and omissions described throughout this Complaint, they knowingly received financial benefit by knowingly assisting, supporting, or facilitating a venture that was engaged in violations under 18 U.S.C §1591(a)(1) at the Subject Ramada Inn property.

112. Violations of 18 U.S.C §1595(a) by Franchisee Defendant as "perpetrator" operated, jointly, with other unlawful acts and omissions alleged in this Complaint, to cause Jane Doe (S.B.C.) to suffer substantial physical and psychological injuries and other damages because of being trafficked and sexually exploited at the Subject Ramada Inn property.

**II. Cause of Action: Beneficiary Liability under §1595(a) of the TVPRA (all Defendants)**

113.    Jane Doe (S.B.C.) is a victim of sex trafficking within the meaning of 18 U.S.C §§ 1591 and 1595(a) and is thus entitled to bring a civil action under the "beneficiary" theory in 18 U.S.C §1595(a) against anyone who knowingly benefited from participation in a venture that the person knew or should have, with reasonable diligence, known was engaged in a violation of the TVPRA.

114.    Through acts and omissions described throughout this Complaint, Franchisor Defendants and Franchisee Defendant received a financial benefit from participating in a venture with traffickers, including Jane Doe (S.B.C.)'s trafficker, despite the fact that each defendant knew or should have known that these traffickers, including Jane Doe (S.B.C.)'s trafficker, were engaged in violations of 18 U.S.C §1591(a)(1) and 18 U.S.C §1591(a)(2). Thus, Franchisor Defendants and Franchisee Defendant are liable as a beneficiary under 18 U.S.C §1595(a).

115.    Through the acts and omissions described throughout this Complaint, Franchisor Defendants received a financial benefit from participating in a venture with its respective franchisees regarding the operations of its respective hotel properties even though Franchisor Defendants knew or should have known that this venture was violating 18 U.S.C §§ 1591(a) and 1595(a).

116.    Violations of 18 U.S.C §1595(a) by Wyndham Defendants as "beneficiaries" operated, jointly, with other unlawful acts and omissions alleged in this Complaint, to cause Jane Doe (S.B.C.) to suffer substantial physical and psychological injuries and other damages because of being trafficked and sexually exploited at the Defendants' hotel properties.

III.    **Cause of Action: Vicarious Liability for TVPRA Violations (Franchisor Defendants)**

117.    Franchisee Defendant acted as the actual agents of Wyndham Defendants when operating the Subject Ramada Inn. The agency relationship between Franchisee Defendant and

49

each Wyndham Defendants lasted for the period during which the Wyndham Defendants were involved in operation of the Subject Ramada Inn through its role as franchisor.

118.    Through the acts and omissions described throughout this Complaint, each Wyndham Defendants, at the relevant time, exercised or retained the right to exercise systematic and day-to-day control over the means and methods used by Franchisee Defendant to operate the Subject Ramada Inn.

119.    Under the TVPRA and the federal common law, a principal is vicariously liable for the violations of its actual agent and its subagents.

120.    As a result of the relationship between Franchisee Defendant and Wyndham Defendants, Franchisors are vicariously liable for the acts of Franchisee, including at the Subject Ramada Inn location. Factors that support this allegation are that Franchisors shared profits, standardized employee training, standardized and strict rules of operations, Franchisors controlled pricing and reservations, regularly conducted inspections, operational support and control, and other acts described above. Finally, Franchisors had the right to terminate any franchisee that failed to comply with the requirements promulgated by Franchisors. Thus, Franchisors retained control, or the right to control, the mode and manner of work contracted for.

121.    Each Defendant's failure to train and supervise their agents and employees, which was unreasonable in light of the known risk of sex trafficking at the Subject Ramada Inn, enabled and contributed to the sex trafficking of Jane Doe (S.B.C.).

122.    As alleged above, Wyndham Defendants are directly liable to Jane Doe (S.B.C.) for violations of the TVPRA as a beneficiary under 18 U.S.C §1595(a). Franchisee Defendant are also directly liable to Jane Doe (S.B.C.) under § 2255. Wyndham Defendants are vicariously liable to Jane Doe (S.B.C.) for those same violations.

## DISCOVERY RULE

123.    To the extent Defendants assert an affirmative defense of limitations, Jane Doe (S.B.C.) also invokes the continuing tort doctrine because this lawsuit arises out of a pattern of continuous and ongoing tortious conduct by Defendants, individually and in concert, across the subject locations.

124.    Jane Doe (S.B.C.) was subject to continuous trafficking at the subject hotel through at least December 2014, which is not more than 10 years before Jane Doe (S.B.C.) filed this lawsuit.

125.    This continuous trafficking resulted from Defendants' continuous facilitating of trafficking at the subject hotels and Defendants' ongoing venture with one another and with criminal traffickers.

## DAMAGES

126.    Defendants' acts and omissions, individually and collectively, caused Jane Doe (S.B.C.) to sustain legal damages.

127.    Defendants are joint and severally liable for all past and future damages sustained by Jane Doe (S.B.C.).

128.    Jane Doe (S.B.C.) is entitled to be compensated for personal injuries and economic damages, including:

   a.  Actual damages (until trial and in the future)

   b.  Incidental and consequential damages (until trial and in the future);

   c.  Mental anguish and emotional distress damages (until trial and in the future);

   d.  Lost earnings and lost earning capacity (until trial and in the future);

   e.  Necessary medical expenses (until trial and in the future);

f.   Life care expenses (until trial and in the future);

g.   Physical pain and suffering (until trial and in the future);

h.   Physical impairment (until trial and in the future);

i.   Emotional impairment (until trial and in the future);

j.   Exemplary/Punitive damages;

k.   Attorneys' fees; and

l.   Costs of this action.

m.   Pre-judgment and all other interest recoverable.

## JURY TRIAL

129.   Jane Doe (S.B.C.) demands a jury trial on all issues.

## RELIEF SOUGHT

130.   WHEREFORE, Jane Doe (S.B.C.) prays that this case be set for trial before a jury and that, upon a final hearing of the cause, judgment be entered for Jane Doe (S.B.C.) against all Defendants jointly and severally for the actual, compensatory, and punitive damages as the evidence may show, and the jury may determine to be proper, together with the costs of suit, prejudgment interest, post-judgment interest, and such other and further relief to which Jane Doe (S.B.C.) may, in law or in equity, show herself to be justly entitled.

Dated: 12/31/2024

**THE LOCKS LAW FIRM**

*/s/ Francesca A. Iacovangelo*
Francesca A. Iacovangelo, Esq.
601 Walnut Street, Suite 720 E
Philadelphia, PA 19106
(215) 893-3454
(215) 893-3444 Facsimile
fiacovangelo@lockslaw.com

**ATTORNEYS FOR PLAINTIFF**

52