**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| JANE DOE (S.B.C.), AN INDIVIDUAL, <br><br> Plaintiff, <br><br> v. <br><br> WYNDHAM HOTELS & RESORTS, INC.; RAMADA FRANCHISE SYSTEM, INC.; and SWISS HOTELS 786, L.L.C., <br><br> Defendants. | CIVIL ACTION NO: 2:24-cv-11512 <br><br><br><br><br><br> JURY TRIAL DEMANDED |

**PLAINTIFF'S** ~~ORIGINAL~~ **FIRST AMENDED COMPLAINT**

~~TO THE HONORABLE JUDGE OF SAID COURT:~~

Jane Doe (S.B.C.), Plaintiff in the above-styled and numbered cause, files this ~~Original~~ First Amended Complaint against ~~WYNDHAM HOTELS & RESORTS, INC., RAMADA FRANCHISE SYSTEM, INC; AND SWISS HOTELS~~ Wyndham Hotels & Resorts, Inc.; Ramada Worldwide Inc.; Swiss Hotels 786, L.L.C.; Super 8 Worldwide, Inc.; JC Inn, Inc. d/b/a Super 8 by Wyndham Kelso Longview Area; Howard Johnson International, Inc.; and Samjoo Properties LLC d/b/a Howard Johnson Inn & Suites as Defendants, and would respectfully show the Court and jury as follows:

**SUMMARY**

1.      Jane Doe (S.B.C.) files this civil lawsuit seeking compensation for the harm she suffered ~~as a result~~ because of the sex trafficking she endured in ~~a hotel~~ hotels owned, operated, maintained, and controlled by Defendants and their agents and employees.

2.      Sex trafficking is the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purposes of causing the person to engage in a

1

commercial sex act either (1) before the person turns 18 years old; or (2) through force, fraud, or coercion.[1] ~~To "harbor" means to "give shelter or refuge to."~~ Traffickers or 'pimps' ~~who~~ use threats, violence, manipulation, lies, debt bondage, and other forms of coercion to compel adults and children to engage in commercial sex acts against their will~~, often use hotels to harbot their victims~~.

3.      Some victims are brought into trafficking through abduction or use of physical violence, while many other trafficking relationships begin with a false promise of a romantic relationship or financial security.[2] Traffickers often prey on individuals with vulnerabilities that make them more susceptible to coercion and control.[3]

4.      <u>Traffickers then use a variety of techniques to maintain control over their victims. Some traffickers use physical violence and overt threats to control their victims, while others use more subtle forms of fraud and coercion.[4] Many traffickers use techniques to undermine victims' ability to think and act independently through repetitive infliction of psychological trauma. These techniques can include high levels of control, exposure to chronic stress and threat, isolation, provocation of fear, and the creation of a sense of helplessness in victims.[5]</u>

5.      Sex trafficking has become a public health crisis that has reached epidemic proportions in the United States. It is now widely recognized, including by Congress and many state legislatures, that combating sex trafficking requires more than just criminal penalties for ~~traffickers~~pimps and sex buyers.

---

[1] 18 U.S.C. § 1591; 22 U.S.C. § 7102.
[2] The National Prevention Toolkit, Sex Trafficking, https://nationaltoolkit.csw.fsu.edu/leo/part-2/sex-trafficking
[3] Polaris Project, Sex Trafficking: The Basics, https://polarisproject.org/understanding-human-trafficking/
[4] The National Prevention Toolkit, Sex Trafficking, https://nationaltoolkit.csw.fsu.edu/leo/part-2/sex-trafficking
[5] Elizabeth Hopper, Ph.D. & José Hidalgo, M.D., *Invisible Chains: Psychological Coercion of Human Trafficking Victims*, 1 Intercultural Hum. Rts. L. Rev. 185, 191 (2006).

6.      Since 2003, federal law, through the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §1581, et seq, has provided victims of sex trafficking a civil remedy against perpetrators of criminal sex trafficking.

7.      In 2008, Congress recognized the need to extend liability beyond sex buyers and sellers and intentionally expanded the scope of the TVPRA to reach those who—while not criminally liable under the TVPRA—financially benefit from participation in a venture that they know or *should know* engages in criminal sex trafficking.

8.      As discussed herein, Jane Doe (S.B.C.) alleges that Defendants derived financial benefit from facilitating sex trafficking by providing venues where traffickers could exploit victims, including victims like Jane Doe (S.B.C.), with minimal risk of detection or interruption. Jane Doe (S.B.C.) further alleges that Defendants continued supporitngenabled traffickers, including Jane Doe (S.B.C.)'sher own trafficker, despite evidentobvious and apparent signs of widespread and ongoingsex trafficking in these hotels. Defendants were, therefore, knowingly receiving a benefit from participation in a venture that Defendants knew or should have known was engaged in sex trafficking.

9.      Defendants had the opportunity to prevent the severe and permanent harm that Jane Doe (S.B.C.) experienced as the result of continuous trafficking. Defendants failed to do so. Instead, Defendants recklessly and/or negligently facilitated her sex trafficking. Accordingly, Jane Doe (S.B.C.) files this lawsuit.

## **PARTIES**

10.      Plaintiff, Jane Doe (S.B.C.), is a resident of Washington. She may be contacted through her lead counsel, whose information is contained below.

3

11.     Jane Doe (S.B.C.) is a victim of sex trafficking under 18 U.S.C. § 1591(a) because she was ~~harbored, transported, or~~ provided for the purpose of ~~causing her~~being caused, through force, fraud, or coercion, to commit a commercial sex act.

12.     The trafficking of Jane Doe (S.B.C.) occurred in or affected interstate commerce.

13.     Given the nature of the allegations in this lawsuit, there is a collective and compelling interest in not publicly revealing the identity of Jane Doe (S.B.C.).

14.     Defendant Wyndham Hotels & Resorts, Inc.~~, (WHR).~~ is a for-profit Delaware corporation with its principal place of business in Parsippany, New Jersey~~and may be~~. Defendant has been served ~~through its registered agent for service, Corporate Creations Network Inc. at 3411 Silverside Road, Rodney Building #104, Wilmington, Delaware 19810~~and has made an appearance in this lawsuit.

~~12.     All references to WHR include any department, division, office, agency, subsidiary, corporate affiliate, predecessor corporation, or successor corporation, whether domestic, foreign, and/or international. The term also includes any director, officer, agent (either with direct/actual authority or implied/apparent authority), employee, person, firm, or corporation acting on behalf of Wyndham Hotels and Resorts, Inc. now or at any time relevant to the claims herein.~~

15.     Defendant Ramada ~~Franchise System, Inc. ("RFS")~~ Worldwide Inc. is a for-profit Delaware corporation with its principal place of business in Parsippany, New Jersey. Defendant has been served and has made an appearance in this lawsuit.

16.     Defendant Super 8 Worldwide, Inc. is a for-profit Delaware corporation with its principal place of business in Parsippany, New Jersey~~and~~. Defendant may be served through its registered agent for service, Corporate Creations Network Inc. at 181 New Road, Suite 304, Parisppany, NJ.

4

17.     Defendant Howard Johnson International, Inc. is a for-profit Delaware corporation with its principal place of business in Parsippany, New Jersey. Defendant may be served through its registered agent for service, Corporate Creations Network Inc. ~~at 801 Highway 1, North Palm Beach, FL 33408~~at 181 New Road, Suite 304, Parisppany, NJ.

18.     ~~WHR and RFS~~Defendants Wyndham Hotels & Resorts, Inc., Ramada Worldwide Inc., Super 8 Worldwide, Inc., and Howard Johnson International, Inc. will be referred to collectively as ~~the~~ "Franchisors" or "Wyndham Defendants"~~ or "Wyndham" or "Franchisor Defendants."~~ ~~Upon information and belief~~At all relevant times, the Wyndham Defendants~~, either directly or through the acts of predecessors for which they are responsible, owned, operated, controlled, and/or managed the Ramada Inn that was~~ were the franchisors for the Ramada by Wyndham SeaTac Airport hotel located at 16720 International Blvd., Seattle, WA 98188, the Super 8 by Wyndham Kelso Longview Area hotel located at 250 S Kelso Dr., Kelso, WA 98626, and the Howard Johnson by Wyndham hotel located at 9201 NE Vancouver Mall Dr, Vancouver, WA 98662.

19.     ~~Defendant Swiss Hotels 786, L.L.C.~~Specifically, at all relevant times, Defendant Ramada Worldwide Inc. was a franchisor of the Ramada by Wyndham SeaTac Airport hotel, Defendant Super 8 Worldwide, Inc. was a franchisor of the Super 8 by Wyndham Kelso Longview Area hotel, and Defendant Howard Johnson International, Inc. was a franchisor of the Howard Johnson by Wyndham hotel located at 9201 NE Vancouver Mall Dr, Vancouver, WA 98662.

20.     Defendant Swiss Hotels 786, L.L.C. ("Swiss Hotels") is a Washington limited liability company with its principal place of business in Washington. Defendant has been served and has made an appearance in this lawsuit. At all relevant times, Defendant Swiss Hotels owned,

operated, controlled, and managed the Ramada by Wyndham SeaTac Airport hotel located at 16720 International Blvd., Seattle, WA 98188.

21.    Defendant JC Inn, Inc. d/b/a Super 8 by Wyndham Kelso Longview Area ("JC Inn") is a for-profit Washington corporation with its principal place of business in Washington. Defendant may be served through its registered agent for service, Kim and Kim CPAs, Inc. at 23416 Hwy 99, Suite B, Edmonds, WA 98026. At all relevant times, Defendant JC Inn owned, operated, controlled, and managed the Super 8 by Wyndham Kelso Longview Area hotel located at 250 S Kelso Dr., Kelso, WA 98626.

22.    Defendant Samjoo Properties LLC d/b/a Howard Johnson Inn & Suites ("Samjoo Properties") is a Washington limited liability company with its principal place of business in Washington. Defendant Swiss Hotels 786, L.L.C. during the periodmay be served through its registered agent for service, Sangcheon Yim at issue8108 NE 71st Loop, Vancouver, WA 98662. At all relevant times, Defendant Samjoo Properties owned, operated, controlled, and/or managed the Ramada InnHoward Johnson by Wyndham hotel located at 16720 International Blvd, Seattle, WA 98188, through the Wyndham franchising system. Defendant Swiss Hotels 786, L.L.C. may be served through its registered agent, Jong Park, 16720 International Blvd, SeaTac9201 NE Vancouver Mall Dr, Vancouver, WA, 98188 or wherever they may be found 98662.

23.    DefendantDefendants Swiss Hotels 786, L.L.P., JC Inn, and Samjoo Properties will be collectively referred to herein as "Franchisee" "Ramada FranchiseeFranchisees" or "Franchisee DefendantDefendants."

24.    Wyndham Defendants and Franchisee Defendants will be referred to collectively as "Defendants."

6

**JURISDICTION AND VENUE**

25.    This Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the TVPRA.

26.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because one or more Defendants reside in this district ~~and all Defendants are resident of New Jersey for purpose of venue under 28 U.S.C. §§ 1391(c)~~.

~~20.    Venue is also proper in this Court pursuant to 28 U.S.C. §§ 1391(b)(2) because a substantial part of the events or omissions giving rise to the clai occurred in the Districs of New Jersey.~~

27.    ~~The~~All Wyndham Defendants ~~all mainstains their~~have the same principal place of business, which is in Parsippany, New Jersey, within the District of New Jersey. Corporate activities related to the operation of ~~each of~~ the Subject ~~Ramada Inn~~Hotels occurred at this New Jersey headquarters~~, and documents related to~~. Therefore, each of the ~~Subject Ramada Inn are stored and maintained at this~~Wyndham Defendants is a resident of the District of New Jersey ~~headquarters~~for the purpose of § 1391(b)(1).

28.    Each of the Wyndham Defendants participated in a joint venture operating the Subject Hotels from a central location at the Wyndham corporate offices in Parsippany, New Jersey, within this district. On information and belief:

- The relationship between the Wyndham Defendants was centered at the Wyndham corporate offices in the District of New Jersey.

- The Wyndham Defendants signed agreements with one another related to the Subject Hotels from Wyndham corporate offices in the District of New Jersey.

- The Wyndham Defendants exercised joint control over operations of the Subject Hotels from a central location at Wyndham corporate offices in the District of New Jersey.

- The Wyndham Defendants distributed revenue earned from the Subject Hotels among themselves from Wyndham corporate offices in the District of New Jersey.

- The Wyndham Defendants developed policies for the Subject Hotels from Wyndham corporate offices in the District of New Jersey.

- The Wyndham Defendants communicated with one another regarding operation of the Subject Hotels from Wyndham corporate offices in the District of New Jersey.

29. Under 28 U.S.C. § 1391(c)(2), Franchisees are residents of New Jersey for the purpose of § 1391(b)(1) because the Court has personal jurisdiction over each of the Franchisees.

30. Under § 1391(d), Franchisees are residents of New Jersey for the purpose of § 1391(b)(1) because, if the District of New Jersey was a separate state, Franchisees' contacts with the district would be sufficient to subject them to personal jurisdiction.

31. Plaintiff's claims against ~~of the Franchisee Defendant~~Franchisees arise out of ~~Franchisee Defendant's~~Franchisees' contacts with New Jersey through ~~it franchuising relationship with the Wyndham Defendants. These franchising~~ Franchisees' relationships ~~were centeres at~~with the Wyndham ~~Defendants'~~Defendants, who have their principal place of business in the District of New Jersey. ~~The Franchisee Defendant's~~Franchisees' participation in a venture with the Wyndham Defendants operating ~~its respective hotel~~the Subject Hotels occurred, in substantial part, in New Jersey~~. For example~~ because upon information and belief:

- ~~Upon information and belief, each Franchise Defendant~~Franchisees actively sought out a franchising relationship by contacting the Wyndham Defendants in New Jersey;

- Franchisees acknowledged that the negotiation, execution, and acceptance of the franchising agreements occurred in the District of New Jersey;

- Franchisees each agreed that their ongoing performance of the franchising agreements would take place, in part, in the District of New Jersey;

- The franchising ~~agreement~~agreements had a choice of law provision selecting the law of New Jersey as the governing law;

8

c. Franchisee Defendant agreed to resolve all disputes with the Wyndham Defendants by mediation, arbitration and/or litigation in New Jersey.

d. Franchise Defendant agreed to submit all notices required under the franchising agreement to the Wyndham Defendants in New Jersey.

e. The Wyndham Defendants dictated rules and policies related to operation of the Subject Ramada Inn, including those related to safety, security, human traffickin, employee training and response, from their principal place of business in New Jersey.

- The rules and policies that the Wyndham Defendants adopted required Franchisee DefendantThe franchising agreements required Franchisees to report information to their headquartersthe Wyndham Defendants in New Jersey, including information about all incidents involving safety, security, public relations, or serious injuryinjuries to persons or property that occur at, or involve, the Subject Ramada InnHotels, including those involving sex trafficking victims like Jane Doe (S.B.C.);

- Franchisee DefendantFranchisees agreed to submit all notices required under the franchising agreements to the Wyndham Defendants in the District of New Jersey;

- Franchisees were required to attend training and meetings in New Jersey;

- The Wyndham Defendants dictated policies related to safety, security, human trafficking, employee training and Franchisees' responses, as well as other subjects from their principal place of business in the District of New Jersey;

- Franchisees had an ongoing obligation to participate in centralized programs operated by the Wyndham Defendants from their principal place of business in the District of New Jersey;

i. Franchisee Defendant utilized centralized customer feedback and complaint resolution system managed by the Wyndham Defendants from New Jersey, and the Wyndham Defendants and Franchisee Defendant coordinated efforts to analyze and respond to guest feedback.

j. Franchisee Defendant's employees received training and operational guidelines from the Wyndham Defendants, with key training materials being developed and distributed from New Jersey, particularly in the areas of safety and anti-trafficking protocols. Upon information and belief, each Franchisee Defendant was required to attend training in New Jersey.

- Franchisees were required to purchase insurance on behalf of one or more New Jersey entities (the Wyndham Defendants);

9

- Reservation information for rooms at the Subject ~~Ramada Inn~~Hotels passed through a system operated and managed by the Wyndham Defendants from their principal place of business in New Jersey;

- Payment information for rooms at the Subject ~~Ramada Inn~~Hotels passed through a system operated and managed by the Wyndham Defendants in New Jersey;

- The ~~benefit~~benefits that ~~Franchisee Defendant~~Franchisees received from room rentals ~~was~~were governed by the New Jersey franchising ~~agreement.~~agreements;

- ~~Franchisee Defendant~~Franchisees agreed to make all payments due under the franchising ~~agreement~~agreements at the Wyndham Defendants' principal place of business in the District of New Jersey;

- ~~Franchisee Defendant's operation~~Franchisees' operations of the Subject ~~Ramada Inn was~~Hotels were controlled and/or influenced by many policies set and enforced by the Wyndham Defendants from their principal place of business in Parsippany, New Jersey; and

- p. ~~Franchisee Defendant was required to purchase insurance for the New Jersey based Wyndham entities related to operation of the Subject Ramada Inn.~~

- Franchisees signed a software licensing agreement with the Wyndham Defendants for the property management software the Wyndham Defendants required Franchisees to use when operating the Subject Hotels, including, but not limited to, when booking rooms at the hotels and processing payments for those rooms. Franchisees agreed to file any lawsuit arising from the licensing agreement in the Eastern District of New Jersey and waived personal jurisdiction and venue objections.

32. Franchisee Defendants were Wyndham corporate affiliates who participated in a joint venture with the Wyndham Defendants centered in the District of New Jersey as described above, **and** parties to franchising agreements and management agreements with the Wyndham Defendants, thereby operating the Subject Hotels in substantial part, in New Jersey, as described above.

33. Upon information and belief, ~~each Franchisee Defendant~~Franchisees also contractually consented to jurisdiction in the District of New Jersey.

## STATEMENT OF FACTS

I.    **Jane Doe (S.B.C.) is a Survivor of Unlawful Sex Trafficking at Hotels Owned, Operated, Managed, and Controlled by Defendants.**

34.    Jane Doe (S.B.C.) is a survivor of sex traffickingmet her trafficker in the fall of 2011 at an Alcoholics Anonymous meeting. Shortly thereafter, she entered into what she believed was a romantic relationship with her trafficker, having no reason to suspect she would be forced into a life of commercial sex. Aware from the outset that Jane Doe (S.B.C.) struggled with addiction, her trafficker introduced her to heroin, to which she quickly became addicted. Through a combination of drug dependency, emotional manipulation by someone she believed to be her life partner, and acts of violence, Jane Doe (S.B.C.) was forced into engaging in commercial sex acts from approximately October 2011 through April 17, 2015. The exploitation she endured left Jane Doe (S.B.C.) in fear for her life and suffering from an addiction that continues to affect her to this day.

35.    At various times between October 1, 2011 through August 7, 2012, Jane Doe (S.B.C.) was continuously and unlawfully trafficked at the Ramada by Wyndham SeaTac Airport hotel located at 16720 International Blvd., Seattle, WA 98188 ("Subject Ramada"). Jane Doe (S.B.C.) was trafficked through force, fraud, and coercion by her trafficker and was required to engage in numerous commercial sex acts for his financial benefit at the Subject Ramada.

36.    At various times between September 1, 2012 through October 4, 2013, Jane Doe (S.B.C.) was trafficked continuously from November 2012 through December of 2016. Specifically, Jane Doe (S.B.C.) wasand unlawfully trafficked at the Howard Johnson by Wyndham hotel located at 9201 NE Vancouver Mall Dr, Vancouver, WA 98662 ("Subject Howard Johnson"). Jane Doe (S.B.C.) was trafficked from January 2013 through Decemberthrough force,

11

fraud, and coercion by her trafficker and was required to engage in numerous commercial sex acts for his financial benefit at the Subject Howard Johnson.

37.    At various times between April 1, 2014 at the following location:through July 31, 2014, Jane Doe (S.B.C.) was continuously and unlawfully trafficked at the Super 8 by Wyndham Kelso Longview Area hotel located at 250 S Kelso Dr., Kelso, WA 98626 ("Subject Super 8"). Jane Doe (S.B.C.) was trafficked through force, fraud, and coercion by her trafficker and was required to engage in numerous commercial sex acts for his financial benefit at the Subject Super 8.

Ramada located at 16720 International Blvd, Seattle, WA 98188.

38.    The Subject Ramada, Subject Super 8, and Subject Howard Johnson will be referred to collectively as the "Subject Hotels."

39.    Between October 1, 2012 through July 31, 2014, Jane Doe (S.B.C.) was trafficked countless times at the Subject Hotels.

40.    Jane Doe (S.B.C.)'s trafficking's sexual exploitation repeatedly occurred in rooms of this Holiday Inn locationthe Subject Hotels and was facilitated by IHGthe Wyndham Defendants and Franchisee DefendantDefendants. She was repeatedly harbored, maintained, provided, and solicited, and forced to engage in commercial sex at the subject locations. causing her to engage in commercial sex at the Subject Hotels.

3.    Her trafficker controlled her by manipulating Jane Doe into believing that he cared for her and threatened her to leave her with nothing if she did not engage in commercial sex acts for his financial benefit. Her trafficker constantly threathened her to do what he said.

4.    Her traffickers posted advertisements of her for commercial sex services online without her consent.

12

5.    Her trafficker engaged in a pattern of control and intimidating behavior that cause Jane Doe (S.B.C.) to believe she would be harmed if she did not comply with his ongoing demand that she engage in commercial sex for his financial benefit.

41.    Jane Doe (S.B.C.) did not want to engage in commercial sex acts but felt as if she had no choice but to comply with her trafficker's demands.

42.    Jane Doe (S.B.C.) was not allowed to keep any of the money she made.

7.    Jane Doe (S.B.C.) was repeatedly trafficked in Defendants' hotel and each Defendant facilitated her trafficking.

8.    Jane Doe (S.B.C.)'s trafficking has profound effects on her, consistent with "red flags" of trafficking that are well-recognized in the hospitality industry. These effects were obvious and apparent to the staff and management of the subject hotel including effects on Jane Doe (S.B.C.)'s appearance, demeanor, movements throughout the hotel, and her interactions with her traffickers, hotel staff, and others. Observing these effects provided Defendants with notice that Jane Doe (S.B.C.) was being continually subjected to coercion, control, and exploitation.

9.    Jane Doe (S.B.C.) remained under the continuous control of her traffickers through at least December of 2014.

43.    During the period thatThere were obvious signs that Jane Doe (S.B.C.) was being trafficked at the Subject Hotels such that the Wyndham Defendants and Franchisee Defendants knew or, through the exercise of reasonable diligence should have known, that they were benefiting from a venture causing her sexual exploitation.

44.    Some of the obvious signs of Jane Doe (S.B.C.)'s trafficking at the Subject Hotels included the fact that she and her trafficker would stay for extended periods—typically at least two to four weeks at a time—before leaving for a similar length of time and then returning to repeat

13

the same pattern. The hotel rooms were paid for with prepaid cards, and instead of booking the full stay up front, the rooms were extended one day at a time at the front desk with cash. The do not disturb sign was consistenly placed on the doors throughout each stay, and housekeeping was rarely allowed to enter, despite constant requests for fresh towels and linens. Several different men who were not hotel guests visited Jane Doe (S.B.C.)'s rooms daily for short periods of time. While she was with a john, her trafficker would loiter in the hallways, lobbies, or parking lots of the Subject Hotels. In addition, her trafficker sold drugs out of the hotel rooms and parking lots.

45.    During Jane Doe (S.B.C.)'s trafficking period, there were two types of Wyndham properties: corporate properties operated by corporate affiliates and franchised properties owned by third-party franchisees and operated in conjunction with Wyndham affiliates and as agents of Wyndham affiliates.

46.    At all relevant times, the Subject Hotels were hotels branded by the Wyndham Defendants.

47.    At all relevant times, Franchisee Defendants owned, operated, and managed the Subject Hotels and employed the staff at the Subject Hotels through the franchising system of the Wyndham Defendants. Specifically, Swiss Hotels owned, operated, and managed the Subject Ramada and employed the staff at the Subject Ramada through the franchising system of the Wyndham Defendants; JC Inn owned, operated, and managed the Subject Super 8 and employed the staff at the Subject Super 8 through the franchising system of the Wyndham Defendants; and Samjoo Properties owned, operated, and managed the Subject Howard Johnson and employed the staff at the Subject Howard Johnson through the franchising system of the Wyndham Defendants.

48.    At all relevant times, the Wyndham Defendants were directly involved in the relevant operations of the Subject Hotels and exercised systemic control over Franchisee

14

Defendants with respect to operation of the Subject Hotels such that Franchisee Defendants were the Wyndham Defendants' actual agents for operation of the Subject Hotels. The Wyndham Defendants also retained control over aspects of the operations of the Subject Hotels directly related to the claims of Jane Doe (S.B.C.). Further, the Wyndham Defendants together with Franchisee Defendants, acted as the joint employer for the staff of the Subject Hotels.

49.    The trafficker of ~~Jane Doe (S.B.C.) was trafficked at the Subject Ramada Inn, there were obvious signs of the activity associated with her trafficking. Thourghout this period, Jane Doe (S.B.C.) was under the control of the same trafficker. This trafficker used a consistent *modus operandi* while trafficking~~ Jane Doe (S.B.C.) and other ~~victims. This trafficker imposed strict rules on Jane Doe (S.B.C.) and other victims and followed patterns consistent with how~~ sex traffickers ~~typically operate in hotels. Thus, the trafficking activity at each of the Subject Ramada Inn resulted in obvious and recurring signs that matched "red flags" of~~ frequently used the Subject Hotels for sex trafficking ~~recognized by the hotel industry and each of the Defendants~~.

~~11.    From between January 2013 to December 2014, Jane Doe (S.B.C.) was trafficked an incalculable number of timed at the Subject Ramada Inn.~~

There were obvious signs that Jane Doe (S.B.C.) was being trafficked at the Subject ~~Ramada Inn~~Hotels such that the Wyndham Defendants and Franchisee ~~Defendant~~Defendants knew or, through the exercise of reasonable diligence should have known, that they were participating in a venture causing her sexual exploitation.

~~13.    Some of the obvious signs of Jane Doe (S.B.C.)'s trafficking at the Subject Ramada Inn included the fact that hotel rooms would be paid for in cash, Jane Doe (S.B.C.)'s trafficker would be present with Jane Doe at check in.  Extra towels and clean sheets were frequently requested. Housekeeping was not allowed in the room. There was constant heavy foot traffic in~~

~~and out of her room involving men who were not hotel guests.  These individuals entered and left at unusual hours and were present at the hotel for brief periods of time. Jane Doe had a physical altercation with a John and her screams were heard from the hallway.~~

~~14.    At relevant times, Franchisee Defendant owned, operated, and managed the Subject Ramada Inn and employed the staff at the Subject Ramada Inn through the franchising system of the Wyndham Defendants.~~

~~15.    At all relevant times, the Wyndham Defendants were directly involved in the relevant operations of the Subject Ramada Inn and exercised systemic control over the Franchisee Defendant with respect to operation of the Subject Ramada Inn such that the Franchise Defendant were the Wyndham Defendants' actual agents for operation of the Subject Ramada Inn. The Wyndham Defendants also retained control over aspects of the operations of Subject Ramada Inn directly related to the claims of Jane Doe (S.B.C.).~~

~~16.    The trafficker of Jane Doe (S.B.C.) and other sex traffickers frequently used Wyndham branded hotels for sex trafficking with approval, acquiescence, and/or implicit support of Defendants and their employees and agents, including the staff of the Subject Ramada Inn named herein.~~

**II.    The Hotel Industry's Role in Sex Trafficking and Defendants' Knowledge of the Problem.**

50.    The widely known and pervasive relationship between sex trafficking and the hotel industry necessarily shapes what ~~Wyndham~~ Defendants knew or should have known regarding the trafficking ~~at their hotel properties, the specific trafficking activity that resulted in the trafficking~~ of Jane Doe (S.B.C.) ~~was pervasive and appatent~~ at the Subject ~~Ramada Inn named herein~~Hotels.

16

51.     Today, sex slavery is pervasive in the United States, and hotels are the primary place where it happens.[6] For years, sex traffickers have been able to reap ~~their~~enormous profits with "little risk when attempting to operate within hotels."[7] In 2014, 92 percent of calls to the Human Trafficking Hotline involved reports of sex trafficking taking place at hotels.[8] Hotels have been found to account for over 90 percent of places where commercial exploitation of children happens most often.[9] ~~risk when attemptin to operate within hotels. In 2014, 92% of calls received by the National Human Trafficking Hotline involved reports of sex trafficking taking place at hotels. Hotels have been found to account for over 90% of the commercial exploitation of children.~~

52.     Because of this link between hotels and sex trafficking, government agencies and non-profits have devoted significant efforts to educating the hotel industry, including Defendants, on best practices for identifying and responding to sex trafficking.[10]

53.     Multiple agencies and organizations who actively combat sex trafficking, including the United States Department of Homeland Security, the National Center for Missing and Exploited Children, the Polaris Project, the Texas Attorney General, Love 146, and ECPAT, among

---

[6] "This is not only a dominant issue, it's an epidemic issue." *See* Jaclyn Galucci, Human Trafficking is an Epidemic in the U.S. It's Also Big Business, Fortune, April 2019, at https://fortune.com/2019/04/14/human-sex-trafficking-usslavery/ citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council. "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere." *Id.*

[7] *See* Human Trafficking in the Hotel Industry, Polaris Project, February 10, 2016, at https://polarisproject.org/blog/2016/02/human-trafficking-in-the-hotel-industry/.

[8] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hospitality Industry*, CORNELL HOSPITALITY REPORT, 15(15), 3-10 (2015), available at: https://humantraffickingsearch.org/wp-content/uploads/2019/05/Adoptingthecode.report.cornell.pdf

[9] Erika R. George & Scarlet R. Smith, *In Good Company: How Corporate Social Responsibility Can Protect Rights and Aid Efforts to End Child Sex Trafficking in Modern Slavery*, 46 N.Y.U. J. INT'L L. & POL. 55, 92 (2013).

[10] *See, e.g.*, Department of Homeland Security, *Blue Campaign Toolkit*, available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf; National Center for Missing & Exploited Children, *Child Sex Trafficking Overview*, available at: https://www.missingkids.org/content/dam/missingkids/pdfs/CST%20Identification%20Resource.pdf; Love 146, *Red Flags for Hotel and Motel Employees*, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf; Texas Attorney General, Human Trafficking Red Flags, available at: https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf .

others, have established recommended policies and procedures for recognizing the signs of sex trafficking.[11] ~~This resulted in the development of "red flags"~~

54. Widely recognized signs of sex trafficking, ~~Law enforcement agencies,~~ which can be observed by hotel staff and ~~other organizations with subject matter expertise identified specific indicators~~which Defendants were made aware of, include but are not limited to:

    a. Individuals showing signs of ~~the presence~~fear, anxiety, tension, submission, and/or nervousness;

    b. Individuals showing signs of ~~sex trafficking at~~physical abuse, restraint, and/or confinement;

    c. Individuals exhibiting evidence of verbal threats, emotional abuse, and/or being treated in a ~~hotel~~demeaning way;

    d. Individuals showing signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;

    e. Individuals lacking freedom of movement or are constantly monitored;

    f. Individuals avoiding eye contact and interaction with others;

    g. Individuals having no control over or possession of money or ID;

    h. Individuals dressing inappropriately for their age or have lower quality clothing compared to others in their party;

    i. Individuals having few or no personal items—such as no luggage or other bags;

    j. Individuals appearing to be with a significantly older "boyfriend" or in the company of older males;

    k. A group of girls appearing to be traveling with an older female or male;

    l. A group of males or females with identical tattoos in similar locations. This may indicate "branding" by a trafficker;

---

[11] *See, e.g.*, Department of Homeland Security, *Blue Campaign Toolkit*, available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf; National Center for Missing & Exploited Children, *Child Sex Trafficking Overview*, available at: https://www.missingkids.org/content/dam/missingkids/pdfs/CST%20Identification%20Resource.pdf; Love 146, *red Flags for Hotel and Motel Employees*, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf; Texas Attorney General, Human Trafficking Red Flags, available at: https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf .

m. Drug abuse or frequent use of "party drugs" such as GHB, Rohypnol, Ketamine, MDMA (Ecstasy), Methamphetamines, Cocaine, and Marijuana;

n. Possession of bulk sexual paraphernalia such as condoms or lubricant;

o. Possession or use of multiple cell phones; and

p. Possession or use of large amounts of cash or pre-paid cards.[12]

55. The signs of sex trafficking in a hotel environment follow well-established patterns and can easily be detected by appropriately trained staff. ~~From check in to check out, there are indicators that traffickers and their victims routinely exhibit during their star at the hotel. These recurring indicators are known as "red flags" of sex trafficking.~~

~~21. Recognized "red flags" of sex trafficking that are considered general indicators of trafficking that can be observed by staff throughout a hotel[11] include:~~

- ~~individuals who appear to be with a significantly older "boyfriend" or in the company of much older males;~~
- ~~a group of girls who appears to be traveling with an older female or male;~~
- ~~a group with similar tattoos, which can indicate "branding" by a trafficker;~~
- ~~individuals showing fear, anxiety, tension, submissiveness and/or nervousness;~~
- ~~individuals who seem disoriented;~~
- ~~individuals showing signs of physical abuse;~~
- ~~individuals showing signs of restrain or confinement;~~
- ~~individuals showing signs of malnourishment, poor hygiene, fatigue, or sleep deprivation;~~
- ~~individuals with signs of untreated illness or injuries;~~
- ~~individuals who appear to lack freedom of movement;~~
- ~~individuals who are being constantly monitored and/or escorted around the hotel;~~
- ~~individuals who avoid eye contact;~~
- ~~individuals who avoid interactions with others;~~
- ~~individuals who are not in possessions of their own identification;~~
- ~~individuals who have few or no personal possessions;~~
- ~~individuals who dress provocatively;~~
- ~~a high volume of men who are not registered guests entering and exiting a room; and~~
- ~~individuals who wait in common areas while other men frequent the room.~~

---

[12] *Id.*

22.   Recognized "red flags" of sex trafficking that can be detected by front-desk staff and hotel security[12] include:

- patrons appeared distressed at check-in;
- the same person reserving multiple rooms;
- rooms paid for with cash or prepaid cards;
- rooms are paid for one day at a time;
- requests for isolated rooms or rooms close to an exit;
- use of hotel computers for adult oriented or sexually explicit websites;
- patrons not forthcoming about identifying information when registering;
- individuals checking in but then leaving a room only infrequently, not at all, or at odd hours;
- individuals lack identification;
- car in the parking lot is parked so license plate is not visible;
- individual present who avoids eye contact, does not communicate, and is accompanied by someone else who appears to speak for them; and
- individual appears to be giving scripted responses.

23.   Recognized "red flags" of sex trafficking that can be detected by housekeeping, maintenance, and room service staff[13] include:

- constant use of the "Do Not Disturb" sign;
- requests for housekeeping services (towels, linens, etc.) but denying staff entry into the room;
- refusal of cleaning services for multiple days;
- excessive amounts of cash in a room;
- presence of multiple computers, cell phones, pagers, or other technology;
- the same person reserving multiple rooms;
- individuals leaving the room infrequently, not at all, or at unusual hours;
- individuals loitering in hallways or appearing to monitor a room;
- excessive alcohol in a room;
- illegal drugs in a room;
- evidence of pornography;
- excessive number of people staying in a room;
- guests with few or no personal possessions in room;
- provocative clothing and shoes;
- constant flow of men into a room at all hours; and excessive amounts of sex paraphernalia in rooms.

24.   The signs of sex trafficking in a hotel environment follow well established patterns and can easily be detected by appropriately trained staff. Tool kits specific to the hotel industry

have been developed, which help hotel staff in every position identify and respond to signs of sex trafficking.[13] From check-in to check-out, there are indicators that traffickers and their victims routinely exhibit during their stay at a hotel.

25.     ~~The organizations who developed these "red flags," then educated and trained the hotel industry about them. For example, the United States Department of Homeland Security's Blue Campaign initiative issued specific guidance to the United States hotel industry through a "Hospitality Toolkit" describing human trafficking warning signs that could be detected by various categories of hotel staff.~~

26.     ~~Before Jane Doe (S.B.C.)'s trafficking at the Subject Ramada Inn, each Defendant was educated and trained on these "red flags" of sex trafficking. The organizations that developed these "red flags" identified them as indicators specific to sex trafficking in a hotel environment. At all relevant times, each Defendant acknowledged and recognized these "red flags" specifically as signs of sex trafficking and instructed and trained their staff to identify and investigate them as signs of sex trafficking when observed in the hotel.~~

56.     <u>Defendants were aware or should have been aware of these signs of sex trafficking when operating, controlling, and managing the Subject Hotels, when enacting and enforcing policies and procedures applicable to those hotels, and when training, educating, and supervising the staff of those hotels.</u>

57.     The relationship between a pimp and a prostitute is inherently coercive, and the United States Department of Justice and other agencies and organizations have recognized that most individuals involved in prostitution are subject to force, fraud, or coercion.[14] It is also well

---

[13] Department of Homeland Security, *Blue Campaign Toolkit*, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.
[14] *See, e.g.*, *A National Overview of Prostitution and Sex Trafficking Demand Reduction Efforts, Final Report*, https://www.ojp.gov/pdffiles1/nij/grants/238796.pdf; *Prostitution and Trafficking in Women: An Intimate*

understood, and specifically trained in hotel safety training courses, that "prostitution," "sex trafficking," and "child sex trafficking" involve a single common denominator, the exchange of sex for money.

58.     The definition of sex trafficking in the TVPRA under 18 U.S.C. § 1591(a)(1) incorporates the definition of commercial sex act. Defendants may attempt to draw a distinction between commercial sex or prostitution and sex trafficking, but they have long understood the practical and legal association between commercial sex and sex trafficking in a hotel environment. Thus, Defendants knew or should have known that signs of commercial sex (prostitution) activity in their hotels were in fact signs of sex trafficking.[15]

59.     All Defendants were aware or should have been aware of these signs of sex trafficking when operating, controlling, and managing their hotel properties, when enacting and enforcing policies and procedures applicable to those hotels, and when training, educating, and supervising the staff of that hotelthose hotels.

30.     There were also well-established practices for hotels to avoid the facilitation of sex trafficking. For example, End Child Prostitution and Trafficking ("ECPAT USA") has identified hotel-specific best practices for preventing sex trafficking, such as (1) not permitting cash payments; (2) requiring vehicle information and photo id at check-in; (3) monitoring online sex ads such as Craigslist and Backpage for their hotel name and pictures of the rooms; (4) changing Wi-Fi passwords in rooms and cafes regularly and blocking websites frequently used to advertise commercial sex on hotel Wi-Fi; (5) watching for a trend of visitors to the same room; (6) being aware of rooms with excess condoms, lubricants, and towels; (7) requiring all visitors to be logged,

---

*Relationship*, https://www.ojp.gov/ncjrs/virtual-library/abstracts/prostitution-and-trafficking-women-intimate-relationship.
[15] *Id.*

~~including guest name, visitor name, arrival time, departure time, and room number; and (8)~~

~~developing a protocol for response to indicia of trafficking activity.~~

60.    The most effective weapon against sexual exploitation and human trafficking is education and training.[16] As ECPAT concluded:

> The hospitality industry is in a unique position to identify and report human trafficking due to its perceived anonymity. Traffickers believe they can go unnoticed while exploiting victims across the globe in hotels— ranging from budget properties to luxury resorts. From check-in to check-out, there are a number of indicators victims and exploiters exhibit during the time they are on a hotel property.[17]

61.    This same conclusion is echoed by others who seek to eliminate <u>or minimize</u> sex trafficking in the hospitality industry, including the American Hotel Lodging Association: "Hotel employees who have undergone training are more aware of trafficking when it happens – and are more willing to report it – than those who have not been trained.[18] In reference to companies like Defendants, ECPAT observed: "If they do nothing to raise awareness or to prevent child trafficking, they risk becoming an indirect and unintentional conduit for the abuse that takes place."

62.    Given the prevalence of ~~sex~~<u>human</u> trafficking in hotels and the abundance of information about how ~~franchisors,~~ owners, operators, and hotel employees can identify and respond to this trafficking, it has become apparent that the decision of a hotel chain to continue generating revenue from traffickers without taking necessary steps to identify and prevent trafficking in its hotels is a conscious decision to financially benefit by ~~supporting and~~ facilitating unlawful sex trafficking.

---

[16] Polaris, *Recognizing Human Trafficking*, https://polarisproject.org/recognizing-human-trafficking/ (last visited April 13, 2023).

[17] ECPAT USA, *Training for Hotel Associates*, https://www.ecpatusa.org/hotel-training (last visited April 13, 2023). *See also* Caroline L. et al., *Sex Trafficking in the Tourism Industry*, J. Tourism Hospit. (2015), https://www.longdom.org/open-access/sex-trafficking-in-the-tourism-industry-2167-0269-1000166.pdf.

[18] AHLA, *Free Online Training*, https://www.ahla.com/issues/human-trafficking (last visited April 13, 2023).

63.    ~~The Wyndham~~ Defendants ~~and Franchisee Defendant had a responsibility to adopt, implement, and adequately enforce policies to avoid facilitating sex trafficking and to train hotel staff to identify and respong to "red flags" of sex trafficking.~~

~~35.    Unfortunately for Jane Doe (S.B.C.), the Wyndham Defendants and Franchisee Defendant~~ have failed, at all levels, to take appropriate action in response to their knowledge ~~of widespread and ongoing~~regarding human trafficking in their hotels. Instead, ~~they~~Defendants have continued financially benefiting ~~by~~from providing venues for the sexual exploitation of victims like Jane Doe (S.B.C.).

### III.    Sex Trafficking Has Long Been Prevalent at ~~Defendants' Hotel~~ Wyndham Properties ~~and Defendants Have Known About It~~.

64.    Defendants' actual knowledge is *not* limited to a general awareness of the problem of sex trafficking in the hotel industry. ~~Each of the~~ Defendants ~~has~~have also known, or should have known, since well before Jane Doe (S.B.C.)~~'s trafficking~~ was trafficked at the Subject Hotels, that sex trafficking ~~was ongoing and widespread~~is endemic at Wyndham ~~branded~~ properties, including the ~~properties where Jane Doe (S.B.C.) was trafficked~~ Subject Hotels.

### A.    Sex Trafficking at Wyndham ~~Branded Hotels~~Properties was ~~well~~Well Known by ~~Wyndham~~All Defendants.

~~37.    Upon information and belief, each of the Defendants monitored criminal activity occurring at Wyndham branded hotels and were aware of activity indicating commercial sex, sex trafficking and/or related crimes occurring at those branded hotels, including the specific hotel properties where Jane Doe (S.B.C.) was trafficked.~~

65.    Upon information and belief, at all relevant times Wyndham has adopted a centralized approach to trafficking-related issues at all its branded properties. Wyndham's public statements confirm that it knew sex trafficking was a problem at its hotels and that it retained

control over the response of its branded hotels to sex trafficking. Wyndham has recognized it has a "critical role in increasing awareness and prevention" of sex trafficking in its hotels.[19] It has publicly claimed to be taking steps to avoid facilitating sex trafficking in its hotels since at least 2011.[20] However, Wyndham has refused to publish reports to show its progress on the EPCAT goals to combat sex trafficking in hotels.[21]

66.    Unfortunately, while Wyndham's statements reflect actual knowledge of the problem of sex trafficking, they reflect only a public relations strategy rather than a genuine commitment to stop facilitating trafficking. Emails among company executives reflect a hesitance to commit to meaningful anti-trafficking measures and a desire to avoid negative publicity without any significant burden.[22]

67.    The problem of sex trafficking at Wyndham branded properties was sufficiently well known that, in 2011, there was a public petition with thousands of signatures to stop Wyndham hotels from supporting child sex exploitation at Wyndham properties. Although the Wyndham brand publicly committed to take steps to stop facilitating trafficking, this promise proved empty; the Wyndham brand has been named a "major contributor to sexual exploitation" and part of the "dirty dozen list" by the National Center on Sexual Exploitation.[23]

68.    In the past twenty years, Wyndham-branded properties have been mentioned in at least two hundred criminal trafficking cases filed by the federal government.[24]

---

[19] https://hotelsmag.com/news/wyndham-implements-anti-prostitution-training/
[20] https://hotelsmag.com/news/wyndham-implements-anti-prostitution-training/
[21] https://thecode.my.salesforce-sites.com/apex/MemberProfilenew?id=0019000000GxgPrAAJ&year=2023
[22] https://journalism.berkeley.edu/projects/should-hotel-chains-be-held-liable-for-human-trafficking/ ("Scott McLester, Wyndham's former general counsel and chief compliance officer, wrote in an e-mail to the company's then C.E.O., Stephen Holmes, 'Even though we have been hesitant to commit to everything the [EPCAT] Code was asking for, the issue is not going away and it's starting to impact commercial relationships.' McLester added that the organization's 'concern about being 'bullied' into signing the Code is outweighed by the relative harmlessness of the Code itself.'")
[23] https://endsexualexploitation.org/wyndham/
[24] https://journalism.berkeley.edu/projects/should-hotel-chains-be-held-liable-for-human-trafficking/

25

69.     Information that has become public through news stories establishes the entrenched and pervasive nature of the Wyndham ~~hotels~~Defendants' role in providing a venue where sex trafficking has continued unabated for years. Upon information and belief, the Wyndham Defendants ~~and Franchisee Defendant~~ monitored news stories and online reviews for indicia of criminal activity, including sex trafficking at their branded properties. Examples of news stories confirm the widespread presence of sex trafficking, prostitution, and related criminal activity at Wyndham branded hotels ~~include~~, including:

- ~~In September 2009, police discovered a prostitution ring at the Ramada Inn on Roosevelt Boulevard in Philadelphia. Police looking for a defendant in a drug case discovered 11 women. Some of the women reported that they were being held against their will and sexually assaulted."[28]~~

- ~~In May 2010, Waterloo, Iowa Police followed used a Craigslist ad and made arrangements to meet females for sex at the local Ramada Inn. Police arrested two.[29]~~

- ~~In February 2010, police in Burbank, California arrested three at the Ramada Burbank Airport Hotel on charges of prostitution as part of their effort to curb the sex trade..[30]~~

- ~~In June 2012 Beaverton, Oregon police made an arrest at a Ramada Inn Northeast Portland in connection with a nationwide FBI sex trafficking sting.[31]~~

- ~~In July 2012, East Hartford's "Hot Spot Unit" conducted a sting at at the Ramada Inn on Roberts Street in Hartford, Connecticut where it arrested a man for promoting prostitution and 6 women on charges of prostitution.[32]~~

- ~~In January 2013 two women were arrested on suspicion of prostitution at the Ramada Inn Burbank in Burbank, CA.[33]~~

- ~~In April 2013, police found an underage girl in a room where prostitution was believed to be occurring at a Tampa, Florida Ramada Inn. A twenty-five-year-old woman fled the scene. She was later arrested on charges of procuring a person under 18 for the purpose of prostitution, deriving support from the proceeds of prostitution and renting space to be used for prostitution.[14] She was later convicted of charges of trafficking three underage teens, including a 16-year-old girl and a 14-year-old boy.[34]~~

- ~~In November 2013, an investigation into prostitution ring, led to the arrest of five~~

people and the seizure electronic equipment at the Ramada Inn in La Vergne, Tennessee.[35]

- In March 2014, undercover police raided a room at the Ramada Inn on Roosevelt Boulevard in Philadelphia arresting a woman for solicitation of prostitution and a man for suspected drug dealing.[36]

- In April 2014, police in Rock Hill, North Carolina, as part of a prostitution sting that netted five, made arrests at the Ramada Inn. In total the arrests included three women and two men.[37]

- In June 2014, the mother of a mentally ill woman who police say was killed after meeting for sex at a Ramada Inn in College Park, Maryland said her daughter was mentally ill and was pimped by men via computer ads."[38]

- In September 2014, police in Parsippany, New Jersey – the same city Wyndham maintains its principal place of business - arrested a man and a woman in at a Ramada Inn only 12 minutes from Wyndham's corporate office on charges of theft and prostitution.[39]

- In March 2015, police arrested a woman who was renting a room at the Ramada Inn in Wayne, New Jersey for prostitution.[40]

- In April 2015, a woman was arrested on prostitution and drug charges by an undercover police officer in a sting at a Whitehall, Pennsylvania Ramada Inn.[41]

- In August 2015, at least 20 people were arrested in a prostitution sting conduced at a Des Moines, Iowa Ramada by Wyndham as part of an operation that began as a result of complaints from local business owners and citizens.[42]

- In December 2015 Hanover County, North Carolina District Attorney issued an admonishment to a Ramada Inn on Market Street, Wilmington, North Carolina, among others, for, "repeated acts which create and constitute a breach of the peace, including but not limited to prostitution, assaults, fights, and discharging firearms.[43]

- In February 2016, a Franklin Tennessee Police Department used Backpage.com as part of a sting operation that lead to the arrest of a woman at the Ramada Inn on charges of prostitution, and possession of drug paraphernalia.[44]

a. In 2010, a California man was arrested for trafficking a 16-year-old victim after being spotted by law enforcement with the minor at a Super 8 in California.[25]

---

[25] https://www.wired.com/2010/11/epps/

b.  In 2011, a man was sentenced for sex trafficking after he forced minor girls to engage in commercial sex for his financial benefit, including at a Super 8 Motel in Virginia.[26]

c.  In 2011, a man was sentenced to life for child sex trafficking for requiring a minor to perform commercial sex services more than 50 times over a 14-day period at a Florida Super 8 Motel.[27]

d.  In 2011, an MS-13 gang member was indicted for trafficking girls at a Super 8 Motel near Washington, D.C.[28]

e.  In 2012, four were indicted after forcing a 24-year-old woman to engage in commercial sex at Ohio hotels, including a Super 8.[29]

f.  In 2012, a man was arrested for attempting to entice a 15-year-old girl to engage in prostitution at a Super 8 Motel in Oklahoma.[30]

g.  In 2013, two were arrested for trafficking a juvenile girl at an Illinois Super 8.[31]

h.  In 2013, a man was arrested on human trafficking charges after he forced a woman to engage in commercial sex at hotels, including a Louisiana Super 8 Motel.[32]

i.  A man was sentenced to 21 years in prison for sex trafficking his 16-year-old girlfriend starting in August 2013 at two hotels in Dallas, including a Super 8 Motel.[33]

j.  In 2013, a man was arrested at a Super 8 in Rhode Island and charged with trafficking a 17-year-old girl at the motel.[34]

k.  In 2013, a Super 8 motel in Massachusetts was searched and a man was charged with sex trafficking of a 17-year-old developmentally disabled girl after staying with her at that hotel.[35]

---

[26] Gang member sentenced for sex trafficking in Prince William, News & Messenger (Manassas, Virginia) (November 4, 2011) https://plus.lexis.com/api/permalink/562d85d9-e662-4e4f-8f7f-67b52fa537e8/?context=1530671

[27] https://www.fbi.gov/jacksonville/press-releases/2011/ja011011.htm

[28] https://www.thepublicdiscourse.com/2011/10/4034/

[29] https://www.10tv.com/article/news/crime/crime-tracker/four-indicted-first-human-trafficking-case-franklin-county/530-36f713e6-5488-4465-90c0-7eb99504a635

[30] Man faces new sex-trafficking charges, Tulsa World (Oklahoma ) (March 9, 2013) https://plus.lexis.com/api/permalink/a9062a1a-76b4-4811-89ab-5b0b3c877a88/?context=1530671

[31] https://www.channel3000.com/news/local-news/2-women-accused-of-human-trafficking-at-motel/article_98edf1d4-d231-5ea1-a6b9-e71c83f44750.html

[32] https://www.endslaverytn.org/news/tenn-man-booked-in-human-trafficking-newsarticle

[33] https://www.ice.gov/news/releases/dallas-gang-member-sentenced-21-years-federal-prison-child-sex-trafficking-conviction

[34] https://turnto10.com/archive/new-details-in-ardrey-sex-trafficking-investigation

[35] https://www.providencejournal.com/story/news/crime/2013/09/14/20130914-missouri-man-charged-with-sex-trafficking-in-mass-teens-disappearance-ece/35397014007/

l.  In 2013, two pled guilty to sex trafficking charges after forcing a child to engage in commercial sex at Super 8 Motel in Texas.[36]

m.  In 2014, a sex trafficking task force arrested four in a Portland area sweep of a Super 8.[37]

n.  In 2014, two were charged with trafficking a 13-year-old girl at a Minnesota Super 8.[38]

o.  In 2014, a man was charged in connection with a Lansing, MI based sex trafficking ring involving four 15- to 18-year-old girls who would meet customers at the Super 8 in Lansing.[39]

p.  In 2015, a Texas man was arrested and charged with human trafficking and second degree kidnapping after a woman said she was forced to perform sexual acts and was being held against her will at a Baton Rouge Super 8.[40]

q.  In 2015, a LaGrange Kentucky Police Department's Special Investigation Unit discovered an alleged human trafficking and prostitution ring at a Super 8 motel involving a 16-year-old girl.[41]

r.  In 2016, two men were charged with human trafficking-related offenses after officers responded to a Super 8 Motel in Frederick, Maryland.[42] One was later sentenced to 25 years in prison for second-degree rape and three counts of human trafficking.[43]

s.  In 2017, a man faced human trafficking charges after a sting at a Super 8 in Harrisburg, PA.[44]

t.  In 2017, a man was accused of running a prostitution ring involving Alvin ISD minors out of a Lake Jackson, TX Super 8.[45]

---

[36] https://www.chron.com/news/article/two-plead-guilty-to-child-sex-trafficking-5000132.php
[37] https://www.centralmaine.com/2014/03/03/sex_trafficking_task_force_arrests_4_in_portland_area_prostitution_sting/
[38] https://www.grandforksherald.com/newsmd/moorhead-police-charge-two-with-sex-trafficking-13-year-old
[39] https://www.lansingstatejournal.com/story/news/local/2014/11/20/witnesses-face-lansing-man-charged-sex-trafficking-ring/70010754/
[40] https://www.wafb.com/story/29240032/texas-man-charged-with-human-trafficking-kidnapping-in-baton-rouge/
[41] https://www.lagrangenews.com/2015/10/03/alleged-human-trafficker-faces-charges/
[42] https://www.nbcwashington.com/news/local/two-charged-in-maryland-with-rape-human-trafficking-others/111815/
[43] https://www.fredericknewspost.com/news/crime_and_justice/courts/houston-man-sentenced-to-25-years-for-human-trafficking-in-frederick/article_81a5fa1e-598c-5431-b2f0-77dd49b1b545.html
[44] https://www.pennlive.com/news/2017/01/man_charged_with_human_traffic.html
[45] https://www.kgw.com/article/news/crime/man-accused-of-running-prostitution-ring-involving-alvin-isd-minors/285-424495364

u. In 2017, a sex trafficking operation was busted at a Super 8 in Lakeland, TN.[46]

v. In 2017, a Texas statewide sex trafficking ring shut down multiple hotels, including a Super 8 in Fort Worth.[47]

w. In 2018, authorities investigated a human trafficking case involving a 16 year old boy who was found at a Super 8 in Duson, LA.[48]

70. Upon information and belief, the Wyndham Defendants monitored criminal activity occurring at their branded hotels and were aware of activity indicating commercial sex trafficking or related crimes occurring at those branded hotels, including the Subject Hotels.

71. Reviews of Wyndham branded properties, which upon information and belief the Wyndham Defendants monitored regularly, also show both the pervasiveness of sex trafficking at their branded properties and the Wyndham Defendants' knowledge of same. For example:

a. An August 2008 review of a Wyndham branded property in Arizona states: "Woke in middle of night (2:30am) with loud party on 2nd floor with bodies slamming into walls, and looked out window to see hooker and pimp making deal with another man in pickup in the parking lot."[49]

b. A January 2010 review of a Wyndham branded property in Escondido, California states: "This is a hooker hangout, doors slaming at 3:00 AM, You will hear pimps on their cellphones outside in the middle of the night. Ladies arriving at 4:00 AM, Management MUST be aware this is going on and condone this. I expected John Walsh to show up with a film crew."[50]

c. A February 2010 review of a Wyndham branded property in Los Angeles, California states: "This place lacks security and there were drug dealers trying to push their products inside of the hotel. This place is Scary. The neighborhood was frightening and there were also prostitutes and homeless/addicts all over the place and renting rooms in the hotel. The desk guy looked at my friends attire (faux fur coat) and assumed he was a pimp and that we were prostitutes and seemed surprised that we had made reservations for more than one night. He kept giving us this strange smile... icky. This place left me with a bad feeling. If you want to stay here

[46] https://www.actionnews5.com/story/35657458/sex-trafficking-operation-busted-at-super-8-in-lakeland/
[47] https://tylerpaper.com/news/local/statewide-sex-trafficking-ring-shut-down-with-eight-arrests-including-some-tied-to-tyler/article_2db545e0-e48c-5c82-ace0-a7d27e746b96.html
[48] https://www.klfy.com/local/authorities-investigate-human-trafficking-case-involving-16-year-old-boy/
[49] https://www.tripadvisor.co/Hotel_Review-g60950-d74409-Reviews-Super_8_by_Wyndham_Tucson_Downtown_Convention_Center-Tucson_Arizona.html
[50] https://www.tripadvisor.com/Hotel_Review-g32358-d235407-i132418454-Super_8_Escondido-Escondido_California.html

to save a few bucks my advice is to utilize the buddy system whenever you leave your room to visit the vending machines... after checking in for the night that is probably the only thing you will feel even moderately safe doing. eek. I can deal with scary hotels but this place is a disaster waiting to happen."[51]

d. A June 2010 review of a Wyndham branded property in Virginia states: "The location is in a very unsafe place. There were junkies and prostitutes using the premises of the hotel."[52]

e. A July 2010 review of a Wyndham branded property in Texas states: "After a night out parking lot full had to park under drive thur in front of hotel no other space. Number One reason to not stay here HOOKERS!!! walking the parking lot, walking the sidewalks and feeder road roads in front of Motel. All hours of the day."[53]

f. An October 2011 review of a Wyndham branded property in Tennessee states: "Don't stay here unless you want drugs or a prostitute....or both. There were drunks running up the halls all night and the maid offered to have sex with my husband for money. When he refused, she then offered to sell him pills."[54]

g. A February 2012 review of a Wyndham branded property in Florida states: "This hotel should not even be listed as a choice to stay in. Upon check, 3 rooms from me was a sexual battery crime scene. Prostitutes and drug deals were going on all over the property. The room was filthy, smelled horrible and I wouldn't even touch the bed! This hotel is a LIVE IN hotel for Prostitutes, drug dealers and gangs!!!!! DO NOT STAY HERE!!"[55]

h. An April 2012 review of a Wyndham branded property in Virginia states: "Just beware, there are "escorts" who are constantly on the lookout for fresh meet. A pimp will knock on your door asking to use your cell to call his girlfriend. From then on, she will do the work."[56]

i. An April 2012 review of a Wyndham branded property in Texas states: "We have stayed in hotels all over the world and I have never had as terrible and frightening an experience as I had at this hotel. The place was crawling with prostitutes and seedy looking guys looking for prostitutes. We tried to stay here anyway, but the night manager started threatening us! In the end we had to call the police in order

---

[51] https://www.tripadvisor.com/Hotel_Review-g32655-d235134-Reviews-Super_8_by_Wyndham_Hollywood_La_Area-Los_Angeles_California.html

[52] https://www.expedia.com/Norfolk-Hotels-Super-8-By-Wyndham-NorfolkChesapeake-Bay.h7202.Hotel-Reviews

[53] https://www.tripadvisor.com/Hotel_Review-g30196-d109015-Reviews-Super_8_by_Wyndham_Austin_North_University_Area-Austin_Texas.html

[54] https://www.tripadvisor.com/Hotel_Review-g55138-d97967-Reviews-or165-Super_8_by_Wyndham_Knoxville_Downtown_Area-Knoxville_Tennessee.html

[55] https://www.tripadvisor.com/Hotel_Review-g34378-d113362-Reviews-Super_8_by_Wyndham_Lantana_West_Palm_Beach-Lantana_Florida.html

[56] https://www.expedia.com/Manassas-Hotels-Super-8-By-Wyndham-Manassas.h12141.Hotel-Reviews

31

to safely leave. The police were very sympathetic, and apparently they have frequent problems with this hotel. Stay Away."[57]

j.  An October 2012 review of a Wyndham branded property in Florida states: "the last time i stayed at this super 8, a hooker approached me in the parking lot and i informed you . this time there was a drug dealer in the next door room, cars coming and going all day & night a car would pull up and one person goes inside and 5 minutes later comes out. when i was checking out i told the desk clerk and the girl in the office says oh i know who that is. well if you knew about why was he still there. i will never stay there again, and i'm a loyal super 8 customer."[58]

k.  A March 2013 review of a Wyndham branded property in Louisiana states: "There was a PROSTITUTE running her business from a room, with her pimp standing outside. She propositioned a co-worker as he was going to his room. Then in the middle of the night she and her clients were fighting very loudly over money and services issued!"[59]

l.  A March 2013 review of a Wyndham branded property in Ohio states: "I've been solicited for drugs and by prostitutes here on several occassions. I told the hotel staff about it and they seem to turn a blind eye to the problem because these people are also buying rooms."[60]

m.  A February 2013 review of a Wyndham branded 8 property in Minnesota states: "This hotel was disgusting. Homeless man passed out in lobby, possible prostitute hanging out in hallway with pimp, cigarette smell, ridiculous noise level throughout night, etc. Dirty shoes in microwave, empty beer cans in fridge. I cannot express enough how terrible this place really is."[61]

n.  An April 2013 review of a Wyndham branded property in Georgia states: "The hotel was filled with prostitutes and drug dealers and I was put in the back with my children which gave me no type of security. Super 8 needs to remove their name from this building."[62]

o.  A July 2013 review of a Wyndham branded property in California states: "Our first night we were greeted by undercover police busting the prostitutes using the spare

---

[57] https://www.tripadvisor.ca/Hotel_Review-g56003-d240483-Reviews-Super_8_by_Wyndham_Houston_Brookhollow_NW-Houston_Texas.html
[58] https://www.tripadvisor.com/Hotel_Review-g34378-d113362-Reviews-Super_8_by_Wyndham_Lantana_West_Palm_Beach-Lantana_Florida.html
[59] https://www.tripadvisor.ca/Hotel_Review-g40314-d120851-Reviews-FairBridge_Inn_Express_Metairie-Metairie_Louisiana.html
[60] https://www.tripadvisor.com/Hotel_Review-g50891-d226034-Reviews-Quality_Inn_Columbus_East-Reynoldsburg_Ohio.html
[61] https://www.tripadvisor.com/Hotel_Review-g43493-d247863-Reviews-Super_8_by_Wyndham_St_Cloud-Saint_Cloud_Minnesota.html
[62] https://www.tripadvisor.com/Hotel_Review-g34856-d217054-Reviews-Super_8_by_Wyndham_Atlanta_Hartsfield_Jackson_Airport-College_Park_Georgia.html

32

rooms to turn tricks. Maids make extra income unlocking vacant rooms. I would not recommend this place for children.Or anyone for that fact."[63]

p.  An August 2013 review of a Wyndham branded property in Ohio states: "This hotel gives the Super 8 chain a bad reputation. The local restaurant management told us not to answer door due to prostitution issues."[64]

q.  An October 2013 review of a Wyndham branded property in Virginia states: "We ended up wedging a pole in the door for safety reasons. After dark the place turned into, I do NOT exaggerate, a open hoer house. At lease 4 pimps were doing business with a dozen or so girls there. If not for the safety reasons it was a life experience seeing that side of society. We were surprised at a chain like Super 8 condoning this activity. . . . The big thing was the blatant open prostitution that was condoned by your chain was despicable. The car music blaring and loud laughing and yelling was just like out of a rap video. Shame on you Super 8 for condoning this kind of activity just to fill a room."[65]

r.  A January 2014 review of a Wyndham branded property in Lake Worth, Florida states: "Cops arresting drug dealers upon my arrival. Prostitutes. Very unsafe… Wasted money at super 8. Should have slept under a bridge instead!"[66]

s.  A May 2014 review of a Wyndham branded property in Houston, Texas states: "However, we have been staying here for a while on business and have noticed lots of young white women (who look and dress like prostitutes) with black men who appear to be their pimps and I've seen them using two rooms using one for "business". Staff should really be more aware of what's really going on here. Also, have smelled pot being smoked everyday and it just seems to be ignored by the staff as well."[67]

t.  A June 2014 review of a Wyndham branded property in Austin, Texas states: "What can I say? The rooms are small, the furniture tore up, refrigerator not cold, sink and tub would back up with water, carpet sticky, lights with no lampshades, and hookers and pimps running around with the management's blessing."[68]

---

[63] https://www.tripadvisor.com/Hotel_Review-g32655-d252254-Reviews-or50-Super_8_by_Wyndham_Canoga_Park-Los_Angeles_California.html
[64] https://www.tripadvisor.com/Hotel_Review-g50891-d226034-Reviews-Quality_Inn_Columbus_East-Reynoldsburg_Ohio.html
[65] https://www.tripadvisor.com/Hotel_Review-g58026-d110776-Reviews-or10-Super_8_by_Wyndham_Norfolk_Chesapeake_Bay-Norfolk_Virginia.html
[66] https://www.expedia.com/Lantana-Hotels-Super-8-By-Wyndham-Lantana-West-Palm-Beach.h855762.Hotel-Reviews
[67] https://www.tripadvisor.com/Hotel_Review-g56003-d2531544-Reviews-Super_8_by_Wyndham_Houston_North_I_45-Houston_Texas.html
[68] https://www.tripadvisor.com/Hotel_Review-g30196-d142017-Reviews-Super_8_by_Wyndham_Austin_University_Downtown_Area-Austin_Texas.html

u. A July 2014 review of a Wyndham branded property in Norfolk, Virginia states: "This place is in a cheaper end of town and the other guests looked like drunks and hookers hanging out in folding chairs on the balcony. Police were in the parking lot when we arrived."[69] Hotel management responded to this review on July 29, 2014.

v. An October 2014 review of a Wyndham branded property in Denver, Colorado states: "The cleaning of the place was awful, prostitutes knocking on doors touting for business, the only reason i ended up staying there longer than a night was there was nowhere else. Will never go back again."[70]

w. A December 2014 review of a Wyndham branded property in Augusta, Georgia states: "My room was right beside permanent residents. Had a prostitute come in my room while i was trying to load luggage in my vehicle...NEVER again will I stay here!"[71]

x. A February 2015 review of a Wyndham branded property in Pompano Beach, Florida states: "I thought of something positive, you won't have to go looking for a hooker... they are already staying there."[72]

y. A March 2015 review of a Wyndham branded property in Houston, Texas states: "Awfull. Drug dealers and prostitutes everywhere. Hotel staff just let it happen. Saw one of them with a crack pipe. I couldn't stay. Didn't even stick around long enough to check in. I called the police to report what I saw going on. Bad bad bad. Stay away from tjis one."[73]

z. An April 2015 review of a Wyndham branded property in Sacramento, California states: "Rooms were clean, but the smell of weed filled the hallways. Shady characters and possible prostitution activity were common throughout our stay. our Van door lock was broken, luckily we had nothing valuable inside. The front desk was friendly and courteous. I knew somethng was up when an armed security guard was present during check in."[74] Management responded to this review on April 12, 2015.

aa. A May 2015 review of a Wyndham branded property in Colarado Springs, Colorado states: "I'm not sure if it was the blood in the shower or the homeless man camped out in the stairwell that caps the awfulness of this place but maybe it was the prostitute's post-coital walk of shame on our last night that did it. Either way, this

---

[69] https://www.tripadvisor.com/Hotel_Review-g58026-d110776-Reviews-or10-Super_8_by_Wyndham_Norfolk_Chesapeake_Bay-Norfolk_Virginia.html
[70] https://www.tripadvisor.ca/Hotel_Review-g33388-d82976-Reviews-Super_8_by_Wyndham_Denver_Stapleton-Denver_Colorado.html
[71] https://www.expedia.com/Augusta-Hotels-Super-8-By-Wyndham-Augusta.h10194.Hotel-Reviews
[72] https://www.expedia.com/Fort-Lauderdale-Hotels-Super-8-By-Wyndham-Pompano-Beach.h856303.Hotel-Reviews
[73] https://www.expedia.com/Houston-Hotels-Super-8-By-Wyndham-HoustonDtwnI-610.h892798.Hotel-Reviews
[74] https://www.tripadvisor.com/Hotel_Review-g32999-d969149-Reviews-Super_8_by_Wyndham_Sacramento-Sacramento_California.html

34

stay - without hyperbole - was the worst paid-lodging stay I've had in at least a decade…"[75]

bb. A July 2015 review of a Wyndham branded property in Raleigh, North Carolina states: "The two nights we were there were almost frightening. There were prostitutes visting guests, they were couples having fist fights both nights. Some man was on the property in broad daylight screaming all kinds of profanity. There was homeless guy hanging out in the parking lot and pretty sure he helped himself to coffee int he lobby and nobody said anything. I called and complained twice about the man screaming and the guys skating boarding on the walkway at 4:30 a.m. outside our door. The have no control over their property and will never stay there again!"[76]

cc. A September 2015 review of a Wyndham branded property in Austin, Texas states: "I was propositioned twice by hookers who had rooms in the building and saw two drug deals go down in the parking lot. There are people going through the parking lot and picking up the dealer and then drop him off in a couple of minutes. The girls are also hanging outside and when a car pulls up they get in with the guy. They return in a few minutes and drop her off. The guys never get out."[77]

dd. A December 2015 review of Wyndham branded property in Fort Myers, Florida states: "This hotel is not in a good area nor is it a good place to stay. there were drugs being sold in the hotel parking lot and prostitutes were all around the hotel. Not a safe place to stay."[78]

ee. An April 2016 review of a Wyndham branded property in Austin, Texas states: "I'm going to be more blunt here than other reviewers. This is a whore house they even rent rooms by the hour, I found this out when attempting to do early check in and they have me the hourly rates. The bathroom is filthy, aged and poor quality simply painted cement with cracks and scratches. It is in a rough neighborhood so watch out for your car. Drugs and prostitutes. I even saw two guys lingering in line outside a room waiting for their turn. Lastly I was awoken at 6:15am by a man who was yelling at and, from the sounds of it, beating a dog. The female occupant of the room was begging him to stop which resulted in a slap."[79]

ff. An August 2016 review of a Wyndham branded property in North Hollywood, California states: "There was prostitution going on. Overall service suck, not worth at all the $140 that I paid."[80]

---

[75] https://www.yelp.com/biz/super-8-by-wyndham-colo-sprs-garden-of-the-gods-colorado-springs
[76] https://www.tripadvisor.com/Hotel_Review-g49463-d94688-Reviews-Super_8_by_Wyndham_Raleigh-Raleigh_North_Carolina.html
[77] https://www.tripadvisor.com/Hotel_Review-g30196-d142017-Reviews-Super_8_by_Wyndham_Austin_University_Downtown_Area-Austin_Texas.html
[78] https://www.expedia.com/Fort-Myers-Hotels-Super-8-By-Wyndham-Fort-Myers.h49549.Hotel-Reviews
[79] https://www.yelp.com/biz/super-8-by-wyndham-austin-university-downtown-area-austin
[80] https://www.expedia.com/Los-Angeles-Hotels-Super-8-By-Wyndham-North-Hollywood.h916715.Hotel-Reviews

gg. A February 2017 review of a Wyndham branded property in New Orleans, Louisiana states: "Location was terrible which made Uber rides a fortune. What they don't tell you is that it's located in the 8th ward and full of prostitution and drugs."[81] Hotel management responded to this review on March 8, 2017.

hh. A May 2017 review of a Wyndham branded property in Minneapolis, Minnesota states: "Pictures are nothing like the hotel. Prostitutes, drugs, a building and parking lot full of very unsavory people is what you will get."[82]

ii. An August 2017 review of a Wyndham branded property in Lake Worth, Florida states: "If you can afford to stay someplace else then do it!!! Please do not bring your children here. Drugs, prostitution, police every day, ambulances in and out for overdoses. It's cheap for a reason people."[83] Hotel management responded to this review.

jj. A November 2017 review of a Wyndham branded property in Los Angeles, California states: "This place is disgusting, it smelled like urine in most of the hotel including our room and there were men coming in and out through the stairway. I think there might have been prostitution going on Wyndham should be ashamed at this property is part of their chain."[84] Hotel management responded to this review on November 27, 2017.

kk. An April 2018 review of a Wyndham branded property in Columbia, South Carolina states: "This place was horrible!! The clerk was hanging out with I guess extended stay guests in the front parking lot when we arrived. Two girls that looked like prostitutes were hanging around. Not such a safe looking place."[85] Hotel management responded to this review on April 25, 2018.

ll. A July 2018 review of a Wyndham branded property in Garland, Texas states: "Dont stay here unless you have ltc... there is drugs prostitution and all they do not clean nothing and the pool sucked I had condoms in the night stand... I would never put the Wyndham name on this crap hole hotel."[86] Hotel management responded to this review on July 17, 2018.

---

[81] https://www.tripadvisor.com/Hotel_Review-g60864-d120826-Reviews-Super_8_by_Wyndham_New_Orleans-New_Orleans_Louisiana.html
[82] https://www.expedia.com/Minneapolis-St-Paul-Hotels-Super-8-By-Wyndham-Brooklyn-CenterMPLS.h124015.Hotel-Reviews
[83] https://www.expedia.com/Lantana-Hotels-Super-8-By-Wyndham-Lantana-West-Palm-Beach.h855762.Hotel-Reviews
[84] https://www.tripadvisor.com/Hotel_Review-g32655-d235134-Reviews-Super_8_by_Wyndham_Hollywood_La_Area-Los_Angeles_California.html
[85] https://www.tripadvisor.com/Hotel_Review-g54184-d226843-Reviews-Super_8_by_Wyndham_Columbia-Columbia_South_Carolina.html
[86] https://www.tripadvisor.com/Hotel_Review-g55884-d241642-Reviews-Super_8_by_Wyndham_Garland_North_Dallas_Area-Garland_Texas.html

mm.   A September 2018 review of a Wyndham branded property in Austin, Texas states: "Then we went to the room where we met a prostitute at the stairs. Went into our room which smelled very badly of mold. The air ventilation was terrible - way below standard. We went to bed, had trouble sleeping because we felt unsafe and uncomfortable. The night was full of noice with the sex activities, cars arriving and leaving, yelling and screaming in the parking lot and doors were slamming."[87]

nn.   A December 2018 review of a Wyndham branded property in Oklahoma City, Oklahoma states: "very nasty rude staff unclean only waffles for breakfast. bathroom was nasty the toilet leaked.hookers were telling my son how much they charged do not stay here no matter how cheap. Thier were people yelling."[88] Hotel management responded to this review on December 22, 2018.

72.   These articles and reviews are only representative examples. There are many similar articles about sex trafficking and other associated criminal activity at Wyndham branded hotels. Moreover, on information and belief, the Wyndham Defendants are aware of additional significant law enforcement activity related to trafficking at their hotels that was not reported in the media.

44.   Based on information and belief, the Wyndham Defendants and Franchisee Defendant managed and monitored on-line reviews of Ramada Inn hotel locations. Examples of reviews reflecting indicia of sex trafficking and related criminal activity include:

- In December 2007   Regarding the very Toms River, New Jersey Ramada Inn which Jane Doe was trafficked, in a review titled, "Hookers, Drugs, and poor service," a reviewer wrote "[a]s my wife and I went to our room, we were first asked for money from some guy in the hallway, then a prostitute informed us for a fee, she would join us…."[45]

- In February 2010   Regarding the Ramada by Wyndham in Rochelle Park, New Jersey, a reviewer wrote, "[t]hin walls, so EVERYTHING was heard, especially when some pimp was yelling & cursing at his "employee" from 1am till 4 am. The clientele were mostly thugs & one-night-standers"[46]

- In September 2010   regarding the Ramada by Wyndham Pikesville/Baltimore North, a customer complained, "[a]nd to top it all

---

[87] https://www.tripadvisor.com/Hotel_Review-g30196-d142017-Reviews-Super_8_by_Wyndham_Austin_University_Downtown_Area-Austin_Texas.html
[88] https://www.tripadvisor.com/Hotel_Review-g51514-d243913-Reviews-or20-Super_8_by_Wyndham_Midwest_City_OK-Midwest_City_Oklahoma.html

off, we were awakened at 2 AM by a large party of about 25 young people outside the room, some of whom were apparently prostitutes - young girls in skimpy clothes talking to men through car windows." The General Manager replied but did not address the prostitution complaint."[47]

- In October 2011 - Regarding the Ramada by Wyndham in East Orange, New Jersey, a reviewer wrote, "[w]as there any prostitution at the hotel? Maybe. But the pimps in the lobby always held the door for us..."[48]

- In June 2012 - Regarding the Ramada by Wyndham in East Orange, New Jersey, in a review titled, "It Is As Bad As They Say," a reviewer wrote, "[v]isible prostitutes going up and down the hall"[49]

- In September 2012 - regarding the Ramada by Wyndham in Wyndham's home town of Parsippany, New Jersey, a reviewer advised, "[p]lease avoid this hotel at all costs unless you're a trucker or prostitute"[50]

- In October 2012 - regarding the Ramada by Wyndham in Flemington, New Jersey, a local resident wrote a review saying, "i'M A LOCAL, SO I CAN GIVE YOU AN IDEA OF THIS PLACE. First, don't go. period. If you GOOGLE this location, you'll get results that include MURDER, PROSTITUTION, DRUGS, OD'D, SUICIDE and more."[51]

- In November 2012 - regarding the Ramada Limited in Cockeysville, Maryland, a reviewer wrote, "seems to be mainly a place for hooker hookups and not somewhere anyone actually stays."[52]

- In December 2012 - Regarding a Ramada by Wyndham in East Orange, New Jersey, a reviewer wrote, "[m]y colleague rode up the elevator with someone she was sure was a hooker…"[53]

- In March 2013 - regarding the Ramada by Wyndham Baltimore West in Baltimore, Maryland, a reviewer, in a review titled "Prostitute plaza," wrote, "[o]ur second evening we were confronted by ladies who were at the time selling themselves to us. As we walked to our car the next morning we were once confronted again by 2 different professional women advancing sexual and in appropriate verbiage to my 18 year old son"[54]

- In April 2013 - Regarding the Ramada by Wyndham in East Orange, New Jersey, a reviewer wrote, "[t]his is a criminal house. Prostitution, Drugs…"[55]

- In July 2013 - Regarding the Ramada by Wyndham in East Orange, New Jersey, a reviewer wrote, "[w]hile on of my family members was

38

checking in it became obvious to them this is also a place where prostitutes come to request a room for only 3-4 hours."[56]

- In August 2013 – regarding Ramada by Wyndham West Atlantic City in Atlantic City, New Jersey, a reviewer reported, "a load of police cars because there was a prostitution raid…." The hotel's webmaster replied saying they appreciated the review and observations"[57]

- In September 2013 – regarding the Ramada by Wyndham in Yonkers, New York, a reviewer complained, "[a]ll night…drugs and prostitution business is going on there with the knowledge of the staff and managers…"[58]

- In February 2014 – regarding the Ramada by Wyndham in East Orange, New Jersey, a concerned citizen reported, "[t]here is also a revolving door of prostitution going on at the Ramada Inn" in East Orange, New Jersey  on a message board"[59]

- In May 2014 – regarding the Ramada by Wyndham in Flemington, New Jersey, a reviewer reported, "[a] local restaurant informed us the Ramada is used as a half-way house for criminals recently released from prison, the late night visit to one of the rooms for suspected prostitution is about all you need to know about Ramada-Flemington."[60]

- In September 2014 – Regarding the Ramada by Wyndham in East Orange, New Jersey, a reviewer wrote, "[t]here were pimps and prostitutes everywhere."[61]

- In November 2014 – regarding the Ramada by Wyndham Waukegan/Great Lakes in Waukegan, Illinois, a reviewer noted, "I encountered the back door propped open on several occasions and different men pulling up in numerous vehicles, staying for a half hour or less each time. I called the front desk and reported this and was told the one man security would handle it. He didn't. Condoning prostitution is grounds for business license revocation or suspension." Regarding prostitution, the Manager replied, "We never condone any illegal activities, have overnight security to assure the peace of all our guests, and cooperate fully with local law enforcement immediately should we encounter any illegal activities."[62]

- In June 2015 regarding the Ramada by Wyndham Whitehall/Allentown in Whitehall, Pennsylvania, a reviewer said, "[t]here were prostitutes in and out of this place."[63]

- In a July 2015 review of a Ramada by Wyndham in East Orange, New Jersey, a reviewer wrote, "[o]n the way back to our room, my husband heard a prostitute making "deals" with her clients. The foot traffic is heavy within this hotel, and now it makes sense. If you're looking for a prostitute, then this is the place to be, but this is not a family friendly hotel." The General Manager replied but did not address the concerns regarding prostitution"[64]

- In August 2015 – regarding the Ramada by Wyndham Parsippany in Wyndham's home town of Parsippany, New Jersey, a reviewer titled their review, "Do NOT Feel SAFE Here Anymore-- has Become a HOTSPOT for Prostitution!!-," and wrote, "FIRST ALL DOORS Of the Hotel are "Open" to ANYONE walking from the Streets…Arriving back to my Room one evening at 1A, watching cars parking, then Various men Walking Right into the hotel. When I Went into End main door), I Was Absolutely Scared to Death Noticing a Man Crouched down Behind The STAIRS!!!! "Obviously Waiting His Turn" Hearing him Say "I am here". "I am Inside". The TRAFFIC Coming and Going Just that ONE NIGHT Was unbelieveablofe. It Became OBVIOUS That PROSTITUTION Had Become Quite POPULAR At This Hotel, It Was like a "Rats Nest", Men Walking in all hours, Men sitting in their Cars ALL HOURS. It Was a Very Shameful, and Disturbing Sight. I Did Not Feel SAFE I Did Not Feel Respected by the Hotel, I Was Very Saddened to See What has happened to this place!!!! I Actually Sat in my Car one evening at 11:30PM, literally Saw 7 Vehicles pull into parking lot, they would park, Men walking straight into the HOTEL!!! I Sat for about 20 minutes was All, Seeing All the Weird Men Coming and Going It was A Very CREEPY experience, it was Very Disturbing to me. You Don't have to be a Genius to See what is going on There…It is Hard to Believe that The Hotel is Allowing this type of Illegal Activity, These prostitutes are "Running Their Business" Selfish behavior and Non-Caring. The Hotel is CREEPY Now, ALL WEIRD MEN Coming and Going…The Ramada REPUTATION has certainly Changed for the WORSE. The Prostitution at the Hotel is Bringing WEIRD, CREEPY, LOW-CLASS people, If I WANTED A HOTEL With
prostitution, With NO LOCKS on the Doors, With NO SECURITY, Random Men Hiding under stairway, Walking Around inside All hours, I Could get That in Newark. This Whole Place Has Become SHAMEFUL…I Don't Recommend it for Anyone, Unless you are a "JOHN" Wanting a Good Time!!!!"[65]

- In September 2015 – regarding the Ramada by Wyndham Parsippany in Wyndham's home town of Parsippany, New Jersey, a reviewer titled their review, "ALL I SAW Was Hookers, (And to Make it More Interesting, TRANS-SEXUAL MEN Who WERE PROSTITUTES)," and wrote, "…the LOCKS ARE ALL BROKEN and ANYONE CAN

40

JUST WALK INSIDE THE BUILDING, NO SECURITY, NO LOCKS … I Think That 75% of the people Were prostitutes, and Everyone that I Saw parking and going inside Were Not GUESTS at the hotel, I Find it very Hard to believe That there is NO MANAGEMENT Seeing this activity…DRUGS, Hookers, It was AWFUL!!!!!"[66]

- In November 2015 – regarding the Ramada Hotel & Conference Center by Wyndham in Edgewood, Maryland a reviewer titled their review, "Hookers bad WiFi and smelly room." The General Manager replied as to the other issues raised, but ignored the prostitution complaint."[67]

73. These articles, news stories, guest surveys, and online reviews show that the use of Wyndham hotels for sex trafficking was not isolated to one hotel property or a single geographic area. The common use of Wyndham hotels for sex trafficking became a nationwide problem that stemmed from decisions made at the corporate/franchisor level.

74. Both the Wyndham Defendants and Franchisee Defendants knew of the sex trafficking crisis prevalent in the hotel industry generally, as well as specifically at Wyndham branded hotels, including the Subject Hotels, and while they claim not to tolerate such activity, the evidence shows and will show at trial that sex trafficking continued at the Subject Hotels frequently and long after the trafficking of Jane Doe (S.B.C.).

75. This sampling of news stories, reviews, and other public information establishes that, at the time Jane Doe (S.B.C.) was trafficked at the Subject Ramada InnHotels, the Wyndham Defendants knew or should have known that, at least the following:

a. There was widespread and ongoingThe use of their properties for sex trafficking was not limited to one location or geographic region but was a widespread problem;

b. Sex trafficking was a brand wide problem for Wynsham originating from management level decisions at their corporate offices in New Jersey;

b. Commercial sex work occurring at Wyndham brandedtheir properties involved trafficking and compelled prostitution;

41

c. ~~Wynsham franchisees and~~ Their hotel staff were not taking reasonable steps to ~~deter, detect, and disrupt~~ identify, report, and respond to known or probable sex trafficking occurring at their hotel properties ~~and were facilitating sex trafficking at the branded hotel properties~~;

d. ~~Wyndham's~~ Their efforts, if any, to stop facilitating sex trafficking in their ~~branded~~ properties were not effective; and

e. ~~Wyndham and its franchisees were earning revenue~~ They were, by their acts and omissions, facilitating sex trafficking at their properties by providing venues where ~~widespread and ongoing sex~~ that trafficking was occurring widely and without sufficient detection or deterrence.

76. Despite the continually mounting evidence that sex trafficking at ~~their~~ Wyndham properties was ongoing and growing, the Wyndham Defendants ~~and each of the Franchisee Defendant chose to earn revenue by continuing conduct that they~~ did not change course. The Wyndham Defendants chose to continue earning revenue and profits from renting out space in their hotels, including the Subject Hotels, as a venue for trafficking.

**B. Sex Trafficking Was Prevalent and Obvious at the Subject Hotels.**

77. The Wyndham Defendants and Franchisee Defendants also knew or should have known ~~would facilitate~~ that sex trafficking was prevalent at the Subject Hotels.

~~47. Sex trafficking was widespread and pervasive at the subject Ramada Inn specifically.~~

78. ~~The Wyndham~~ Defendants ~~and Franchisee Defendant~~ knew ~~or should have~~ that the Subject Hotels were in high-crime areas with a known ~~about the sex trafficking pervasive at their respective Subject Ramada Inn location based on obvious indicators~~ history of reports of ~~this activity~~ sex trafficking.

79. ~~Internet~~ Online reviews ~~for~~ of the Subject Ramada ~~Inn~~, which upon information and belief were monitored by the Wyndham Defendants and ~~Franchisee Defendant manage and monitor show the pervasiveness~~ Swiss Hotels, establish the nature of ~~the Subject Ramada's role as~~

a venue for criminal activity, including sex trafficking before and well after Jane Doe (S.B.C.) was trafficked. For example:

a. A 2010 TripAdvisor review of the Subject Ramada Inn states: "Basically if you like Prostitutes and Drug Dealers this is your place, The place is managed by a Very Young Arrogant Manager and his response to my complaints was everyone deserves a second chance, not to mention the noise…"[89]

b. A 2012 TripAdvisor review of the Subject Ramada states: "…keep in mind ur in a drug and prostitute area. so i would make sure ur not walking alone. And hell no I would not recommend this hotel to my worse enemy!!!.   Oh yeah and each and everyone of us itched from something in that room! Not sure what was going on with that. We cut our vacation short to get out of there. It was just gross and we will never return! Even if our free voucher shows up."[90]

c. A 2014 TripAdvisor review of the Subject Ramada Inn states: "This Ramada in was old, dirty and no attention is paid to detail. Why do I say that? Because beside the brown spots in a 12" circle on the ceiling above the bed, someone wrote "Dead Hooker Blood" with an arrow pointing to the ... 30-50 spots on the ceiling."[91]

d. A 2014 TripAdvisor review of the Subject Ramada states: "We love Ramada…this one we will never return to. Broken equipment. Dirty. Prostitutes. Fight in the hall. This was just some of the issues."[92]

e. A 2014 TripAdvisor Reviewreview of the Subject Ramada states: "… There were prostitutes in the hallways and a drunk man tried to force his way into my room(no joke). We had to call security…"[93]

f. A 2016 TripAdvisor review forof the Subject Ramada Inn states: "Parked car on 6/26 through 7/3. Upon check out on 7/4 my daughters car had her glove box was open. When she checked in her trunk all Hef clothes were stolen. The night of 7/3 was really loud with street people. Not a good idea walking to the mini mart at mid night ( flight got in at 11:30pm) gig approached twice by drug dealers and a hooker. Will not stay at hotel of in the similar neighborhood again. Ramada just said thanks for telling us about car broke into and still charged us for leaving are car for the week."[94]

g. A 2016 TripAdvisor review forof the Subject Ramada Inn states: "the Daytime Ladies was great the helpfulness and very professional no complaints on them. The

---

[89] https://www.tripadvisor.com/Hotel_Review-g58732-d224851-Reviews-Ramada_by_Wyndham_SeaTac_Airport-SeaTac_Washington.html
[90] Id.
[91] Id.
[92] Id.
[93] Id.
[94] Id.

43

night crew was very bad if I was the owners I would clean House all would be fired the front desk person is rude needs a lot of work the parking guy was sleeping and cones off parking spaces for people that will pay him drugs and hookers go through the back door all night no sign of security at all."[95]

80.    Online reviews of the Subject Super 8, which upon information and belief were monitored by the Wyndham Defendants knewand JC Inn, establish the nature of the Subject Super 8's role as a venue for criminal activity, including sex trafficking:

a. A 2018 Yelp review of the Subject Super 8 states: "I am only giving 1star since I survived the night. This place stinks and is filthy Wyndham should be ashamed of there self for allow place like this to operate. Do yourself a favor and avoid this dump I would not even allow my dogs to walk on the carpet. I noticed in the parking lot there were people sitting in cars at 1:00 a.m that were not guests (victims) geez wonder what they were up to. I am going to call corporate and complain this place is just nasty."[96]

b. A 2018 Yelp review of the Subject Super 8 states: "Well I'm so disgusted I can't even begin to tell you how bad this place is! Please do yourself and family a favor and don't stay in this toxic environment. Filthy isn't even appropriate word for this place. Wyndham should be so ashamed of this place and not checking up on the reviews and fixing the issues. NO EXCUSE for filth!!!! Soap and water are cheap! Longview was once such a beautiful town and now????? People standing around outside at early hours, it felt like they were just waiting for you to go inside and need I say more! Filthy, disgusting and not a safe feeling environment. Sums it up!!!"[97]

c. A 2018 Google Maps review of the Subject Super 8 states: "Strong odor of Marijuana being smoked. They will throw your belongings away if left unattended. Set my room card on the counter. Watch the staff throw it in the trash. Later I retrieved giving it to the front clerk. Manager acts over professional with poor attitude. Nothing like what it once was to stay there."[98]

d. A 2022 Google Maps review of the Subject Super 8 states: "Roaches everywhere. So glad I only stayed 1 night. Gross. I should have known things would be bad

---

[95] *Id.*
[96] https://www.yelp.com/biz/super-8-by-wyndham-kelso-longview-area-kelso?start=10&rr=1#reviews
[97] https://www.yelp.com/biz/super-8-by-wyndham-kelso-longview-area-kelso?start=30&sort_by=date_asc#reviews
[98] https://www.google.com/maps/reviews/@46.1417771,-122.8948896,17z/data=!3m1!4b1!4m6!14m5!1m4!2m3!1sChZDSUhNMG9nS0VJQ0FnSURBNF9uelpREAE!2m1!1s0x0:0xe7af2151852a9963?entry=ttu&g_ep=EgoyMDI1MDYyMi4wIKXMDSoASAFQAw%3D%3D

because upon pulling in to check in to the hotel, I saw about 5 or 6 cop cars outside. There had been a domestic."[99]

e. A 2022 Google Maps review of the Subject Super 8 states: "Completely trash all around from the front end guy that canceled our reservation to advertising open indoor pool witch it wasn't to the county sheriff and state patrol copscruzing parking lot every 10 min to kinda tell you what the area is like nothing but drug out p.o.s. double charg my card the list goes on ...do your self a favor don't stay hear the comfort inn right across highway was far better fir similar price."[100]

f. A 2022 Yelp review of the Subject Super 8 states: "WORST HOTEL EVER!!!! … we arrive at the hotel and the man at the night desk was watching a porn, yeah that's right we walked in and heard it all with my 12yr old son hearing it all … I know how this all goes it's not the employees who are to blame it's the owner they obviously are cutting cost and causing their hotel to become trash, which is probably why the customers are meth addicts which makes a family with kids feel really safe to be in so if your a meth head this is your ideal hotel if not you probably should stay anywhere else it'd be better and safer trust me."[101]

81.     Online reviews of the Subject Howard Johnson, which upon information and belief were monitored by the Wyndham Defendants and Samjoo Properties, establish the nature of the Subject Howard Johnson's role as a venue for criminal activity, including sex trafficking:

- A 2015 Expedia review of the Subject Howard Johnson states: "Checked in Friday. Ok until 9:00 pm and then the noise started. People running up and down the halls and knocking on doors and yelling. 15 or 20 people partying in several rooms. Called desk and they indicated they would take care of it. Called desk 4 times and went down and talked with the desk person. Desk person indicated that she asked them to leave but they refused. I asked about security for the hotel, they have none. They said they would call the cops. At approximately 4:00 Cops apparently came. For seven hours these people took over the third the third floor of this hotel. Upon checkout we asked for our money back but was refused. Feel that this hotel is unsafe and was wary about leaving our room because of the people in the hall. Will never stay at another Howard Johnson…"[102]

---

[99] https://www.google.com/maps/reviews/@46.1417771,-122.8948896,17z/data=!3m1!4b1!4m6!14m5!1m4!2m3!1sChdDSUhNMG9nS0VJQ0FnSUNPX3JlUXpBRRAB!2m1!1s0x0:0xe7af2151852a9963?entry=ttu&g_ep=EgoyMDI1MDYyMi4wIKXMDSoASAFQAw%3D%3D

[100] https://www.google.com/maps/reviews/@46.1417771,-122.8948896,17z/data=!3m1!4b1!4m6!14m5!1m4!2m3!1sChZDSUhNMG9nS0VJQ0FnSUNXcS1idlF3EAE!2m1!1s0x0:0xe7af2151852a9963?entry=ttu&g_ep=EgoyMDI1MDYyMi4wIKXMDSoASAFQAw%3D%3D

[101] https://www.yelp.com/not_recommended_reviews/super-8-by-wyndham-kelso-longview-area-kelso

[102] https://www.expedia.com/Vancouver-Hotels-Howard-Johnson-Hotel-Suites-By-Wyndham-Vancouver.h64206.Hotel-Information?pwaDialog=product-reviews

- A 2016 Expedia review of the Subject Howard Johnson states: "This place was full of meth attics and prostitutes. Not kid friendly at all dirty worst place I've ever stayed"[103]

- A 2016 Expedia review of the Subject Howard Johnson states: "…Walls are extremely thin and could hear the man next door yelling at the woman he was with."[104]

- A 2016 Expedia review of the Subject Howard Johnson states: "…You can hear everything through the walls, in the middle of the night people were fighting and someone was yelling for the person to open the door to the room and doors were slamming, was kind of scary!"[105]

- A 2016 Expedia review of the Subject Howard Johnson states: "We needed a place to stay for a quick overnight. Loved the price but was hoping it wouldn't be as grungy as it was. No fridge, bad flourescent lighting, burn marks in blankets, holes patched up in walls, loud intercourse in the middle of the night from neighbor, grimy pool that we didn't go near, very outdated, dude at the front desk barely acknowledged us...pretty nasty experience all in all. You get what you pay for, apparently."[106]

- A 2016 Google Maps review of the Subject Howard Johnson states: "Came from out of town on business 1st Stained and dirty bed linen, towels smelled like a dog, heater smelled like it was catching fire alot of ruff raff people hanging around difficult to find parking to wake up next day and both sides of my Mercedes was scratch from doors opening into them which I blame on the little parking they offer and the in and out traffic all night and since we where from out of town and here just on business didn't know until after all this that it's considered a drug hotel by the local businesses as a business man I am asking all of you stay away from this hotel seems more like a homeless shelter and or brothel if you have any respect for yourself or the ones with you stay away from this establishment please and almost forgot my wife and I witnessed housekeeping not changing the linens only remaking the beds after they had been slept in by other guest to me it is disgusting and wrong and dirty"[107]

- A 2017 Google Maps review of the Subject Howard Johnson states: "I found a used condom on the floor The front desk treated me like crap very rude i didnt feel like a guest I felt like a bother. Tv didnt work she practly shoved the remote at

---

[103] *Id.*
[104] *Id.*
[105] *Id.*
[106] *Id.*
[107] https://www.google.com/maps/reviews/@45.6577192,-122.5786482,17z/data=!3m1!4b1!4m6!14m5!1m4!2m3!1sChZDSUhNMG9nS0VJQ0FnSURnODdXMlh3EAE!2m1!1s0x0:0x7e3de56859a02447?entry=ttu&g_ep=EgoyMDI1MDYyMy4yIKXMDSoASAFQAw%3D%3D

me ..Kids screaming and jumping all night ..Woke up to black sugar ants at this point we checked out never to return. Do not stay its a dive"[108]

- A 2017 Expedia review of the Subject Howard Johnson states: "The hotel lobby was dirty and the front doors were not working part of the time and had to be pried open. A hotel resident was robbed on the property while I stayed there and according to the staff, it wasn't the first time…"[109]

- A 2019 Google Maps review of the Subject Howard Johnson states: "Horrible service not to mention the rash I have all over my body ! Pretty sure they had bed bugs sheets etc.didnt seem or smell clean would compare this.to a low budget hotel full of.drug addicts . And to top it off they charged me an extra $250 for smoking in my room I dont even smoke !!!"[110]

- A 2020 Expedia review of the Subject Howard Johnson states: "…Found out the hotel is in a terrible part of town with homeless people and drug dealers hanging in the park lot. So probably a blessing in disguise. Buyer beware. Do alot of research if you decide to stay here"[111]

82.    Traffickers, including Jane Doe (S.B.C.)'s trafficker, repeatedly chose to use ~~the Subject Ramada Inn location for their sex trafficking activity. They selected these hotels because of policies and practices that created a favorable environment for trafficking and because hotel staff turned a blind eye to signs of trafficking. These traffickers followed a repetitive and routine procedure during stayst at the Subject Ramada Inn. There were obvious signs of this activity, which were consistent with the well known "red flags" for sex trafficking in the hospitality industry.~~ Wyndham properties, including the Subject Hotels, for their sex trafficking activity. As such, the Wyndham Defendants and Franchisee Defendants also knew or should have known about the

---

[108] https://www.google.com/maps/reviews/@45.6577192,-122.5786482,17z/data=!3m1!4b1!4m6!14m5!1m4!2m3!1sChZDSUhNMG9nS0VJQ0FnSUNndTlTUWN3 3EAE!2m1!1s0x0:0x7e3de56859a02447?entry=ttu&g_ep=EgoyMDI1MDYyMy4yIKXMDSoASAFQAw%3D%3D

[109] https://www.expedia.com/Vancouver-Hotels-Howard-Johnson-Hotel-Suites-By-Wyndham-Vancouver.h64206.Hotel-Information?pwaDialog=product-reviews

[110] https://www.google.com/maps/reviews/@45.6577192,-122.5786482,17z/data=!3m1!4b1!4m6!14m5!1m4!2m3!1sChdDSUhNMG9nS0VJQ0FnSUN3NTRMWWp3RRAB!2m1!1s0x0:0x7e3de56859a02447?entry=ttu&g_ep=EgoyMDI1MDYyMy4yIKXMDSoASAFQAw%3D%3D

[111] https://www.expedia.com/Vancouver-Hotels-Howard-Johnson-Hotel-Suites-By-Wyndham-Vancouver.h64206.Hotel-Information?pwaDialog=product-reviews

pervasive sex trafficking at ~~their respective~~the Subject ~~Ramada Inn location~~Hotels based on obvious indicators of this activity.

~~51.    These traffickers, including (S.B.C.)'s trafficker, operated with little regard for concealment, due to an implicit understanding between Defendants and the traffickers. This understanding enabled the traffickers to operate openly, as they had found a venue where they could conduct their operations without disruption from Defendants.~~

~~52.    Upon information and belief, there were other victims being trafficked at the Subject Ramada Inn at the same time as (S.B.C.), and there were obvious signs these victims were being trafficked.~~

~~53.    Based upon information and belief, the conduct of Defendants facilitated the trafficking of multiple victims by multiple traffickers at their respective Subject Ramada Inn. Defendants developed a continuous business relationship with these traffickers who operated at the hotels on a routine and repetitive basis.~~

83.    Upon information and belief and based on hotel reviews and records of law-enforcement calls, there were multiple trafficking victims exploited at ~~each of~~the Subject ~~Ramada Inn~~Hotels prior to Jane Doe (S.B.C.)'s trafficking who exhibited "red flags" of trafficking that were observed by hotel staff and management, including paying with cash or prepaid cards, having high volumes of men who were not registered guests in and out of their ~~room~~rooms at unusual times, <u>arriving with few possessions for extended stays</u>, and other signs consistent with the "red flags" of trafficking identified above. Trafficking has a significant effect on its victims, and, upon information and belief, there were obvious "red flags" of trafficking apparent from the appearance, demeanor, and restricted movements of these victims, as well as the nature of these victims'

interactions with their traffickers and others, all of which provided notice that these victims were being subject to violence, coercion, control, and exploitation.

84. All knowledge from the staff at the Subject ~~Ramada Inn~~Hotels is imputed to the ~~Franchisee Defendant, which employed the hotel staff. Thus, each Franchisee~~Wyndham Defendants. The Wyndham Defendants knew about ~~the~~this widespread and ongoing trafficking at the Subject ~~Ramada Inn locations~~Hotels, including the trafficking of Jane Doe (S.B.C.), through the direct observations of hotel staff, including management-level staff. ~~This knowledge is further imputed to the Wyndham Defendants based on the existence of an actual agency relationship as described below.~~

~~56. In addition to available public sources of information about trafficking and knowledge imputed from the hotel staff and management, each of the Franchisee Defendant learned or should have learned about the obvious signs of widespread trafficking at its hotel, based on non-public sources of information including but not limited to:~~

> ~~a. surveillance of the property;~~
>
> ~~b. internal investigations;~~
>
> ~~c. customer complaints;~~
>
> ~~d. monitoring of customer feedback;~~
>
> ~~e. information received from law enforcement;~~
>
> ~~f. and other sources of non-public information available to each Franchisee.~~

85. Upon information and belief, the Wyndham Defendants knew or should have known about the widespread trafficking at the Subject ~~Ramada Inn based on the tools they used to monitor and oversee these hotels. The tools they used included~~ Hotels, based on:

> a. The obligation of hotel staff and ~~franchisee~~hotel management to report suspected criminal activity, including sex trafficking, to the Wyndham Defendants;

49

b. The Wyndham Defendants' regular monitoring of online reviews;

c. The Wyndham Defendants' collection and monitoring of customer surveys and complaints;

d. ~~The Wyndham Defendants' requirement that franchisee submit regular and detailed reports to the Wyndham Defendants about day-to-day hotel operations;~~

e. ~~The Wyndham Defendants' collection and monitoring of data about guests at the Subject Ramada Inn, including but not limited to room reservations, identification and payment information, data from websites visited on Wi-Fi, and other guest data;~~

f. ~~The Wyndham Defendants' supervision and control over day-to-day operations of the Subject Ramada Inn through detailed information and extensive reports that it obtained through the property management system and other software systems it required franchisee to use and through which franchisee was obligated to allow the Wyndham Defendants to obtain real-time data to allow it to monitor hotel operations on a day-to-day basis;~~

g. ~~The Wyndham Defendants' employment of "field agents" to work with hotels on security issues, including trafficking issues;~~

h. ~~The Wyndham Defendants' access to surveillance and security systems;~~

d. The Wyndham Defendants' regular inspections of ~~each of~~the hotel property;

e. Information provided to the Wyndham Defendants by law enforcement; and

f. Other sources of information available to the Wyndham Defendants.

86. ~~The~~ Upon information and belief, under the Wyndham ~~Defendants required~~ Defendants' protocols, hotel staff and management ~~, and franchisee to report suspected criminal activity~~ at the Subject ~~Ramada Inn, including suspected sex trafficking, to the Wyndham Defendants. Based on the obvious "red flags" pf sex trafficking at the Subject Ramada Inn, Franchise Defendant and the staff and management of the Subject Ramada Inn~~Hotels were required to~~, and upon information and belief did,~~ report numerous instances of suspected sex trafficking to the Wyndham Defendants ~~before and during~~ prior to Jane Doe (S.B.C.)'s trafficking ~~Upon information and belief, before and during Jane Doe (S.B.C.)'s trafficking, the Wyndham Defendants observed obvious "red flags" of numerous instances of sex trafficking occurring at the~~

~~Subject Ramada Inn~~ based on ~~their supervision and monitoring of the properties~~the numerous "red flags" exhibited by the victims who were exploited at the Subject Hotels.

**C. ~~All~~Knew Defendants ~~knew~~Knew Jane Doe (S.B.C.) was ~~being trafficked~~Being Trafficked at the Subject ~~Ramada Inn because~~Hotels Because of the ~~apparent~~Apparent and ~~obvious "red flags"~~Obvious "Red Flags" of ~~sex trafficking~~Sex Trafficking.**

87.    During the period that Jane Doe (S.B.C.) was trafficked at the Subject ~~Ramada Inn, there were obvious signs that her~~Hotels, it was apparent she was the victim of sex trafficking.

88.    Because it was known among the community of trafficers ~~were engaged in sex trafficking~~that staff at the Subject Hotels turned a blind eye to sex trafficking, Jane Doe (S.B.C.)'s trafficker made little or no effort to disguise his role or his actions.

89.    At the Subject Ramada, Jane Doe (S.B.C.) exhibited numerous obvious signs of trafficking, including:

- The hotel rooms in which she was trafficked were initially paid for with a prepaid card and then paid for in cash each subsequent day at the front desk;

- The hotel rooms in which she was trafficked were ~~frequently~~never paid for ~~with cash~~more than one night at a time;

- Although Jane Doe (S.B.C.)~~'s~~ always checked in with her trafficker ~~was present with her at check in~~ and stayed in the same room with him, numerous men continued to enter and exit the ~~parking lot to smoke a cigarette. It was obvious to room each day, making clear that the arrangement extended beyond that of a typical hotel ~~staff that Jane Doe (S.B.C.) was being monitored and her freedom being restricted.~~ couple;

- ~~Extra towels and sheets were frequently requested.~~ Jane Doe (S.B.C.) regularly ate at a Chinese restaurant located either within or immediately adjacent to the Subject Ramada (approximately four to five times per week per stay) where she appeared to be under the influence of drugs and was frequently seen wearing provocative clothing;

- Housekeeping ~~was not~~ staff was often prevented from entering the room for regular cleaning, towel exchange, and other standard room services;

- Jane Doe (S.B.C.) constantly requested fresh towels and linens;

51

- On occasions when housekeeping was allowed into the room, used condoms, lubricant, and drugs were frequently present;

- There was heavy foot traffic in and out of Jane Doe (S.B.C.)'s room involving men who were not hotel guests;

- Each time a man who was not a hotel guest entered Jane Doe (S.B.C.)'s room, her trafficker could be seen loitering around the property until the unregistered guest left, at which point the trafficker would immediately return to the room;

- Jane Doe (S.B.C.) had ~~sevceral~~approximately three to seven johns ~~every day~~come to her room each day she stayed at the Subject Ramada. These individuals, ~~entered~~who were not hotel guests, entered through the lobby to access her room and came and ~~left at unusual hours~~went at random times throughout the day;

- Jane Doe (S.B.C.)'s trafficker openly sold drugs out of both the hotel room and ~~were~~the parking lot of the Subject Ramada during their stays;

- Jane Doe (S.B.C.) did not stay at the Subject Ramada as part of a one-time or isolated visit; rather, she returned to the hotel on multiple occasions, with each stay lasting between two to four weeks; and

- Other obvious signs of trafficking consistent with the modus operandi of her traffickers and which included well known "red flags" for trafficking in a hotel.

90.    Upon information and belief, multiple employees at the Subject Ramada, including management-level employees, observed and/or were made aware of these signs of trafficking while acting within the scope and course of their employment. Specifically, on one occasion, a violent altercation involving a john took place, causing Jane Doe (S.B.C.) to scream until her trafficker intervened; hotel staff responded to the disturbance by calling the room and sending someone upstairs to ask if everything was okay.

91.    At the Subject Super 8, Jane Doe (S.B.C.) exhibited numerous obvious signs of trafficking, including:

- The hotel rooms in which she was trafficked were initially paid for with a prepaid card and then paid for in cash each subsequent day at the front desk;

- The hotel rooms in which she was trafficked were never paid for more than one night at a time;

- Although Jane Doe (S.B.C.) always checked in with her trafficker and stayed in the same room with him, numerous men continued to enter and exit the room each day, making clear that the arrangement extended beyond that of a typical hotel couple;

- Housekeeping staff was often prevented from entering the room for regular cleaning, towel exchange, and other standard room services;

- Jane Doe (S.B.C.) constantly requested fresh towels and linens;

- On occasions when housekeeping was allowed into the room, used condoms, lubricant, and drugs were frequently present at the hotel for brief periods of time;

- There was heavy foot traffic in and out of Jane Doe (S.B.C.)'s room involving men who were not hotel guests;

- Each time a man who was not a hotel guest entered Jane Doe (S.B.C.)'s room, her trafficker could be seen loitering around the property until the unregistered guest left, at which point the trafficker would immediately return to the room;

- Jane Doe (S.B.C.) had approximately three to seven johns come to her room each day she stayed at the Subject Super 8. These individuals, who were not hotel guests, entered through the lobby to access her room and came and went at random times throughout the day;

- Jane Doe (S.B.C.)'s trafficker openly sold drugs out of both the hotel room and the parking lot of the Subject Super 8 during their stays;

- Jane Doe (S.B.C.) did not stay at the Subject Super 8 as part of a one-time or isolated visit; rather, she returned to the hotel on at least two separate occasions, with each stay lasting between one to two weeks; and

- Other obvious signs of trafficking consistent with the modus operandi of her traffickers and which included well known "red flags" for trafficking in a hotel.

92.    Upon information and belief, multiple employees at the Subject Super 8, including management-level employees, observed and/or were made aware of these signs of trafficking while acting within the scope and course of their employment.

93.    At the Subject Howard Johnson, Jane Doe (S.B.C.) exhibited numerous obvious signs of trafficking, including:

- The hotel rooms in which she was trafficked were initially paid for with a prepaid card and then paid for in cash each subsequent day at the front desk;

53

- The hotel rooms in which she was trafficked were never paid for more than one night at a time;

- Although Jane Doe (S.B.C.) always checked in with her trafficker and stayed in the same room with him, numerous men continued to enter and exit the room each day, making clear that the arrangement extended beyond that of a typical hotel couple;

- A female employee at the Subject Howard Johnson became personally acquainted with Jane Doe (S.B.C.) and her trafficker and would occasionally visit their room to socialize;

- Housekeeping staff was often prevented from entering the room for regular cleaning, towel exchange, and other standard room services;

- Jane Doe (S.B.C.) constantly requested fresh towels and linens;

- On occasions when housekeeping was allowed into the room, used condoms, lubricant, and drugs were frequently present;

- There was heavy foot traffic in and out of Jane Doe (S.B.C.)'s room involving men who were not hotel guests. This traffic was visible to hotel staff.;

- Each time a man who was not a hotel guest entered Jane Doe (S.B.C.)'s room, her trafficker could be seen loitering around the property until the unregistered guest left, at which point the trafficker would immediately return to the room;

- Jane Doe (S.B.C.) had approximately three to seven johns come to her room each day she stayed at the Subject Howard Johnson. These individuals, who were not hotel guests, entered through the lobby to access her room and came and went at random times throughout the day;

- Jane Doe got into a physical altercation with a john and her screams were heard from the hallway. Her trafficker rushed into the room when he heard her screams.

- After Jane Doe (S.B.C.) checked out, hotel cleaning staff whould have noticed sex paraphernalia like excessive condom wrappers in the trash.

- Jane Doe (S.B.C.)'s trafficker openly sold drugs out of both the hotel room and the parking lot of the Subject Howard Johnson during their stays;

- Jane Doe (S.B.C.) did not stay at the Subject Howard Johnson as part of a one-time or isolated visit; rather, she returned to the hotel on multiple occasions, with each stay lasting between two weeks to three months; and

- Other obvious signs of trafficking consistent with the modus operandi of her traffickertraffickers and which included well known "red flags" for trafficking in a hotel.

94.     ~~Based upon~~Upon information and belief, multiple employees at the Subject ~~Ramada Inn~~Howard Johnson, including management-level employees, observed and/or were made aware of these ~~obvious~~ signs of trafficking while acting within the scope and course of their employment.

95.     Upon information and belief, a female employee at the Subject Howard Johnson who befriended Jane Doe (S.B.C.) and her trafficker accepted drugs from the trafficker in exchange for her cooperation.

96.     Upon information and belief, hotel staff at the Subject Howard Johnson would call Jane Doe (S.B.C.) and her trafficker near the end of each month-long stay to inform them that, because they had stayed for 30 days, they were eligible for a sales tax refund.

97.     As such, ~~Franchisee Defendant and~~ the Wyndham Defendants and Franchisee Defendants knew or ~~were willfully blind to the facts~~should have known that Jane Doe (S.B.C.) was being trafficked at the Subject ~~Ramada Inn~~Hotels.

98.     Given these obvious signs, the Wyndham Defendants and Franchisee Defendants knew or should have known about the trafficking of Jane Doe (S.B.C.) at the Subject Hotels based on ~~the policies~~the policy or ~~protocols~~protocol that required hotel staff to report suspected criminal activity, including sex trafficking.

## IV.    All Defendants Actively Facilitated Sex Trafficking at the Subject Hotels, Including Jane Doe (S.B.C.)'s Trafficking.

99.     The Wyndham Defendants ~~also knew or should have known about the trafficking of Jane Doe (S.B.C.) based on the numerous tools, described above, though which they monitored and supervised the Subject Ramada Inn. The "red flags" of Jane Doe (S.B.C.)'s trafficking at this hotel were sufficiently obvious that, during the numerous times she was trafficked at this hotel, they were sufficiently obvious that, during the numerous times she was trafficked at this hotel,~~

~~they were readily delectable through the oversight tools that the Wyndham Brand Defendant used.~~ ~~The Wyndham Defendants~~ and Franchisee ~~Defendant~~Defendants had both actual and constructive knowledge of the trafficking of Jane Doe (S.B.C.) at the Subject ~~Ramada Inn~~Hotels because ~~that~~the trafficking was the direct result of ~~the Wyndham Defendants and Franchisee Defendant~~ their facilitating her trafficking at the Subject ~~Ramada Inn~~Hotels.

~~67.    Based on their knowledge of the problem of sex trafficking in the hotel industry, at Wyndham branded hotels, and at the Subject Ramada Inn, the Wyndham Defendantd and Franchisee Defendant each had a duty to exercise reasonable prudence to detect ongoing sex trafficking at the Subject Ramada Inn and to make a reasonable investigation in response to signs of potential sex trafficking. If the Wyndham Defendants and Franchisee Defendant had used reasonable prudence, they would have been aware of Jane Doe (S.B.C.)'s trafficking at the Subject Ramada Inn and that they were benefiting from such trafficking.~~

~~**IV. Defendants actively facilitated sex trafficking at the Subject Ramada Inn, including the trafficking of Jane Doe (S.B.C.)**~~

~~**A.      Franchisee Defendant facilitated the trafficking activity at the Ramada Inn, including the trafficking of (S.B.C.)**~~

**A. ~~Franchisee Defendant~~ Swiss Hotels Facilitated the Trafficking of Jane Doe (S.B.C.) at the Subject Ramada.**

100.    Swiss Hotels is responsible for the acts, omissions, and knowledge of all employees of the Subject Ramada ~~Inn property~~ when operating the hotel because these acts and omissions were committed in the ~~scope and~~ course and scope of employment, because ~~Franchisee Defendant~~Swiss Hotels ratified these acts and omissions, and because ~~Franchisee Defendant~~Swiss Hotels failed to exercise reasonable care with regard to the hiring, training, and supervision of ~~their~~these employees given the specific risks, known to ~~Franchisee Defendant~~Swiss Hotels, of sex trafficking occurring at Wyndham properties including the Subject Ramada ~~Inn location~~.

56

101.    Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Subject Ramada ~~Inn location, Franchisee Defendant~~, Swiss Hotels continued renting rooms to ~~these~~ traffickers, including the rooms used to sexually exploit ~~victims~~Jane Doe (S.B.C.).

102.    ~~Franchisee Defendant~~Swiss Hotels knew or was willfully blind to the fact that Jane Doe (S.B.C.) was being trafficked ~~at the Subject Ramada Inn location~~ and, despite this, benefited from continued association with her trafficker by providing ~~them~~him a venue in the form of hotel rooms and related services, to facilitate Jane Doe (S.B.C.)'s sexual exploitation.

103.    ~~Franchisee Defendant also~~Swiss Hotels facilitated ~~widespread~~ Jane Doe (S.B.C.)'s trafficking at the Subject Ramada ~~Inn location~~ through numerous acts and omissions, including ~~the~~:

- Allowing traffickers to reserve rooms while maintaining relative anonymity and non-traceability;
- Failing to report suspected trafficking activity according to reasonable practices, industry standards, and/or applicable policies;
- Despite seeing obvious signs of ~~(S.B.C.), in ways~~distress, failing to take any steps to inquire about the welfare of Jane Doe (S.B.C.);
- Continuing to rent rooms to traffickers, including ~~developing relationships with traffickers, including~~ Jane Doe (S.B.C.)'s trafficker, ~~and creating an understanding that these traffickers could operate at their hotel without risk of interference~~ despite the observed signs of trafficking;
- ~~Continuing to provide rooms, services and assistance to traffickers in the face of obvious "red flags" of trafficking of (S.B.C) and other victims at the Subject Ramada Inn;~~
- ~~Allowing inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining their front line staff regarding issues related to human trafficking.~~
- ~~Inadequate and inadequately enforced~~ Failing to take reasonable steps to hire, train and supervise staff to properly detect and respond to sex trafficking at the Subject Ramada;

- ~~Failing to contact law enforcement despite obvious indicia of criminal activity, including sex trafficking, occurring at tht Subject Ramada Inn.~~

- ~~Implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by their hotel staff;~~

- ~~Providing rooms at the Subject Ramada Inn location in a designated area of the property allowinf ease of access for "johns" but also minimizing risks of detection; and~~

- ~~Franchisee Defendant's acts and omissions, which were motivated by a single minded focus on profit maximization, showed serious indifference to an callous disregard for the rights of sex trafficking victims including~~ Enabling traffickers to access ancillary services that supported trafficking activities, such as furnishing an unusually large number of sheets and towels to facilitate the commercial sex acts and providing disproportionate housekeeping services necessary to clean up the paraphernalia left after the transactions related to commercial sex; and

- Providing the free Wi-Fi that Jane Doe (S.B.C.)'s trafficker used to advertise and solicit buyers to purchase commercial sex ~~trafficking causes immesurable harm to victims and, nonetheless, knowingly or recklesslu engaged in a longstanding pattern of conduct that generated revenue by facilitating that trafficking at the Subject Ramada Inn location.~~ delivered by Jane Doe (S.B.C.) at the Subject Ramada.

**B.  JC Inn Facilitated the Trafficking of Jane Doe (S.B.C.) at the Subject Super 8.**

104.    JC Inn is responsible for the acts, omissions, and knowledge of all employees of the Subject Super 8 when operating the hotel because these acts and omissions were committed in the course and scope of employment, because JC Inn ratified these acts and omissions, and because JC Inn failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the specific risks, known to JC Inn, of sex trafficking occurring at Wyndham properties including the Subject Super 8.

105.    Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Subject Super 8, JC Inn continued renting rooms to traffickers, including the rooms used to sexually exploit Jane Doe (S.B.C.).

58

106.    JC Inn knew or was willfully blind to the fact that Jane Doe (S.B.C.) was being trafficked and, despite this, benefited from continued association with her trafficker by providing him a venue in the form of hotel rooms and related services, to facilitate Jane Doe (S.B.C.)'s sexual exploitation.

107.    JC Inn facilitated Jane Doe (S.B.C.)'s trafficking at the Subject Super 8 through numerous acts and omissions, including:

- Allowing traffickers to reserve rooms while maintaining relative anonymity and non-traceability;
- Failing to report suspected trafficking activity according to reasonable practices, industry standards, and/or applicable policies;
- Despite seeing obvious signs of distress, failing to take any steps to inquire about the welfare of Jane Doe (S.B.C.);
- Continuing to rent rooms to traffickers, including Jane Doe (S.B.C.)'s trafficker, despite the observed signs of trafficking;
- Failing to take reasonable steps to hire, train and supervise staff to properly detect and respond to sex trafficking at the Subject Super 8;
- Enabling traffickers to access ancillary services that supported trafficking activities, such as furnishing an unusually large number of sheets and towels to facilitate the commercial sex acts and providing disproportionate housekeeping services necessary to clean up the paraphernalia left after the transactions related to commercial sex; and
- Providing the free Wi-Fi that Jane Doe (S.B.C.)'s trafficker used to advertise and solicit buyers to purchase commercial sex delivered by Jane Doe (S.B.C.) at the Subject Super 8.

**C.  Samjoo Properties Facilitated the Trafficking of Jane Doe (S.B.C.) at the Subject Howard Johnson.**

108.    Samjoo Properties is responsible for the acts, omissions, and knowledge of all employees of the Subject Howard Johnson when operating the hotel because these acts and omissions were committed in the course and scope of employment, because Samjoo Properties ratified these acts and omissions, and because Samjoo Properties failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the specific risks,

59

known to Samjoo Properties, of sex trafficking occurring at Wyndham properties including the Subject Howard Johnson.

109.    Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Subject ~~Ramada Inn, Wyndham Defendants~~Howard Johnson, Samjoo Properties continued renting rooms to traffickers, including the rooms used to sexually exploit ~~victims~~Jane Doe (S.B.C.).

110.    ~~Wyndham Defendants~~Samjoo Properties knew or ~~were~~was willfully blind to the fact that Jane Doe (S.B.C.) was being trafficked and, despite this, benefited from continued association with her trafficker by providing ~~them~~him a venue in the form of hotel rooms and related services, to facilitate Jane Doe (S.B.C.)'s sexual exploitation.

111.    Samjoo Properties facilitated Jane Doe (S.B.C.)'s trafficking at the Subject Howard Johnson through numerous acts and omissions, including:

- Allowing traffickers to reserve rooms while maintaining relative anonymity and non-traceability;

- Failing to report suspected trafficking activity according to reasonable practices, industry standards, and/or applicable policies;

- Despite seeing obvious signs of distress, failing to take any steps to inquire about the welfare of Jane Doe (S.B.C.);

- Continuing to rent rooms to traffickers, including Jane Doe (S.B.C.)'s trafficker, despite the observed signs of trafficking;

- Failing to take reasonable steps to hire, train and supervise staff to properly detect and respond to sex trafficking at the Subject Howard Johnson;

- Enabling traffickers to access ancillary services that supported trafficking activities, such as furnishing an unusually large number of sheets and towels to facilitate the commercial sex acts and providing disproportionate housekeeping services necessary to clean up the paraphernalia left after the transactions related to commercial sex; and

- Providing the free Wi-Fi that Jane Doe (S.B.C.)'s trafficker used to advertise and solicit buyers to purchase commercial sex delivered by Jane Doe (S.B.C.) at the Subject Howard Johnson.

**D.  The Wyndham Defendants Facilitated the Trafficking of Jane Doe (S.B.C.) at the Subject Hotels.**

112.    The Wyndham Defendants are responsible for the acts, omissions, and knowledge of all employees of the Subject Hotels when operating the hotels because these acts and omissions were committed in the course and scope of employment, because the Wyndham Defendants ratified these acts and omissions, and because the Wyndham Defendants failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the specific risks, known to the Wyndham Defendants, of sex trafficking occurring at Wyndham branded locations including the Subject Hotels.

113.    Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Subject Hotels, the Wyndham Defendants continued renting rooms to traffickers, including the rooms used to sexually exploit Jane Doe (S.B.C.).

114.    The Wyndham Defendants knew or were willfully blind to the fact that Jane Doe (S.B.C.) was being trafficked and, despite this, benefited from continued association with her trafficker by providing him a venue in the form of hotel rooms and related services, to facilitate Jane Doe (S.B.C.)'s sexual exploitation.

115.    The Wyndham Defendants also facilitated widespread trafficking at the Subject Hotels, including the trafficking of Jane Doe (S.B.C.), in ways including:

- Allowing inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to human trafficking;

- Inadequate and inadequately enforced sex trafficking notice and training for hotel staff;

- Choosing not to report known or suspected criminal activity including sex trafficking according to reasonable practices, industry standards, and/or applicable franchisor policies and procedures; and

61

- Implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff.

116. Upon information and belief, the Wyndham Defendants participated directly in aspects of the operation of the Subject ~~Ramada Inn~~Hotels that influenced whether and to what extent trafficking occurred at the hotels, including but not limited to the trafficking of Jane Doe (S.B.C.), as follows:

- The Wyndham Defendants have publicly assumed responsibility and control over the human trafficking response of all Wyndham properties, including the Subject ~~Ramada Inn~~Hotels, including design and implementation of practices to prevent trafficking, safety and security procedures, employee and franchisee education, training, and response, partnership with external organizations, and advocacy;

- The Wyndham Defendants retained control over when ~~its~~their branded hotels, including the Subject Hotels, would share information with law enforcement and when law enforcement would be contacted about suspected criminal activity in Wyndham branded hotels~~, such as the Ramada Inn hotels~~;

- The Wyndham Defendants retained control over the response to trafficking by creating a reporting hotline for hotel staff and franchisees to report suspected human trafficking to the Wyndham Defendants. The Wyndham Defendants determined when issues should be escalated to the National Human Trafficking Hotline or law enforcement;

- The Wyndham Defendants retained control over determining which hotels needed additional training or other resources based on a high risk of human trafficking and other related criminal activity;

- The Wyndham Defendants expressly retained control to terminate hotel staff and/or a franchising agreement based on the response to human trafficking;

- The Wyndham Defendants retained control, at the brand-wide level, over training on how to spot the signs of and help prevent human trafficking. The Wyndham Defendants determined whether the training is provided, when it is provided, the content of the training, how the training is delivered, who receives the training, and the consequences if someone does not participate in the training or fails to follow such training;

- Although they delayed making any reasonable effort to do so, the Wyndham Defendants acknowledge that they retain control to adopt requirements for

62

franchised hotels specifically designed to prevent human trafficking and other criminal activity;

- The Wyndham Defendants maintain a Safety & Security Team and a Critical Incident Rapid Response Team that are charged with investigating and responding to potential criminal incidents at all Wyndham properties, including suspected trafficking incidents;
- The Wyndham Defendants are responsible for adopting, enforcing, and monitoring policies and codes of conduct related to human trafficking at the Subject ~~Ramada Inn~~Hotels;

- The Wyndham Defendants maintained control over all details of the terms under which franchised hotels, including the Subject ~~Ramada Inn~~Hotels, offered internet services to customers, including dictating the software, hardware, and service provider to be used, setting all policies about use and restrictions on use, and actively collecting and monitoring guest internet usage data. The Wyndham Defendants dictated whether sites frequently used to solicit clients for sex trafficking victims would be accessible through the internet at the Subject ~~Ramada Inn~~Hotels;

- The Wyndham Defendants retained control over the setting, supervision, overseeing, and enforcement of detailed policies and protocol for housekeeping services at the Subject ~~Ramada Inn~~Hotels, including policies for how often rooms must be entered, how to respond to guest refusals of entry into rooms, and steps to monitor guest safety issues through housekeeping services; and

- The Wyndham Defendants collected, maintained, and analyzed detailed data regarding housekeeping services at the Subject ~~Ramada Inn~~Hotels, including trends that would reveal patterns consistent with human trafficking.

117.    The Wyndham Defendants directly participated in and retained day-to-day control over renting rooms at ~~all~~ the Subject ~~Ramada Inn~~Hotels location by, among other things:

- The Wyndham Defendants controlled all details of the guest reservation, check-in, and payment processes through management and control over all systems used for those processes and adoption of detailed and specific policies governing the means and methods used for each of these processes;

- The Wyndham Defendants directly made reservations for rooms at the Subject ~~Ramada Inn~~Hotels and accepted payment for those rooms through a central reservation system that they controlled and operated. The Wyndham Defendants could reserve rooms and accept payments without requiring franchisee approval or involvement;

63

- The Wyndham Defendants established and maintained control over a brand-wide "do not rent" system. The Wyndham Defendants set all policies related to use of this system and dictated the day-to-day details of reservations at the Subject Hotels through detailed policies that it established regarding use of this "do not rent" system;

- The Wyndham Defendants controlled room rates, required discounts, mandatory fees, and rewards program;

- The Wyndham Defendants controlled and restricted the ability of franchiseeFranchisees and staff to refuse or cancel a reservation;
- The Wyndham Defendants controlled and oversaw policies and procedures regarding check-in, payment, and identity verification procedures;

- The Wyndham Defendants collected, retained, monitored, and analyzed detailed data about every guest who stayed at the Subject Ramada InnHotels;

- The Wyndham Defendants assumed sole ownership over all guest information;

- The Wyndham Defendants established detailed policies and protocol that dictated, step-by-step, everything that would happen from the time a guest arrived at the Subject Ramada InnHotels until they entered their guest room. This included operational directives regarding payment methods, identification requirements, the number of guests that could be in each room and whether information needed to be collected for each guest, what questions hotel staff should and should not ask, and other matters related to check-in; and

- The Wyndham Defendants required franchiseesFranchisees to use Wyndham's property management system and software system, which was owned, maintained, controlled, and operated by the Wyndham Defendants, for virtually all aspects of hotel operations regarding room reservations and payment.

118. The Wyndham Defendants required Franchisee Defendants to keep detailed records of daily operations and then to report this information to the Wyndham Defendants and/or to document such information in the Wyndham Defendants' property management system, which gave the Wyndham Defendants direct and real-time access to such information.

119. Upon information and belief, this data gave the Wyndham Defendants access to information that showed the payment method (i.e., cash) used for each room, the identifying

information of the individual checking into the room, the use (or refusal) of housekeeping services, reports of towel/linen usage, and other documented information about the stay of each guest.

120.    Upon information and belief, the guest and operational data that the Wyndham Defendants had access to regarding the Subject Hotels would have revealed signs of the persistent activity associated with Jane Doe (S.B.C.)'s trafficking over several years, including use of cash or prepaid cards, a pattern of refusing housekeeping services, excessive use of towels and linens, room condition upon departure, staff observations and reporting, and guest complaints associated with the stays.

121.    Upon information and belief, the Wyndham Defendants collected and monitored data regarding guest internet usage at the Subject Hotels, and this data provided the Wyndham Defendants with notice that Jane Doe (S.B.C.)'s trafficker was using the internet at the Subject Hotels to advertise Jane Doe (S.B.C.) for commercial sex.

122.    The Wyndham Defendants regularly inspected the Subject Hotels. Upon information and belief, the Wyndham Defendants also employed individuals who spent time on the ground at franchised hotels, including each of the Subject Hotels, while addressing training and security issues.

123.    Upon information and belief, through this on-site presence at the Subject Hotels, the Wyndham Defendants would have observed the activity associated with Jane Doe (S.B.C.)'s trafficking because this activity was obvious, frequent, and persisted over several years.

124.    Exactly what information regarding trafficking at the Subject Hotels was made available to the Wyndham Defendants is a subject that is within the Wyndham Defendants' control.

125.    Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Subject Ramada Inn named hereinHotels, the Wyndham Defendants continued

65

renting rooms to traffickers, including the rooms used to ~~traffic~~sexually exploit victims, including Jane Doe (S.B.C.).

~~79.    Wyndham knew or should have known that Jane Doe (S.B.C.) was bein trafficked and, despite this, benefited from continued association with her traffickers by providing them hotel rooms and related services to facilitate Jane Doe (S.B.C.)'s sexual exploitation.~~

~~80.    The Wyndham Defendants formed a business relationship with traffickers at the Subject Ramada Inn by renting rooms, collecting guest data, and operating the hotels in a way the attracted business from traffickers and allowed them to operate efficiently with minimal risk of detection or traceability.~~

126.    Upon information and belief, despite having actual or constructive knowledge of the ongoing sex trafficking at the Subject ~~Ramada Inn~~Hotels, the Wyndham Defendants continued participating in a venture at these hotels, with ~~its franchisees~~Franchisee Defendants and hotel staff, in a way that ~~it~~they knew or should have known would lead to additional sex trafficking at the hotels, including but not limited to by the following:

a.  The Wyndham Defendants adopted inappropriate and inadequate practices for selecting, training, supervising, managing, and disciplining ~~franchisees~~Franchisees and hotel staff regarding issues related to human trafficking;

b.  The Wyndham Defendants provided inadequate training on issues related to human trafficking and unreasonably delayed providing training;

c.  The Wyndham Defendants adopted a safety and security budget and safety and security practices that were clearly insufficient considering the known problem of sex trafficking at ~~their~~Wyndham properties, including the Subject Hotels;

d.  The Wyndham Defendants implicitly approved decisions by ~~franchisees~~Franchisees Defendants and hotel staff not to report or respond to criminal activity including sex trafficking appropriately;

e.  The Wyndham Defendants continued to use policies, protocols, and practices that had been shown to lead to widespread trafficking at the Subject ~~Ramada Inn~~Hotels;

66

f.  The Wyndham Defendants attracted traffickers by affirmatively creating favorable venue~~venue~~venues where access was easy, risks of interference were low, and traceability was minimal;

g.  Despite having specific knowledge of policies that would significantly reduce sex trafficking at ~~its~~their branded locations including the Subject ~~Ramada Inn~~Hotels, the Wyndham Defendants declined to implement policies that would likely have the effect of reducing ~~its~~their sex-trafficking related profits or that would require publicly acknowledging the ongoing problem of sex trafficking at ~~its~~their properties;

h.  The Wyndham Defendants willfully delayed taking obvious and apparent steps to stop facilitating sex trafficking, which they had the ability and responsibility to take sooner;

i.  The Wyndham Defendants allowed traffickers to reserve rooms using cash, which provided relative anonymity and non-traceability; and

j.  The Wyndham Defendants provided traffickers with access to internet services in a manner that the Wyndham Defendants knew or should have known would be used to facilitate trafficking by promoting commercial sex services online.

127.    If the Wyndham Defendants had exercised reasonable diligence when operating ~~Subject Ramada Inn~~their properties and, in the areas where they retained control, the Wyndham Defendants would have prevented the Subject ~~Ramada Inn~~Hotels from being used to facilitate widespread and ongoing sex trafficking, including the trafficking of Jane Doe (S.B.C.). Instead, the Wyndham Defendants engaged in a course of conduct that affirmatively facilitated widespread and ongoing sex trafficking, including the trafficking of Jane Doe (S.B.C.).

**V.    Defendants' Ventures at the Subject ~~Ramada Inn Locations~~Hotels.**

128.    ~~Franchisee Defendant and the~~ The Wyndham Defendants ~~benefited from use of the Subject Ramada Inn for sex trafficking. Jane Doe (S.B.C.)'s traffickers and other traffickers rented rooms at the Subject Ramada Inn and used these hotels to harbor, maintain, and provide victims including Jane Doe (S.B.C.). When these traffickers rented rooms, both the Franchisee Defendant and the Wyndham Brand Defendants received a financial benefit.~~

67

~~Franchisee Defendant generated revenue every time a sex trafficker rented a room at the Subject Ramada Inn location, both from room rental fees and from fees for other hotel services.~~

~~Each of the Wyndham Brand Defendants~~ generated substantial income from ~~operations of hotels such as the Subject Ramada Inn. In exchange for providing the services described above, each of the Wyndham Brand Defendants received~~the Subject Hotels, receiving a share of the ~~revenue~~profits from room rentals collected at the ~~Subject Ramada Inn~~hotel. The fees generated by the Wyndham ~~Brand~~ Defendants ~~are~~were primarily based on gross room rentals; therefore, the Wyndham ~~Brand~~ Defendants' ~~revenue increase~~ profits increased with each room rental at the Subject ~~Ramada Inn~~Hotels, including each room rented to a trafficker. Revenue generated from rooms rented at the Subject ~~Ramada Inn~~Hotels was distributed among the Wyndham ~~Brand~~ Defendants, with each benefiting from each rental of a hotel room ~~by traffickers~~to a trafficker, including Jane Doe (S.B.C.)'s trafficker.

~~The Wyndham Brand Defendants also benefited from sex traffickers' frequent use of the Subject Ramada Inn because this regular and routine use of those hotels increased the hotel occupancy rate, and an increase in the hotel occupancy rate resulted in several benefits for the Wyndham Bran Defendants to a trafficker, including that this assisted them in obtaining financing and helped them marked franchising opportunities to potential franchisees.~~

129.    Franchisee Defendants profited from every room rented to a trafficker or for use in trafficking at the Subject Hotels, both from the room fee and from fees for other hotel services.

130.    In ways described more fully above, the Wyndham Defendants and Franchisee ~~Defendant~~Defendants knowingly received a financial benefit from participating in a venture in the form of a continuous business relationship and implicit understanding with the population of sex

traffickers operating out of the Subject ~~Ramada Inn~~Hotels, including Jane Doe (S.B.C.)'s trafficker (hereinafter "**Venture 1**").

131.    The Wyndham Defendants and ~~each~~ Franchisee ~~Defendant~~Defendants formed this continuous business relationship and implicit understanding with the traffickers at the Subject ~~Ramada Inn~~Hotels by continuing to rent rooms to be used for trafficking (including ~~Jane Doe~~ (S.B.C.)'s trafficking) after the Wyndham Defendants and Franchisee ~~Defendant~~Defendants knew or should have known that the rooms were being used for unlawful trafficking.

132.    This business relationship involved mutual pursuant of financial benefit: the traffickers were renting the hotel rooms to generate revenue from sex trafficking and the Wyndham Defendants and Franchisee ~~Defendant~~Defendants were generating revenue by renting the hotel rooms.

133.    This implicit understanding developed because sex traffickers, including Jane Doe (S.B.C.)'s trafficker, frequently used the Subject ~~Ramada Inn~~Hotels for their trafficking knowing that staff members would look the other way. This occurred because of the acts and omissions of the Wyndham Defendants and Franchisee Defendants that created a favorable environment for sex trafficking to flourish.

~~Wyndham Defendants and Franchisee Defendant that created a favorable environment for sex trafficking to flourish. Multiple traffickers operated at each of these hotels, and multiple victims were harbored, provided, and exploited at each of these hotels.~~

134.    Both the Wyndham Defendants and Franchisee ~~Defendant~~Defendants participated in this venture by acting jointly to rent rooms to traffickers and to operate ~~these~~the hotels in a way that attracted business from traffickers and facilitated their trafficking activity. As further described above, ~~each~~ Franchisee ~~Defendant~~Defendants provided "boots on the ground" at ~~its respective~~

~~hotel~~the hotels, and the Wyndham Defendants played a primary role in renting rooms at the Subject ~~Ramada Inn~~Hotels and retained control over and was directly involved in aspects of hotel operations related to sex trafficking.

135.    The Wyndham Defendants and Franchisee ~~Defendant~~Defendants participated in the venture by continually renting rooms to traffickers, including Jane Doe (S.B.C.)'s trafficker, after they knew or should have known that victims like Jane Doe (S.B.C.) were being subjected to unlawful trafficking. They also continued operating the ~~hotel~~Subject Hotels in a way that they knew or should have known would encourage traffickers to select the Subject ~~Ramada Inn~~Hotels as venues for their illegal activities.

136.    The Wyndham Defendants and Franchisee ~~Defendant~~Defendants did not only provide these traffickers with a physical space (harboring) where they could imprison victims and sell them "johns" (providing), but they also provided these traffickers with the cover of a legitimate business as a venue where they could profit from sexual exploitation with a low risk of disruption. This was done pursuant to an implicit agreement with traffickers, which is evidenced by, among other things:

    a.   The population of traffickers, including Jane Doe (S.B.C.)'s trafficker, were familiar to the staff at the Subject ~~Ramada Inn~~Hotels;

    b.   These traffickers reduced their operating burden because they did not need to make significant efforts to conceal their activities from the staff at the Subject ~~Ramada Inn~~Hotels but, instead, freely made requests that would facilitate their trafficking activities without concern for detection or interference by the staff;

    c.   Defendants allowed traffickers to take steps that would minimize their traceability to law enforcement, such as accepting cash payments and not requiring identification from appropriate parties, including Jane Doe (S.B.C.)'s trafficker; and

    d.   Defendants provided additional services to traffickers (including Jane Doe (S.B.C.)'s trafficker), including but not limited to, internet access, excessive towels,

and extra housekeeping services to clean the activities of the trafficking venture once the traffickers vacated the rooms.

137. The criminal traffickers operating at the Subject ~~Ramada Inn~~Hotels as part of Venture 1 violated 18 U.S.C. § 1591 as to victims including Jane Doe (S.B.C.).

138. If the Wyndham Defendants and Franchisee ~~Defendant~~Defendants had not continued participating in a venture that they knew or should have known engaged in violations of the TVPRA, they would not have received a benefit from Jane Doe (S.B.C.)'s trafficking at the Subject ~~Ramada Inn~~Hotels.

139. In ways described more fully above, the Wyndham Defendants and Franchisee ~~Defendant~~Defendants also knowingly received a financial benefit from participating in a commercial hotel-operating venture at ~~their respective~~the Subject ~~Ramada Inn~~Hotels (hereinafter "**Venture 2**").

140. The Wyndham Defendants and Franchisee Defendants had a longstanding business relationship ~~with the Franchisee Defendant~~ pursuant to which they jointly participated in operation of the Subject ~~Ramada Inn~~Hotels with a shared goal of maximizing revenue, including gross room revenue.

141. The Wyndham Defendants and Franchisee ~~Defendant~~Defendants, through their respective roles in hotel operations as described above, facilitated widespread sex trafficking at the Subject ~~Ramada Inn~~Hotels by continuing to operate the hotels in a way that they knew or should have known resulted in them benefiting from significant sex trafficking occurring on site at ~~this hotel~~these hotels.

142. Venture 2 was engaged in a violation of the TVPRA through the widespread sex trafficking at the Subject ~~Ramada Inn~~Hotels, which resulted in Jane Doe (S.B.C.) and other victims being harbored, maintained, and provided in the rooms of the Subject ~~Ramada Inn~~Hotels. Venture

71

2 also engaged in a violation of the TVPRA through the actions of Franchisee ~~Defendant~~Defendants who violated the TVPRA as perpetrators by harboring sex trafficking victims as defined by 18 U.S.C § 1591(a)(1) and by participating in a criminal trafficking venture as defined by 18 U.S.C § 1591(a) (2).

143.    Despite their actual or constructive knowledge that Venture 2 was engaged in violations of 18 U.S.C. §§ 1591(a) and 1595(a), the Wyndham Defendants and Franchisee ~~Defendant~~Defendants participated in the venture by continuing to operate the Subject Hotels in a way that they knew or should have known would lead to further violations of 18 U.S.C. § 1591, including the trafficking of Jane Doe (S.B.C.). The Wyndham Defendants provided Franchisee ~~Defendant~~Defendants with operational support, use of trademarks, marketing services, and other resources to operate the Subject ~~Ramada Inn~~Hotels in a way that they knew or should have known was engaging in violations of 18 U.S.C § 1591(a).

### ~~VI.~~    Franchisee ~~Defendant~~Defendants and the Staff at the Subject ~~Ramada Inn location~~Hotels Acted as the Wyndham Defendants' Actual Agents ~~of Wyndham~~

144.    The Wyndham Defendants are vicariously liable for the acts, omissions, and knowledge of Franchisee ~~Defendant~~Defendants and the staff at the Subject ~~Ramada Inn location~~Hotels, which are the Wyndham Defendants' actual agents or subagents.

145.    The Wyndham Defendants subjected Franchisee ~~Defendant~~Defendants to detailed standards and requirements regarding the operation of the Subject ~~Ramada Inn~~Hotels through the franchising ~~agreement, through~~agreements with each Franchisee Defendant, detailed written policies and manuals, and through other formal and informal protocols, directives, mandates, and expectations imposed by the Wyndham Defendants ~~as they oversaw and supervised hotel operations at each subject location~~.

146.    The Wyndham Defendants obscure the full extent of control they exercise over ~~the franchisee~~Franchisee Defendants by treating the manuals and certain policies as confidential and proprietary and prohibiting any public disclosure of those policies and manuals. ~~The~~Upon information and belief, the standards that the Wyndham Defendants imposed on ~~the franchisee~~Franchisee Defendants:

a.  ~~did~~Did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools Franchisee ~~Defendant~~Defendants used at the Subject Hotels;

b.  ~~covered~~Covered virtually all aspects of hotel operations, including ~~but not limited to personnel, building, grounds, furnishings, fixtures, décor, equipment, vehicles, supplies, foodstuffs, printes matters, and~~ internal operating functions; ~~and~~

c.  ~~dictated~~Dictated the specific manner in which Franchisee ~~Defendant~~Defendants and hotel staff must carry out most day-to-day functions at the Subject Hotels; and

d.  ~~significantly~~Significantly exceeded what was necessary for the Wyndham Defendants to protect ~~its~~their registered trademarks.

147.    In addition to the ways described above, upon information and belief, the Wyndham Defendants exercised and reserved the right to exercise systemic and pervasive control over Franchisee ~~Defendant's~~Defendants' day-to-day operation of the Subject ~~Ramada Inn. The~~Hotels, including the following ways ~~that the Wyndham Defendants exercised this control include~~ :

a.  The Wyndham Defendants required ~~franchisee~~Franchisee Defendants and management of ~~franchised hotel~~the Subject Hotels to participate in mandatory training programs, both during onboarding and on an ongoing basis. This training covered all aspects of hotel operations, including aspects of hotel operations that go significantly beyond what would be necessary for the Wyndham Defendants to protect ~~its~~their registered trademarks;

b.  The Wyndham Defendants ~~maintained a team or regionally based trainers to provide training at branded hotels. Wyndham~~ provided training for hotel management and select hotel staff on-site at the Subject Hotels and at locations selected by the Wyndham Defendants;

c.  The Wyndham Defendants required all hotel staff ~~with~~to participate in training ~~it~~they created through an online learning platform ~~Wyndham University, it~~they

73

controlled and maintained ~~including training specific to hotel based jobs, such as safety and security training for housekeeping staff and safety and security training for the front desk~~;

d. The Wyndham Defendants controlled training provided by ~~franchisee~~Franchisee Defendants to hotel staff by dictating the content of that training, providing required content for that training, and dictating the training methods used;

e. The Wyndham Defendants retained sole discretion to determine whether all training had been completed satisfactorily;

f. ~~Wyndham Defendants maintained oversight in hiring, disciplining, and terminating hotel management and employees;~~

g. ~~Wyndham Defendants required franchisees to participate in mandatory centralized services for day-to-day operation of the hotels;~~

f. For certain products and services that ~~franchisee~~Franchisee Defendants were required to purchase to operate the ~~property~~Subject Hotels, the Wyndham Defendants designated approved vendors and prohibited ~~franchisee~~Franchisee Defendants from purchasing goods and services from anyone other than an approved vendor;

i. ~~Wyndham Defendants required franchisees to use its revenue management system, through which it dictated pricing and strategies to maximize revenue, and which gave it direct ability to supervise day-to-day operations at the hotels through direct access to the system;~~

g. The Wyndham Defendants required Franchisee Defendants to sign a technology agreement governing the terms under which Franchisee Defendants must procure and use technical services and software while operating the Subject Hotels. Franchisee Defendants were required to install and use certain brands, types, makes, and/or models of hardware, software, peripheral equipment, and support services to perform internal operating functions at the Subject Hotels;

h. The Wyndham Defendants set required staffing levels for the ~~subject property~~Subject Hotels;

i. The Wyndham Defendants established detailed job descriptions for all positions ~~in its branded properties~~ at the Subject Hotels and drafted numerous, detailed policies that referenced these positions and dictated which positions must perform which tasks and how they must do so;

j. The Wyndham Defendants set requirements for the hiring process used by ~~franchisee~~Franchisee Defendants and oversaw employee discipline processes and termination decisions;

74

k. The Wyndham Defendants provided benefits for employees of ~~franchisee hotels~~Franchisee Defendants;

l. The Wyndham Defendants required Franchisee Defendants to use a customer resource management program maintained and operated by the Wyndham Defendants;

m. The Wyndham Defendants controlled channels for guests to report complaints or provide feedback regarding the ~~subject properties~~Subject Hotels and directly participated in the response and/or supervised the response to customer complaints or other feedback. The Wyndham Defendants retained the right to provide refunds or other compensation to guests and to require Franchisee ~~Defendant~~Defendants to pay associated costs;

n. The Wyndham Defendants generated reports and analysis of guest complaints and online reviews for the ~~subject properties~~Subject Hotels;

o. The Wyndham Defendants required Franchisee Defendants to use a Guest Relations Application owned, operated, and maintained by the Wyndham Defendants to manage all guest data and information. The Wyndham Defendants could use the backend of this system to analyze data and generate reports;

p. The Wyndham Defendants set detailed requirements for insurance that Franchisee ~~Defendant~~Defendants must purchase and retained the right to purchase insurance for Franchisee Defendants and to bill Franchisee Defendants directly for that insurance if the Wyndham Defendants determined that Franchisee Defendants had not purchased adequate insurance;

q. The Wyndham Defendants regularly audited the books and records of Franchisee ~~Defendant~~Defendants;

r. The Wyndham Defendants conducted frequent and unscheduled inspections of the ~~subject properties~~Subject Hotels;

s. The Wyndham Defendants employed consultants or field agents to become involved in the day-to-day operations of the Subject Hotels;

t. The Wyndham Defendants retained the right to issue fines, require additional training, to impose and supervise implementation of detailed corrective action plans, and to take other steps up to and including termination of the franchising agreement if ~~franchisee~~Franchisee Defendants violated any of ~~Wyndham's~~the Wyndham Defendants' detailed rules, expectations, protocols, or policies, including those that governed day-to-day operations of the ~~subject properties~~Subject Hotels;

75

u.   The Wyndham Defendants controlled all marketing for the ~~subject properties, directly provided marketing services,~~Subject Hotels and prohibited Franchisee ~~Defendant~~Defendants from maintaining any online presence unless specifically reviewed and approved by the Wyndham Defendants;

~~v.   Wyndham Defendants exercised or retained control over all aspects of building and facility design;~~

v.   The Wyndham Defendants imposed detailed recordkeeping and reporting requirements on Franchisee ~~Defendant~~Defendants regarding virtually all aspects of hotel operations;

w.   The Wyndham Defendants required the Franchisee Defendants and hotel staff to keep and submit detailed records of the day-to-day operations of the Subject Hotels;

x.   The Wyndham Defendants supervised and controlled day-to-day operations of the ~~subject properties~~Subject Hotels through detailed information and extensive reports that ~~it~~they obtained through the property management system and other software systems ~~it~~they required Franchisee ~~Defendant~~Defendants to use;

y.   The Wyndham Defendants ~~required the franchisees and~~publicly labeled hotel employees as "our staff ~~to implement a data system that gives Franchisor real time information that it can monitor on a day to day basis; and~~" or "our hotel staff";

z.   The Wyndham Defendants retained the virtually unlimited right to revise policies or adopt new requirements for the day-to-day aspects of hotel operations at the Subject Hotels.

~~105.   The Wyndham Defendants had the right to and did enforce its control over Franchisee Defendant through various methods, including:~~

~~a.   the right to conduct detailed inspections of the subject properties;~~

~~b.   monitoring or auditing the Franchisee Defendant for compliance with policies and expectations;~~

~~c.   directing Franchisee Defendant to take specific steps to come into compliance with detailed and exacting standards regarding day-to-day operations;~~

~~d.   mandating training and education for franchisees and/or hotel staff;~~

~~e.   employing consultants or field agents to become involved in the day-to-day operations of franchised hotels;~~

76

f.   ~~the right to impose fines or penalties;~~

g.   ~~the right to impose additional conditions on franchisees or to restrict or limit its right to provide goods and services; and~~

h.   ~~the right to terminate the franchise agreement for failure to comply with policies that govern the means and methods used for day-to-day operations.~~

~~106.    The Wyndham Defendants are also vicariously liable for Franchisee Defendant and the hotels staff because, as further described above, they retained and exercised control over the specific instrumentalities and aspects of operations that caused Jane Doe (S.B.C.)'s harm, including but not limited to reservations of rooms, hotel security, and detection of and response to suspected sex trafficking. They Wyndham Defendants had the right to exercise detailed, day-to-day control over and involvement in these areas. It also regularly and closely monitored these areas.~~

~~**VII.    Defendants are Jointly and Severally Liable for Jane Doe (S.B.C.)'s Damages.**~~

~~107.    The venture or ventures in which each Defendant participated were direct, producing, and proximate causes of the injuries and damages to Jane Doe (S.B.C.).~~

148.    Under the TVPRA, Defendants are jointly and severally liable for all damages a jury awards to Jane Doe (S.B.C.) for past and future losses she suffered as a proximate result of her sexual exploitation and trafficking <u>at the Subject Hotels</u>.

## ~~CAUSES~~CAUSE OF ACTION – SEX TRAFFICKING UNDER THE TVPRA

~~109.    Jane Doe (S.B.C.) incorporates all other allegations.~~

~~**I.   Cause of Action: Perpetrator liability under 18 U.S.C §1595(a) based on violation of 18 U.S.C §1591(a) (Franchisee Defendant)**~~

110. Jane Doe (S.B.C.) is a victim of sex trafficking within the meaning of § 1591 and 1595(a) and is thus entitled to bring a civil action under 18 U.S.C §1595(a) against the "perpetrator" of any violation of the TVPRA.

111. Franchisee Defendant is a perpetrator within the meaning of 18 U.S.C §1595(a) because they:

a. violated 18 U.S.C §1591(a)(1) when, through the acts and omissions described throughout this Complaint, they harbored individuals (including Jane Doe (S.B.C.)) knowing or in reckless disregard of the fact that the victims would be caused, through force, coercion, or fraud, to engage in commercial sex acts while at the Subject Ramada Inn property.

b. violated 18 U.S.C §1591(a)(2) when, through the acts and omissions described throughout this Complaint, they knowingly received financial benefit by knowingly assisting, supporting, or facilitating a venture that was engaged in violations under 18 U.S.C §1591(a)(1) at the Subject Ramada Inn property.

112. Violations of 18 U.S.C §1595(a) by Franchisee Defendant as "perpetrator" operated, jointly, with other unlawful acts and omissions alleged in this Complaint, to cause Jane Doe (S.B.C.) to suffer substantial physical and psychological injuries and other damages because of being trafficked and sexually exploited at the Subject Ramada Inn property.

## I.    Count 1: Beneficiary Liability under § 1595(a) of the TVPRA (all Defendants).

149. Jane Doe (S.B.C.) is a victim of sex trafficking within the meaning of 18 U.S.C §§ 1591 and 1595(a) and is thus entitled to bring a civil action under the "beneficiary" theory in 18 U.S.C § 1595(a) against anyone who knowingly benefited from participation in a venture that the person knew or should have, with reasonable diligence, known was engaged in a violation of the TVPRA.

150. All Defendants are liable as beneficiaries within the meaning of 18 U.S.C. § 1595(a) because, as further described above, each Defendant knowingly benefitted, by receiving

additional revenue and other benefits, from its participation in a venture Defendants knew or should have known was engaged in a violation of the TVPRA.

151.    **Venture 1:** Through acts and omissions more fully described throughout this Complaint, ~~Franchisor Defendants and Franchisee~~ each Defendant received a financial benefit from participating in a venture with sex traffickers, including Jane Doe (S.B.C.)'s trafficker. Each Defendant violated the TVPRA through its participation, as a beneficiary, in Venture 1 as follows:

a.    Venture 1 resulted when Defendants developed and maintained a continuous business relationship and implicit understanding with sex traffickers at the Subject Hotels by renting them hotel rooms and providing them related services despite the fact that each ~~defendant~~Defendant knew or should have known ~~that~~ these traffickers ~~including Jane Doe (S.B.C.)'s trafficker;~~ were ~~engaged in~~ using the Subject Hotels to engage in violations of 18 U.S.C § 1591(a)(1) and 18 U.S.C § 1591(a)(2), ~~Thus, Franchisor Defendants and Franchisee Defendant are liable as a beneficiary under 18 U.S.C §1595(a)~~ including the trafficking of Jane Doe (S.B.C.).

b.    This venture violated the TVPRA through the conduct of the traffickers who repeatedly exploited victims, including Jane Doe (S.B.C.), in the rooms of the Subject Hotels.

c.    Each Defendant knew or should have known Venture 1 engaged in violations of the TVPRA.

d.    Each member of Venture 1 pursued the purpose of generating revenue through this continuous business relationship. Traffickers (including Jane Doe (S.B.C.)'s trafficker) rented rooms to earn profits by exploiting trafficking victims (including Jane Doe (S.B.C.)). Each Defendant received a financial benefit every time a trafficker rented a room.

e.    Each Defendant participated in the venture by continually renting rooms to traffickers, creating a favorable environment for trafficking, and providing a venture where traffickers could continue their sexual exploitation with minimal risk of detection and disturbance, all the while ignoring the obvious signs of trafficking (including Jane Doe (S.B.C.)'s trafficking).

152.    **Venture 2:** Through acts and omissions more fully described throughout this Complaint, the ~~Franchisor~~Wyndham Defendants received a financial benefit from participating in ~~a venture with its respective granchisees regardint the~~ Venture 2 with Franchisee Defendants

operating the Subject Hotels. Each of the Wyndham Defendants violated the TVPRA through participation, as a beneficiary, in Venture 2 as follows:

a. Venture 2 is a commercial venture that resulted from the business relationship between the Wyndham Defendants during their respective time as franchisors for the Subject Hotels and Franchisee Defendants to operate the Subject Hotels with a common objective of maximizing revenue at the hotels, including gross room revenue.

b. The venture violated the TVPRA through the widespread sex trafficking that occurred at the Subject Hotels, including the trafficking of Jane Doe (S.B.C.).

c. The Wyndham Defendants, at the relevant time, knew or should have known Venture 2 was engaged in violations of the TVPRA.

d. The Wyndham Defendants knowingly benefited from this venture through management fees, royalty fees, reservation fees, marketing fees, and other ancillary fees from the operation of the Subject Hotels, which increased every time a room was rented, including rooms rented to traffickers.

e. The Wyndham Defendants, at the relevant time, participated in this venture by (1) continuing the ongoing business relationship with Franchisee Defendants despite actual or constructive knowledge the Subject Hotels were facilitating sex trafficking; (2) directly involving themselves in and supporting aspects of hotel operations ~~of its respective hotel properties even though Franchisor Defendants knew or should have known that this venture was violating 18 U.S.C §§ 1591(a) and 1595(a)~~ that they knew or should have known were facilitating trafficking at the Subject Hotels; and (3) continuing to lend the perceived legitimacy of their brand and provide marketing services for the Subject Hotels after they knew or should have known the venture was engaged in violations of the TVPRA.

116. ~~Violations of 18 U.S.C §1595(a) by Wyndham Defendants as "beneficiaries" operated, jointly, with other unlawful acts and omissions alleged in this Complaint, to cause Jane Doe (S.B.C.) to suffer substantial physical and psychological injuries and other damages because of being trafficked and sexually exploited at the Defendants' hotel properties.~~

153. The ventures in which each Defendant participated were a direct, producing, and proximate cause of the injuries and damages to Jane Doe (S.B.C.).

80

## II.   Count 2: Vicarious Liability for TVPRA Violations (Franchisor Wyndham Defendants).

154.   Franchisee DefendantDefendants acted as the actual agents of the Wyndham Defendants when operating the Subject Ramada InnHotels. The agency relationship between Franchisee DefendantDefendants and eachthe Wyndham Defendants lasted for the period during which the Wyndham Defendants were involved in operation of the Subject Ramada InnHotels through itstheir role as franchisorfranchisors.

155.   Through the acts and omissions described throughout this Complaint, each Wyndham DefendantsDefendant, at the relevant time, exercised or retained the right to exercise systematic and day-to-day control over the means and methods used by Franchisee DefendantDefendants to operate the Subject Ramada InnHotels.

156.   Under the TVPRA and the federal common law, a principal is vicariously liable for the violations of its actual agent and its subagents.

157.   As a result of the relationship between Franchisee DefendantDefendants and the Wyndham Defendants, Franchisors theWyndham Defendants are vicariously liable for the acts of Franchisee Defendants, including at the Subject Ramada Inn locationHotels. Factors that support this allegation are that Franchisors theWyndham Defendants shared profits, standardized employee training, standardized the strict rules of operations, Franchisors controlled pricing and reservations, regularly conducted inspections, operational support and control, and other acts described above. Finally, Franchisors theWyndham Defendants had the right to terminate any franchiseeFranchisee Defendant that failed to comply with the requirements promulgated by Franchisors theWyndham Defendants. Thus, Franchisors theWyndham Defendants retained control, or the right to control, the mode and manner of work contracted for.

158.    As alleged above, Franchisee Defendants are directly liable to Jane Doe (S.B.C.) for violations of the TVPRA as a beneficiary under 18 U.S.C § 1595(a). The Wyndham Defendants are vicariously liable to Jane Doe (S.B.C.) for the same violation.

159.    Each Defendant's failure to train and supervise their agents and employees, which was unreasonable in light of the known risk of sex trafficking at the Subject ~~Ramada Inn~~Hotels, enabled and contributed to the sex trafficking of Jane Doe (S.B.C.).

~~122.    As alleged above, Wyndham Defendants are directly liable to Jane Doe (S.B.C.) for violations of the TVPRA as a beneficiary under 18 U.S.C §1595(a). Franchisee Defendant are also directly liable to Jane Doe (S.B.C.) under § 2255. Wyndham Defendants are vicariously liable to Jane Doe (S.B.C.) for those same violations.~~

**~~DISCOVERY RULE~~**

**TOLLING OF LIMITATIONS**

160.    ~~To te extend Defendants assert an affirmative defense of limitations, jane Doe (S.B.C.) also invokes the continuing tort doctrine because this~~To the extent Defendants assert an affirmative defense of limitations, Jane Doe (S.B.C.) invokes the discovery rule. At the time of her trafficking and through at least April 17, 2015, Jane Doe (S.B.C.) was under the physical control of her trafficker, who manipulated her through a combination of emotional abuse, physical violence, and chemical dependency—specifically, a heroin addiction that he introduced and sustained to exert control. While she knew she was being posted online and forced to engage in sex acts for her trafficker's financial benefit, she did not know that she was the victim of human trafficking as that term is defined by law or that her injury arose from being trafficked at Defendants' hotels. Like many survivors, Jane Doe (S.B.C.) internalized her exploitation and understood it through the lens of a dysfunctional relationship and personal failure—not as a victim

of force, fraud, or coercion. Even after escaping her trafficker's physical control, the psychological manipulation and drug dependency instilled by her trafficker continued to impair her ability to understand her victimization. Jane Doe (S.B.C.) did not recognize the legal nature of her injury or the role of those who enabled and profited from her exploitation until well after the trafficking ended. Accordingly, the statute of limitations did not begin to run until she discovered—or reasonably could have discovered—the legal cause of her injury, which occurred well within the ten-year limitations period.

161.    To the extent Defendants assert an affirmative defense of limitations, Jane Doe (S.B.C.) invokes the doctrine of equitable tolling. As a result of being a victim of trafficking, Jane Doe (S.B.C.) faced extraordinary and ongoing circumstances, which arose through no fault of her own, that prevented her from filing a lawsuit. These circumstances include years of sustained trauma and a serious addiction to heroin, introduced and maintained by her trafficker to ensure control. Although her physical separation from the trafficker occurred in April 2015, she continued to suffer the effects of psychological manipulation and drug dependency long after. These impairments severely limited her ability to process what had happened to her, to recall key events and timelines, or to understand that she had legal rights and potential claims. These circumstances did not end more than ten years before suit was filed.

162.    Throughout her trafficking, which lasted from the fall of 2011 until at least April 17, 2015, Jane Doe (S.B.C.) was beaten, sexually assaulted, and psychologically manipulated by her trafficker. These abuses were compounded by his deliberate use of heroin addiction as a tool of control. The trauma she endured left her with lingering impairments, including memory lapses, confusion, and an inability to understand the nature of her experiences. These impairments did not immediately disappear upon the end of her trafficking. Instead, they continued to influence her

83

beliefs, memories, and behavior for years, leaving her unable to recognize her experiences as sex trafficking. These impairments prevented her from exercising ordinary diligence to pursue her legal rights.

163.    While under the physical control of her trafficker through at least April 17, 2015, Jane Doe (S.B.C.) did not have the freedom to investigate her claims, to identify those responsible, or to seek legal representation necessary to pursue her legal rights. After that physical control ended, she remained unable to conceptualize her experience as trafficking due to continued psychological trauma and heroin dependency. At no point during or immediately after her exploitation did she believe she had been the victim of trafficking; she viewed her experience as the result of a toxic relationship and her own personal failings. It was only much later—after gaining distance from her trafficker's influence and beginning to process her trauma—that she came to understand what had occurred and to seek legal recourse.

164.    To the extent Defendants assert an affirmative defense of limitations, Jane Doe (S.B.C.) invokes the continuing tort doctrine. This lawsuit arises out of a pattern of continuous and ongoing tortious conduct by Defendants, individually and in concert, ~~across the subject locations~~at the Subject Hotels. The nature of this repeated conduct, and the ongoing harm it caused, supports application of the continuing tort doctrine to toll the limitations period.

~~124.    Jane Doe (S.B.C.) was subject to continuous trafficking at the subject hotel through at least December 2014, which is not more than 10 years before Jane Doe (S.B.C.) filed this lawsuit~~

165.    Jane Doe (S.B.C.) was trafficked at the Subject Hotels through at least July 31, 2014. Although her trafficking at the Subject Hotels ended at that time, Jane Doe (S.B.C.) remained under the physical control of her trafficker until at least April 17, 2015. Even after that control ended, Jane Doe (S.B.C.) continued to suffer the lasting effects of his manipulation and the heroin dependency

84

he had deliberately fostered. These impairments—including addiction, emotional instability, and a warped understanding of her own victimization—prevented her from recognizing the legal nature of her injuries or the role played by the entities that enabled or profited from her trafficking. She did not discover, and could not reasonably have discovered, the legal cause of her injuries more than ten years before this suit was filed. Her claims are therefore timely under the discovery rule, the doctrine of equitable tolling, and the continuing tort doctrine.

166.    This continuous trafficking resulted from Defendants' ~~continuous facilitating~~ongoing facilitation of sex trafficking at the ~~subject hotels~~Subject Hotels and Defendants' ~~ongoing ventures~~continued ventures with one another and with criminal traffickers. Defendants' conduct allowed the trafficking to continue over an extended period of time and contributed to the lasting harm Jane Doe (S.B.C.) suffered. That harm did not end when she left the Subject Hotels or escaped her trafficker's physical control, but continued through the psychological and chemical dependency he inflicted—consequences that were prolonged and aggravated by Defendants' indifference and inaction.

## DAMAGES

167.    Defendants' acts and omissions, individually and collectively, caused Jane Doe (S.B.C.) to sustain legal damages.

168.    Defendants are joint and severally liable for all past and future damages sustained by Jane Doe (S.B.C.).

169.    Jane Doe (S.B.C.) is entitled to be compensated for personal injuries and economic damages, including:

a.    Actual damages (until trial and in the future);

b.    Incidental and consequential damages (until trial and in the future);

c.  Mental anguish and emotional distress damages (until trial and in the future);

d.  Lost earnings and lost earning capacity (until trial and in the future);

e.  Necessary medical expenses (until trial and in the future);

f.  Life care expenses (until trial and in the future);

g.  Physical pain and suffering (until trial and in the future);

h.  Physical impairment (until trial and in the future);

i.  Emotional impairment (until trial and in the future);

j.  Exemplary/Punitive damages;

k.  Attorneys' fees;

l.  Costs of this action; and

m.  Pre-judgment and all other interest recoverable.

## JURY ~~TRIAL~~DEMAND

170.  Jane Doe (S.B.C.) demands a jury trial on all issues.

## REQUEST FOR RELIEF ~~SOUGHT~~

WHEREFORE, Jane Doe (S.B.C.) prays that this case be set for trial before a jury and that, upon a final hearing of the cause, judgment be entered for Jane Doe (S.B.C.) against all Defendants jointly and severally for the actual, compensatory, and punitive damages as the evidence may show, and the jury may determine to be proper, together with the costs of suit, prejudgment interest, post-judgment interest, and such other and further relief to which Jane Doe (S.B.C.) may, in law or in equity, show herself to be justly entitled.

86

Dated:  July 3, 2025

Respectfully submitted,

**ANNIE MCADAMS PC**

*/s/ Annie McAdams*
Annie McAdams, Esq.
2900 North Loop West, Suite 1130
Houston, Texas 77092
(713) 785-6262
(866) 713-6141 Facsimile
*annie@mcadamspc.com*
*service@mcadamspc.com*

-and-

**SICO HOELSCHER HARRIS, LLP**

*/s/ David E. Harris*
David E. Harris, Esq.
Ramsey S. Al-Azem, Esq. (PHV)
819 N. Upper Broadway
Corpus Christi, Texas 78401
(361) 653-3300
(361) 653-3333 Facsimile
*dharris@shhlaw.com*
*ralazem@shhlaw.com*

-and-

**THE LOCKS LAW FIRM**

*/s/ Francesca A. Iacovangelo*
Francesca A. Iacovangelo, Esq.
Eric D. Bihlear, Esq.
601 Walnut Street, Suite 720E
Philadelphia, PA 19106
(215) 893-3454
(215) 893-3444 Facsimile
*fiacovangelo@lockslaw.com*
*ebihlear@lockslaw.com*

**ATTORNEYS FOR PLAINTIFF**

87